# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN
## GREEN BAY DIVISION

|  |  |
|---|---|
| CONVERGEN ENERGY WI LLC and THEODORE HANSEN, | |
| Plaintiffs, | Index No. |
| -against- | **Brown County Circuit Court, Wisconsin, Case No. 2020-CV-000495** |
| CONVERGEN ENERGY LLC, L'ANSE WARDEN ELECTRIC COMPANY, LLC, and LIBRA CAPITAL US, INC., | |
| Defendants. | |

## <u>NOTICE OF REMOVAL</u>

TO:   Honorable William C. Griesbach       Attorney Benjamin LaFrombois
        United States District Court            Von Briesen & Roper, S.C.
        125 South Jefferson Street           2905 Universal Street, Suite 2
        P.O. Box 22490                     Oshkosh, WI 549404
        Green Bay, WI 54305-2490

        Clerk to:
        Honorable Marc A. Hammer
        Brown County Courthouse
        100 South Jefferson Street
        Green Bay, WI 54301

**PLEASE TAKE NOTICE THAT** Defendants, Convergen Energy LLC ("CE"), L'Anse Warden Electric Company, LLC ("Lanse"), and Libra Capital US, Inc. ("Libra") hereby removes Case No. 2020-CV-000495 from the Circuit Court for Brown County, Wisconsin, to the United States District Court for the District of Wisconsin, Eastern Division, pursuant to 28 U.S.C. §§ 1332, 1441 and 1446, and as grounds for removal states as follows:

## NATURE OF THE CASE

1.       On May 14, 2020 Plaintiffs Convergen Energy WI, LLC ("CE-Wisconsin") and Theodore Hansen ("Hansen") filed a Complaint in the Circuit Court for Brown County, Wisconsin, styled, *Convergen Energy WI, LLC et al vs. Convergen Energy LLC et al*, Case No. 2020CV000495 (the "State Court Action"). A copy of the Complaint, with exhibits, is attached hereto as Exhibit 1.

2.       Defendants were not served with the State Court Action summons and Complaint until May 15, 2020.

3.       In the State Court Action, the Plaintiffs seek declaratory judgment and allege that a series of agreements have released Plaintiffs from claims that were detailed in Defendants' draft complaint that was shared with Plaintiffs on May 11, 2020 and ultimately filed in the U.S. District Court for the Southern District of New York the same day the State Court Action was filed.

4.       In its prayer for relief, Plaintiffs seek attorneys' fees, expenses and the following declarations that:

a. "they have been released of all claims that Libra or CE may have had against Plaintiffs CE-Wisconsin and Hansen, including but not limited to the claims set forth in the Draft New York Complaint."

b. "CE and Libra knew of and consented to all material conditions and terms of the acquisition prior to closing, such that the claims set forth in the Draft New York Complaint are without merit."

c. "the terms of the Pellet Supply Agreement are fair and enforceable."

d. "the terms of the Services Agreement are fair and enforceable."

## THERE IS COMPLETE DIVERSITY OF CITIZENSHIP BETWEEN PLAINTIFFS AND DEFENDANTS

5. The Complaint in the State Court Action alleges that CE-Wisconsin is a Delaware limited liability company and "currently a wholly-owned subsidiary of NianticVista Energy, LLC" ("Niantic") (Cmplt. ¶ 9).

6. For purposes of establishing the citizenship of the Partnership for diversity jurisdiction, the well-established rule is that, "General partnerships, limited partnerships, joint stock companies, and unincorporated membership associations all are treated as citizens of every state of which any partner or member is a citizen." *Indiana Gas Co. v. Home Ins. Co.*, 141 F.3d 314, 317 (7th Cir. 1998) (citing *Carden v. Arkoma Associates*, 494 U.S. 185 (1990)).

7. Libra is a Delaware Corporation with a principal place of business in New York. (Declaration of Michael Stolper ¶ 3) ("Dec.").

8. Lanse is a Delaware limited liability company and wholly owned subsidiary of CE. (Dec. ¶ 4).

9.     CE is a Delaware limited liability company and wholly owned subsidiary of Convergen Energy Holdings LLC, a Delaware limited liability company. (Dec. ¶ 5).

10.     Convergen Energy Holdings LLC is a wholly owned subsidiary of First North American Holdings II, Inc., a Delaware corporation. (Dec. ¶ 6).

11.     Upon information and belief, CE-Wisconsin and Niantic are not citizens of Delaware or New York. (Dec. ¶ 7). Plaintiffs have requested Defendants identity the members of CE-Wisconsin and Niantic but have not received an answer. (Dec. ¶ 8).

## THE AMOUNT IN CONTROVERSY EXCEEDS $75,000

12.     The Plaintiffs seek attorneys' fees in addition to declaratory judgement on claims in excess of $10,000,000.00 as alleged in Defendants' complaint filed in filed in the U.S. District Court for the Southern District of New York and in Defendants' draft complaint attached to the Complaint in the State Court Action, thereby putting its claims well above the threshold of an amount exceeding $75,000.00 in controversy as required for diversity jurisdiction under 28 U.S.C. § 1332(a). Indeed, the breach of fiduciary duty claim and aiding and abetting claims against Hansen are valued in excess of $10,000,000.00. The rescission claim against CE-Wisconsin is alone valued in excess of $4,000,000.00.

13.     Although Plaintiffs have not specifically quantified their damages because they are seeking a declaratory judgment, aggregating the actual and punitive damages Defendants seek to avoid with the State Court Action, the amount in controversy certainly exceeds $75,000.00, exclusive of interests and costs.

14.     Legal fees and attorney fees "count toward the jurisdictional minimum if the party is entitled to recover them."  Willis v. Tyco Int'l, No. 10-CV-293, 2010 WL 3835249, at *1 (E.D. Wis. Sept. 27, 2010).

15.     Plaintiffs' State Action is one that may be removed to this Court by Defendants pursuant to the provisions of 28 U.S.C. §§ 1332(a) and § 1446(b) in that it is a civil action in which there is complete diversity of citizenship between Plaintiffs and Defendants and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

16.     The United States District Court for the Eastern District of Wisconsin, Green Bay Division is the appropriate venue for removal of Plaintiffs' State Action pursuant to 28 U.S.C. § 1441, which permits any civil action brought in any state court in which the District Courts of the United States have original jurisdiction to be removed to the District Court of the United States for the district and division embracing the place where the state court action is pending.  28 U.S.C. § 1441(a).

17.     Defendants reserve the right to amend or supplement this Notice of Removal.

18.     By filing this Notice of Removal, Defendants do not waive any defenses that may be available to them.

19.     Defendants have timely filed this Notice of Removal pursuant to 28 U.S.C. § 1446(b) in that it is filed within thirty (30) days of the date Defendants received a copy of the Complaint.

20.     This Notice of Removal is accompanied by written Notice to Plaintiffs, and a written Notice to Clerk of Removal filed with the Clerk of the Circuit Court of Brown County, Wisconsin, on this date, all as required by 28 U.S.C. § 1446(d).

WHEREFORE, Defendants, Convergen Energy LLC, L'Anse Warden Electric Company, LLC, and Libra Capital US, Inc. provide Notice of Removal of the

above-styled action pending in the Circuit Court of Brown County, Wisconsin to the United States District Court for the Eastern District of Wisconsin.

Respectfully submitted,

LAW FIRM OF CONWAY, OLEJNICZAK & JERRY, S.C.
Attorneys for Defendants

By: *Electronically signed by George Burnett*
George Burnett
231 S. Adams Street
P.O. Box 23200
Green Bay, WI 54305
(920) 437-0476   - *Telephone*
 (920) 437-2868 – *Facsimile*
GB@lcojlaw.com
State Bar No. 1005964

## CERTIFICATE OF SERVICE

I hereby certify that I have on June 2, 2020, served a true and correct copy of the foregoing via the Court's e-filing system and email upon the following:

Attorney Benjamin LaFrombois
Von Briesen & Roper, S.C.
2905 Universal Street, Suite 2
Oshkosh, WI 549404
blafrombois@vonbriesen.com

*/s/Bonnie K. Houlihan*

FILED
05-14-2020
Clerk of Circuit Court
Brown County, WI
2020CV000495
Honorable Marc A.
Hammer
Branch 5

## STATE OF WISCONSIN  |  CIRCUIT COURT  |  BROWN COUNTY

CONVERGEN ENERGY WI, LLC,
a Delaware limited liability company,
c/o Corporation Service Company
8040 Excelsior Drive, Suite 400
Madison, WI 53717

and

THEODORE HANSEN
798 Terra Cotta Drive
Neenah, WI 54956,

                              Plaintiffs,

    vs.

CONVERGEN ENERGY LLC,
a Delaware limited liability company,
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808,

L'ANSE WARDEN ELECTRIC COMPANY, LLC,
a Delaware limited liability company,
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808,

and

LIBRA CAPITAL US, INC.,
a Delaware limited liability company,
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808,

                             Defendants.

Case No:_____

Case Code: 30701
Declaratory Judgment

---

### COMPLAINT FOR DECLARATORY JUDGMENT

---



EXHIBIT
1

As their Complaint for Declaratory Judgment, Plaintiffs Convergen Energy WI, LLC and Theodore Hansen, by their attorneys von Briesen & Roper, s.c., hereby do allege and state as follows:

## NATURE OF ACTION

1. At the center of this action is the transaction orchestrated by Libra Capital US, LLC (hereinafter "**Libra**"), and its wholly owned subsidiary Convergen Energy (hereinafter "**CE**") by Libra's Chief Investment Officer/CE's President, Fidel Andueza (hereinafter "**Andueza**") to divest Libra/CE of Convergen Energy WI, LLC (hereinafter "**CE-Wisconsin**").

2. To satisfy debt covenants, Libra needed to raise cash by December 31, 2019. In order to do so, Libra directed CE and Fidel to quickly divest itself of CE-Wisconsin.

3. Andueza then arranged a transaction, whereby Fidel's subordinate employee at Libra, Steven Brooks (hereinafter, "**Brooks**"), Gregory Merle and two of Andueza's contacts, Daniel Garcia Escandon and Ramon Uriarte Inchausti, would acquire CE-Wisconsin from CE and Libra. Andueza further arranged for his contact, Javier Busto Ferraz to provide debt financing in the acquisition of CE-Wisconsin.

4. Libra, through its employee Andueza, was aware of and approved every detail of the transaction.

5. Immediately after the transaction closed, Libra denied having knowledge of the persons involved in the transaction and sought concessions.

4

6. Libra was granted concessions in the form of additional consideration and a payment by Brooks personally as he separated from Libra, each representing a release and satisfaction of the matter.

7. Then on May 11, 2020, Libra demanded an additional payment of $10,000,000 by May 14, 2020, or it would file suit in New York State Courts. A copy of the demand and draft New York complaint is attached hereto as Exhibit A. (The "**Draft New York Complaint.**")

8. The Plaintiffs seek declaratory judgment as to the rights and duties of the parties and persons involved in the transaction.

## PARTIES

9. Plaintiff CE-Wisconsin is a Delaware limited liability company registered as a foreign limited liability Company in Wisconsin with a principal place of business of 600 Liberty Street, Green Bay, WI 54304. CE-Wisconsin is currently a wholly-owned subsidiary of NianticVista Energy, LLC (hereinafter, "**Niantic**").

10. Plaintiff Theodore Hansen (hereinafter "**Hansen**") is an adult private person with no legal disabilities with an address. Hansen is a resident of the State of Wisconsin, with an address of 798 Terra Cotta Drive, Neenah, WI 54956. At all relevant times, Hansen was the chief executive officer of CE-Wisconsin. Hansen reported to Fidel Andueza at Libra.

11. Defendant CE, is a Delaware limited liability company, with its registered agent as Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware. Through other intermediate subsidiaries, CE is wholly owned and controlled by Libra. At all relevant times, Andueza served as CE's President.

12. Defendant L'Anse Warden Electric Company, LLC (hereinafter, "L'Anse"), is Delaware limited liability company registered as a foreign limited liability company in Michigan with principal place of business 601 Abbot Road, East Lansing, MI 48823. L'Anse is a wholly-owned subsidiary of CE and, through other intermediate subsidiaries, is owned and controlled by Libra.

13. Defendant Libra is a Delaware corporation registered as a foreign business corporation in New York with a principal place of business of 134 East 40th Street, New York, NY 10016. Libra is a conglomerate consisting of several affiliates and subsidiaries. Though intermediate subsidiaries, Libra wholly owns and controls CE and L'Anse. Andueza serves as Libra's Chief Investment Officer.

## JURISDICTION AND VENUE

14. The Court has jurisdiction over the parties in this matter pursuant to Wis. Stat. § 801.05(1), because each of the parties are engaged in substantial and not isolated activities within this state. The Court further has jurisdiction pursuant to Wis. Stat. § 801.05(5), in that the action arises out of contracts, promises and goods made, created or otherwise performed in the State of Wisconsin.

15. The Court has jurisdiction over the subject matter of this suit pursuant to Wis. Stat. § 806.04, because this suit asks the Court to declare rights, status and other legal relations between the parties hereto.

16. Venue in Brown County is proper, because CE-Wisconsin's—the acquisition of which is at the center of this dispute—principal place of business is located at 600 Liberty Street, Green Bay, Wisconsin.

6

## RELEVANT FACTS

17. CE-Wisconsin (f/k/a Greenwood Fuels) was purchased by Libra, through CE, in 2010. CE is a wholly owned subsidiary of Libra, and CE-Wisconsin became a wholly-owned subsidiary of CE. At all relevant times, Hansen has been the CEO of CE-Wisconsin.

18. CE-Wisconsin developed a proprietary process to convert waste materials such as paper and plastic and convert it to a coal substitute fuel pellet.

19. L'Anse produces electric power utilizing, in part, the Convergen pellets as fuel.

20. CE-Wisconsin provided management services to L'Anse prior to January 31, 2020.

21. As of December 31, 2019, Libra was required to satisfy bank lending covenants.

22. To satisfy the lending covenants, Libra pursued the sale of CE-Wisconsin with the goal of raising cash by December 31, 2019.

23. The effort to sell CE-Wisconsin was directed by Fidel, Libra's Chief Investment Officer and CE's President.

24. Brooks was a senior vice president for Libra who reported to Andueza.

25. Andueza indicated to Brooks that Libra wanted to sell CE-Wisconsin before December 31, 2019 and that this could be a good investment for Brooks. Andueza further introduced personal contacts of his as investors in the business. Andueza arranged an in-person meeting, which he attended, to discuss the investment, and had multiple one-on-one conversations with the investors. Andueza further was aware of the financial pressures that Libra faced including bank covenants that were tested at year-end and pressured both Brooks and the investors to close the transaction.

Case 1:20-cv-00823-WCG    Filed 06/02/20    Page 11 of 128    Document 1

26. Andueza contacted Gregory Merle, Daniel Garcia Escandon and Ramon Uriarte Inchausti to solicit their interest in joining Brooks in the acquisition of CE-Wisconsin, as well as Javier Busto Ferraz in the form of debt financing.

27. Andueza worked with Merle, Escandon, Inchausti and Ferraz to structure a transaction suitable to Libra.

28. On December 15, 2019, at the request of Andueza, Brooks prepared and emailed a transaction summary to Andueza. A copy of the Email and summary report are attached hereto as Exhibit B.

29. BMO Harris, N.A. was the lender to Libra/CE related to their investments in L'Anse and CE-Wisconsin prior to and after the January 31, 2020 transaction.

30. With Andueza's knowledge and direction, Brooks communicated with BMO in connection with the debt financing of the CE-Wisconsin transition.

31. Andueza traveled to Wisconsin to meet with BMO Harris and helped arrange the debt financing for the transaction.

32. Prior to the acquisition, L'Anse and CE-Wisconsin were co-borrowers under a credit facility with BMO. The facility included a term loan, a line of credit, and a letter of credit which was placed as an operating security under a provision of a power purchase agreement ("PPA") to which L'Anse was a party. CE-Wisconsin supplied fuel pellets to L'Anse to use for the production of electricity. After the acquisition, BMO agreed to continue to extend credit to L'Anse, on the condition that CE-Wisconsin and L'Anse enter into a supply contract to ensure that CE-Wisconsin would continue to supply fuel

8

pellets to L'Anse after the acquisition. A copy of the supply agreement is attached hereto and made a part hereof as Exhibit C (the "**Supply Agreement**").

33. The Supply Agreement is a material condition under the loan agreements between L'Anse and BMO and CE-Wisconsin and BMO. The loan agreements require, through the Supply Agreement, that L'Anse receive an adequate supply of fuel and that CE-Wisconsin be paid market price for the fuel. Both conditions were required to underwrite the loans.

34. Andueza and the investors in the acquisition decided to use Merle's pre-existing company, Niantic, to consummate the transaction. Andueza was not only aware of but arranged for Merle's and Niantic's role in the transaction.

35. Andueza is an expert in the financial analysis of companies in acquisition. He reviewed the proposed terms of the CE-Wisconsin acquisition, including the purchase price, and adjudged them fair.

36. The original closing date of the acquisition was January 31, 2020, at which time CE, CE-Wisconsin and Niantic entered into the acquisition agreement attached hereto as Exhibit D (the "**Acquisition Agreement**").

37. As part of the closing, CE-Wisconsin and L'Anse entered into the Supply Agreement.

38. Also, as part of the closing, CE-Wisconsin and L'Anse entered into an Operations and Management Services Agreement, to ensure continuity of management and a smooth transition for both companies. (the "**Services Agreement**"). Pursuant to that agreement, CE-Wisconsin, through Hansen, has provided management and transition services to L'Anse. A copy of the Services Agreement is attached hereto as Exhibit E.

9

39. Upon information and belief, the sale of CE-Wisconsin and Brooks' involvement as an investor was known of, approved, and directed by Andueza and other executives at CE/Libra, including George Logothetis, Chairman and CEO of Libra.

40. Andueza was fully aware of and intricately involved in all aspects of the negotiation and closing of the acquisition, including that Brooks would be one of the investors who ultimately acquired a share of CE-Wisconsin.

41. Andueza's knowledge as CE's President and Libra's CIO is attributed to CE and Libra. CE and Libra therefore had full knowledge of the negotiation, conditions, terms and nature of the acquisition prior to the original January 30, 2020 closing date, and did not object to any of the transactions.

42. Nevertheless, immediately after the acquisition closed, Libra executives approached Brooks, accused him of improper self-dealing, breaches of duty, and other wrongdoing in connection with the acquisition, and threatened him with legal action and criminal prosecution.

43. Brooks and Libra thereafter negotiated a separation agreement, which was executed on February 19, 2020 (the **"Brooks Separation Agreement"**).

44. Brooks, CE, CE-Wisconsin, and Niantic also negotiated an Amended and Restated Closing Statement, which was executed on February 21, 2020. The Amended Closing Statement is attached hereto as Exhibit F (the **"Amended Closing Statement"**).

45. The Amended Closing Statement states in pertinent part: "The Buyer and Seller agree that there will be no further adjustments or changes to this Amended and Restated

10

Closing Statement after the date hereof, as both Parties have confirmed that this document is now complete and accurate in all regards."

46. Plaintiffs assert that this language, read in conjunction with the Acquisition Agreement and Brooks Separation Agreement, means that Plaintiffs and Brooks were released from any liability that may have arisen in connection with the acquisition, and otherwise resolved all differences between the parties.

47. Plaintiffs further assert that CE and Libra had full knowledge and understanding of the terms of the negotiation, conditions, terms and nature of the acquisition prior the execution of the Amended Closing Statement.

48. On or about May 11, Plaintiffs received an email and the attached Draft New York Complaint from Attorney Michael Stolper, on behalf of Libra. (*See* Exhibit A).

49. Attorney Stolper's email threatens that he will file the Draft New York Complaint no later than noon on May 14, 2020, if Plaintiffs and Brooks did not first resolve the matter. (*See* Exhibit A).

50. The Draft New York Complaint levels several causes of action against CE-Wisconsin, its owner Niantic, Hansen and Brooks, generally alleging that Brooks fraudulently engineered an advantageous deal for himself, Niantic, CE-Wisconsin and Hansen without Libra's knowledge.

51. The Draft New York Complaint further asserts that the Pellet Supply Agreement is fraudulent and unenforceable.

11

52. The Draft New York Complaint further asserts that the Services Agreement, which provides compensation to CE-Wisconsin for transition services provided to L'Anse through Hansen, is unfair, fraudulent and unenforceable.

53. Plaintiffs deny any and all liability for all claims against them asserted in the Draft New York Complaint.

54. The Draft New York Complaint is predicated on the notion that the claims set forth therein survived the acquisition of CE-Wisconsin, as recorded in the Acquisition Agreement and the Amended Closing Statement. As noted above, Plaintiffs assert that all such claims have been released.

55. The Draft New York Complaint is further predicated on the notion that Libra and CE were unaware of the material terms and conditions underlying the Acquisition Agreement and the Amended Closing Statement. As set forth *supra*, Libra and CE, through Andueza and others, had full knowledge of, and consented to, the terms and conditions underlying the Acquisition Agreement and the Amended Closing Statement.

56. As a result, there is an actual and justiciable controversy between the parties warranting a declaration by the Court pursuant to Wis. Stat. § 806.04.

## COUNT I:  DECLARATORY JUDGEMENT

57. Plaintiffs incorporate paragraphs 1 through 58 of this complaint as if fully set forth herein.

58. Section 806.04 of the Wisconsin Statutes confers upon courts within this state the "power to declare rights, status and other legal relations whether or not further relief is or could be claimed." Wis. Stat. § 806.04(1).

12

59. Parties to contracts are proper parties to seek a declaratory judgment:

> Any person interested under a deed, will, written contract or other writings constituting a contract ... may have determined any question of construction or validity arising under the ... contract or franchise and obtain a declaration of rights, status or other legal relations thereunder.

Wis. Stat. § 806.04(2). A party may seek a court's declaration relating to contract rights, "either before or after there has been a breach thereof." Wis. Stat. § 806.04(3).

60. Wisconsin's declaratory judgment statute is "remedial; its purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations; and is to be liberally construed and administered." Wis. Stat. § 806.04(12).

61. In this matter, contract and equitable rights against the Defendants have been asserted by Plaintiffs. Plaintiffs have a right to take advantage of releases granted to them or for their benefit in the Acquisition Agreement, and Amended Closing Statement, and to a declaration that CE and Libra knew of and consented to all material conditions and terms of the acquisition prior to closing.

62. All justiciability requirements are met. *Olson v. Town of Cottage Grove*, 2008 WI 51, ¶29, 309 Wis. 2d 365, 379-80, 749 N.W.2d 211.

63. Plaintiffs seek a declaration that, pursuant to the Acquisition Agreement, and the Amended Closing Statement, read in conjunction with the Brooks Separation Agreement, they have been released of all claims that Libra or CE may have had against Plaintiffs CE-Wisconsin and Hansen, including but not limited to the claims set forth in the Draft New York Complaint.

64. Plaintiffs seek a further declaration that CE and Libra knew of and consented to all material conditions and terms of the acquisition prior to closing, such that the claims set forth in the Draft New York Complaint are without merit.

65. Plaintiffs further seek a declaration that the terms of the Pellet Supply Agreement are fair and enforceable.

66. Plaintiffs further seek a declaration that the terms of the Services Agreement are fair and enforceable.

67. The declarations plaintiffs seek will also directly impact the interests of Brooks, who has been named a party defendant in this matter as a result.

**WHEREFORE**, Plaintiffs CE-Wisconsin and Hansen hereby ask the Court for the following relief:

A. A declaration that, pursuant to the Acquisition Agreement, and the Amended Closing Statement, read in conjunction with the Brooks Separation Agreement, they have been released of all claims that Libra or CE may have had against Plaintiffs CE-Wisconsin and Hansen, including but not limited to the claims set forth in the Draft New York Complaint.

B. A declaration that CE and Libra knew of and consented to all material conditions and terms of the acquisition prior to closing, such that the claims set forth in the Draft New York Complaint are without merit.

C. A declaration that the terms of the Pellet Supply Agreement are fair and enforceable.

D. A declaration that the terms of the Services Agreement are fair and enforceable.

E. Any necessary and proper supplementary relief, pursuant to Wis. Stat. § 806.04(8).

14

F. Costs, attorneys' fees, and expenses allowed by law.

G. Such further relief as the Court deems proper.


Dated this 14th day of May, 2020.                          von BRIESEN & ROPER, s.c.,
                                                           Attorneys for Plaintiffs

                                                           *Electronically signed by Benjamin LaFrombois, Esq.*
                                                           Benjamin D. LaFrombois, Esq.
                                                           State Bar No. 1027910

                                                           William E. Fischer
                                                           State Bar No. 1045725

Direct contact information:
Benjamin D. LaFrombois, Esq.
2905 Universal Street, Suite 2
Oshkosh, WI 54904
920.233.4704 direct dial
blafrombois@vonbriesen.com

William E. Fischer
920.232.4843 direct dial
wfischer@vonbriesen.com

# EXHIBIT A
# TO COMPLAINT

EXHIBIT A TO COMPLAINT



From: **Michael Stolper** <mstolper@seidenlegal.com>
Date: Mon, May 11, 2020 at 1:08 PM
Subject: Convergen Legal matter - Time Sensitive
To: stevebrooks17@gmail.com <stevebrooks17@gmail.com>, ruriarte@moninvest.es <ruriarte@moninvest.es>,
laura.luo@us.kwm.com <laura.luo@us.kwm.com>, vincent.filardo@us.kwm.com <vincent.filardo@us.kwm.com>,
greg.merle@riverviewenergy.com <greg.merle@riverviewenergy.com>, ted.hansen@convergenenergy.com
<ted.hansen@convergenenergy.com>, brian.mikkelson@convergenenergy.com
<brian.mikkelson@convergenenergy.com>
Cc: Robert Seiden <rseiden@seidenlegal.com>, Amiad Kushner <akushner@seidenlegal.com>, Dov B. Gold
<dgold@seidenlegal.com>


**To whom it may concern:**


Absent resolution of the issues raised in the attached complaint by noon Thursday, May
14, 2020, we will be seeking relief in a New York court, as time is of the essence due to the
ongoing irreparable harm at issue.  Be guided accordingly.


Michael Stolper


Michael Stolper, Esq.

**Seiden Law Group, LLP**

469 Seventh Avenue

Suite 502

New York, NY 10018

(212) 337-3502(direct office)

(917) 626-1175 (mobile)

www.seidenlawgroup.com

--
Steve J. Brooks
stevebrooks17@gmail.com

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| CONVERGEN ENERGY LLC, L'ANSE WARDEN ELECTRIC COMPANY, LLC, and LIBRA CAPITAL US, INC. | **Commercial Division** |
| Plaintiffs, | Index No. |
| -against- | **SUMMONS** |
| STEVEN J. BROOKS, NIANTICVISTA ENERGY LLC, GREGORY MERLE, RIVERVIEW ENERGY CORPORATION, DANIEL GARCIA ESCANDON, RAMON URIARTE INCHAUSTI, CHIPPER INVESTMENT SCR, SA, URINCHA SL, THEODORE JOHN HANSEN, BRIAN R. MIKKELSON, and CONVERGEN ENERGY WI, LLC, | Plaintiffs designate New York County as the place of trial<br><br>The basis of Venue is:<br>Plaintiffs' Principal Place of Business |
| Defendants. | |

TO THE ABOVE-NAMED DEFENDANTS:

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer on the Plaintiffs' Attorney within twenty (20) days after the service of this summons, exclusive of the day of service; and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated:     New York, New York
           May __, 2020

                                        **SEIDEN LAW GROUP, LLP**


                                        /s/ Michael Stolper
                                        Michael Stolper
                                        Dov Byron Gold
                                        Attorneys for Plaintiffs
                                        469 7th Avenue, Suite 502
                                        New York, New York 10018
                                        (212) 337-3502

                                        *Attorneys for Plaintiffs*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| CONVERGEN ENERGY LLC, L'ANSE WARDEN ELECTRIC COMPANY, LLC, and LIBRA CAPITAL US, INC., | **Commercial Division** |
| Plaintiffs, | Index No. |
| -against- | |
| STEVEN J. BROOKS, NIANTICVISTA ENERGY LLC, GREGORY MERLE, RIVERVIEW ENERGY CORPORATION, DANIEL GARCIA ESCANDON, RAMON URIARTE INCHAUSTI, CHIPPER INVESTMENT SCR, SA, URINCHA SL, THEODORE JOHN HANSEN, BRIAN R. MIKKELSON, and CONVERGEN ENERGY WI, LLC, | **COMPLAINT** |

Plaintiffs Convergen Energy LLC ("**Convergen**"), L'Anse Warden Electric

Company, LLC (the "**Power Plant**"), and Libra Capital US, Inc. (the "**Company**") allege as

follows:

## NATURE OF ACTION

1.      This is a case about corporate betrayal at the highest level; a saboteur who

stole millions of dollars from his employer with the help of fellow deceitful insiders and corrupt

outside investors.

2.      Plaintiffs are part of an international conglomerate headquartered in New

York known as the Libra Group (the "**Group**"). Defendant Steven J. Brooks ("**Brooks**") was,

until his recent termination, Senior Vice President, Investments, of the Group. Among other

responsibilities, Brooks was responsible for overseeing the Group's energy investments, which

included Convergen, a 100% owned subsidiary of the Group that owns and operates a portfolio

of alternative energy assets including two cogeneration or combined head and power (CHP)

facilities in Manhattan, several biogas facilities in Latvia (Northern Europe), a 20 megawatt

electric power plant in Michigan (the Power Plant) and a renewable pellet manufacturing plant in

Wisconsin (the "**Pellet Plant**"). The Pellet Plant provides renewal fuel pellets to the Power Plant.

        3.     In 2019, Brooks arranged for the sale of the Pellet Plant to what he

represented was a third party, defendant Nianticvista Energy LLC ("**Niantic**"). Brooks

introduced defendant Greg Merle as the principal of Niantic and the representative of Niantic's

other investors, to the Company's principal at the Company's New York headquarters. Brooks

was the senior Company officer charged with vetting, negotiating and consummating the

transaction. As part of the sale, Brooks arranged for the Pellet Plant to continue supplying the

Power Plant with fuel pellets pursuant to a 10-year agreement. The sale closed on January 31,

2020.

        4.     Shortly after the sale closed, the Group uncovered evidence of Brooks'

treachery: (i) Brooks was secretly the buyer of the Pellet Plant (*i.e.*, he is an owner of Niantic);

(ii) Brooks provided a $2.3 million personal guaranty to finance the purchase; (iii) he also

solicited investments in Niantic from the other defendants while employed by the Company in

New York; (iv) the purchase price paid by Brooks and his co-conspirators was at least ten

million dollars less than the fair market value of the Pellet Plant; (v) contrary to Company policy

and practice and in order to ensure his multi-million dollar booty, Brooks failed to procure other

competing bids, going so far as to affirmatively rebuff interest from other potential buyers; (vi)

Brooks inflated the price of the pellets in the long term supply contract with the Power Plant,

effectively shifting future profit from the Power Plant to his new business, the Pellet Plant; (vii)

without the knowledge or approval of the Group Brooks instructed Convergen to pay for

hundreds of thousands of dollars of improvements to the Pellet Plant right before the closing; and

(viii) acting in concert with other with other defendants, Brooks failed to account for and then absconded with $196,420 in cash that was supposed to be paid to Convergen at the closing. The Company had unknowingly entrusted the fox with guarding the hen house.

5. When his employer confronted Brooks with his self-dealing scheme in a face-to-face recorded meeting in Manhattan, Brooks, after repeated denials, confessed to his fraudulent conduct, saying "I am very much responsible" and acknowledged the knowing participation of the other defendants. He later asked for forgiveness and an opportunity to repay the Group for what he had done. Unfortunately, despite his confession and expressions of remorse, Brooks and the other defendants have not remedied their wrongdoing.

6. On the contrary, the Group very recently discovered that as part of the Pellet Plant sale, Brooks and his co-conspirators retained access to active Office 365 email accounts of other Convergen subsidiaries containing highly proprietary and confidential information, including trade secrets. Office 365 is a cloud-based software that includes a hosted email Exchange Server and data storage, which Convergen uses for email accounts and data storage. Among other things these files contain records of Convergen's operation and management of two CHP facilities in Manhattan, the Power Plant in Michigan and Biogas facilities in Latvia. These Office 365 accounts should have been segregated and migrated to Convergen as part of the sale. There was absolutely no justification for defendants to maintain administrator access to the Office 365 accounts of Convergen and its subsidiaries that were unrelated to the Pellet Plant. Upon this discovery, the Company requested immediate cessation of access to and transfer of those Office 365 accounts email files to Convergen. Defendants refused. As a result, defendants continue to have unauthorized access to Convergen's emails that contain proprietary information, including financial and personal information and intellectual

-4-

property and trade secrets. Defendants also refused to turn over the historical email files of the Pellet Plant (needed by Convergen for tax, audit, and compliance purposes), presumably to conceal incriminating emails.

7.      By this action, Plaintiffs seek compensatory and punitive damages and related relief arising out of: (i) the theft of the Company's assets by Brooks and his co-conspirators; and (ii) defendants' refusal to turn over access to active, proprietary email files of Convergen entities and the Pellet Plant.

## PARTIES

8.      Plaintiff Convergen Energy LLC is a Delaware limited liability company with a principal place of business in New York, New York. Convergen is owned by the Group. Convergen was the owner of defendant Convergen Energy WI, LLC, the entity that owned and continues to own the Pellet Plant. Convergen is also the owner of the other entities whose emails have been misappropriated by the defendants.

9.      Plaintiff L'Anse Warden Electric Company, LLC is a Delaware limited liability company with a principal place of business in L'Anse, Michigan.  L'Anse Warden Electric Company, LLC is a subsidiary of Convergen and owns the Power Plant that purchases fuel pellets from the Pellet Plant.

10.     Plaintiff Libra Capital US, Inc. is a Delaware corporation with a principal place of business in New York, New York.

11.     Defendant Brooks resides at 201 East 36th Street, Apartment 19B, New York, New York 10016.

12.     Defendant Convergen Energy WI, LLC is a Delaware limited liability company with a principal place of business at 600 Liberty Street, Green Bay, Wisconsin 54304.

-5-

13.    Defendant NianticVista Energy LLC is a Delaware limited liability company with a principal place of business at 222 Ridgedale Avenue, Suite 302, Cedar Knolls, New Jersey 07927.

14.    Defendant Gregory Merle ("**Merle**") is a member and CEO of Niantic and Brooks' close friend and partner in the scheme to defraud Plaintiffs. Merle became the President of the Pellet Plant after the fraudulent acquisition. Upon information and belief, Merle resides at 15797 111th Terrace North, Jupiter, Florida 33478-6730.

15.    Defendant Riverview Energy Corporation ("**Riverview**") is a Delaware corporation. Upon information and belief, Riverview has a principal place of business at 6671 W. Indiantown Road, Suite 50, #240, Jupiter, FL 33458. Merle is the President of Riverview and Niantic is, upon information and belief, a special purpose entity and instrument of Riverview and Merle.

16.    Defendant Chipper Investment SCR, SA ("**Chipper**") is a co-investor of Niantic in the fraudulent acquisition of the Pellet Plant. Chipper's principal place of business is at Plaza de La Independencia 6, 28001, Madrid, Spain.

17.    Defendant Urincha SL ("**Urincha**") is a co-investor of Niantic in the fraudulent acquisition of the Pellet Plant. Urincha's principal place of business is at Calle Isla de Lanzarote 5, Boadilla Del Monte 28660, Madrid, Spain. Upon information and belief, Urincha is Chipper's corporate president and advisor.

18.    Defendant Ramon Uriarte Inchausti ("**Inchausti**") is a co-investor of Niantic in the fraudulent acquisition of the Pellet Plant. Inchausti resides at Calle Isla de Lanzarote 5, Boadilla Del Monte 28660, Madrid, Spain. Inchausti is an owner of Urincha and Chipper. Upon information and belief, Inchausti is the president, advisor and attorney-in-fact of

-6-

Urincha.

19.    Defendant Danielle Garcia Escandon ("**Escandon**") is a co-investor of Niantic in the fraudulent acquisition of the Pellet Plant. Escandon resides at Calle Alcala, 105, Piso 1 DR, Madrid, 28009, Spain. Upon information and belief, Escandon is an owner of Chipper. Further upon information and belief, Escandon is a representative and attorney-in-fact of Chipper.

20.    Chipper, Escandon, Inchausti, and Urincha are collectively referred to as the "**Spanish Investors**."

21.    Defendant Theodore John Hansen ("**Hansen**") was an employee of Convergen who served as the President of the Pellet Plant and Vice President of the Power Plant prior to the fraudulent acquisition. Hansen is now the CEO of the Pellet Plant and resides at 798 Terra Cotta Drive, Neenah, Wisconsin 54956.

22.    Defendant Brian R. Mikkelson ("**Mikkelson**") was an employee and Vice President of Convergen, Vice President and Controller of the Pellet Plant and Vice President of the Power Plant prior to the fraudulent acquisition. Mikkelson is now the Controller of the Pellet Plant and resides at 2144 Barberry Lane, Green Bay, Wisconsin 54304.

## JURISDICTION AND VENUE

23.    This Court has personal jurisdiction over defendants because each participated in and benefitted from the fraudulent scheme orchestrated and consummated in New York where Brooks was employed, and where victims of the fraudulent scheme – the Company and Convergen – are headquartered. Upon information and belief, each defendant wired money to New York, directly or indirectly through Niantic, to consummate the fraudulent transaction. Further upon information and belief, each of the defendants had extensive contacts with Brooks

while he was in New York and employed by the Company in New York as part of the fraudulent scheme set forth in this complaint.

24.    Venue is appropriate in New York County because the acts giving rise to defendants' misconduct occurred in substantial part in this county and because the Company and Convergen (victims of the fraud) are located in this county.

## FACTUAL ALLEGATIONS

### A. Background

25.    The Group is a privately owned international business group that is active in 35 counties and focused primarily on energy, hospitality, real estate, shipping and aviation that traces its origin to a shipping company established in 1976. In parallel to its business interests, the Group is well known for its extensive social programs, which are for the most part focused on those that have been traditionally denied opportunity. The Group was founded on the values of mutual trust, respect, and loyalty and operates with these same values, empowering and placing significant trust in its employees and officers. The Group was created and runs on the premise of empowerment, as is well known to anyone that has transacted with the group.

26.    The Company, a member of the Group, is a 15-year-old in-house asset management and professional service company that supports other companies that are part of the Group, including Convergen, the Power Plant and the Pellet Plant prior to its sale to Niantic.

27.    In January 2014, the Company hired Brooks. Brooks was introduced to the Company through a close personal relationship with one of the principals of the Group. Brooks worked closely with a senior officer at the Company's New York office and over time Brooks was elevated to Senior Vice President, Investments, of the Group.

28.    One of the areas that Brooks oversaw as a Senior Vice President (and for

the relevant period here) was Convergen's investments in sustainable energy, including the Pellet Plant. The Pellet Plant produces cost-effective fuel alternatives that can be used as a substitute for traditional fossil fuels and burned by the Pellet Plant's customers, including biomass industrial power plants such as the Power Plant, to generate electricity in an environmentally sustainable manner. The pellets efficiently combust to generate sufficient power with less industrial residue and waste products than other alternative fuel sources, which, in turn, reduces scheduled plant outages and lowers maintenance costs. The Pellet Plant generates income from supply agreements that charge a flat fee per ton for its fuel pellets. The Group expected the Pellet Plant to yield a sizable return and formed Convergen to acquire the Pellet Plant in June 2010 for $5 million. In addition to the initial purchase price, since the acquisition Convergen has made additional equity investments in excess of $10.2 million to upgrade the Pellet Plant and enhance the business. Prior to the fraudulent acquisition, defendant Hansen managed the day-to-day operations of the Pellet Plant and reported directly to Brooks.

29.     The Group authorized Convergen to acquire the Power Plant in 2016 as part of a strategy pitched in part by Brooks to unlock value at the Pellet Plant. The strategy was to add the Power Plant as a customer of the Pellet Plant and thereby increase the Pellet Plant's profitability and showcase the advantages of using the Pellet Plant's pellets to attract more customers. In 2019, the Power Plant started purchasing increasing amounts of fuel pellets from the Pellet Plant at $40 per ton. Prior to the fraudulent acquisition, Hansen and Brooks oversaw the Power Plant.

**B. The Sale of the Pellet Plant**

30.     Over the last few years, the Group has instituted a strategy of selling non-core assets to streamline the Company's portfolio management function and to reallocate capital

for new Group investments in core assets. This strategy notwithstanding, in 2019 the Group had no plans or intentions to sell the Pellet Plant or any other Convergen business. As stated above, the Pellet Plant was the primary reason Convergen acquired the Power Plant just three years prior. In 2019, after his direct manager suffered a near fatal accident that required him to go on disability for a good part of the year, Brooks stood as the sole Company executive trusted with overseeing these assets and ensuring that the strategic purposes for their acquisitions were achieved.

31.    Notwithstanding Convergen's long-term corporate objectives, which were supposedly being curated by Brooks, on September 3, 2019 Brooks reached out to the Company's General Counsel to request a non-disclosure agreement for Niantic, a firm Brooks stated was interested in purchasing the Pellet Plant. Brooks represented that Niantic's interest was unsolicited and that Niantic was an affiliate of defendant Riverview, and that both entities were owned and controlled by defendant Merle. Brooks never even hinted at his association with these defendants.

32.    Thereafter, Brooks inserted himself as the point person for a potential deal with Niantic. He facilitated the due diligence and negotiated the sale price and terms with Niantic, taking great care to maintain the appearance of a *bona fide* transaction when communicating with Company's e-mail. Shortly after the NDA was signed, Hansen and Mikkelson, under Brooks' direction, prepared and provided complete disclosure of the Pellet Plant to Niantic.

33.    On November 5, 2019, Merle executed a letter of intent on behalf of Niantic to acquire the Pellet Plant for $5.8 million. The letter of intent was sent from Merle's Riverview email and confirmed that Niantic is "an affiliate of Riverview." Around this time,

Brooks said in a text message to an Executive Board member of the Group in New York,

"[Niantic] appears to be serious."

34.     On November 12, 2019, Brooks emailed an Executive Board member of

the Group that Merle would be in New York (where the Company has offices) and had a short

window to meet the next morning. The choreographed introduction of Merle to the Group took

place at 9:30 am on November 13, 2019. Brooks was present and represented Merle as the CEO

of Niantic. Brooks did not disclose that he is an owner of Niantic and close friend of Merle.

35.     As the sole arbiter within the Group of the merits of this transaction in

2019, Brooks recommended that Convergen accept the offer. The parties subsequently executed

the Acquisition Agreement with an effective date of January 29, 2020. The sale closed on

January 31, 2020 for $5.5 million.[1]

36.     The employees of the Pellet Plant, including Hansen and Mikkelson, went

to work for the new owners. Because Hansen had overseen both the Pellet Plant and the Power

Plant prior to the sale, Brooks arranged as a condition of the Acquisition Agreement for Hansen

to continue overseeing the Power Plant after the sale until a replacement could be installed. Thus,

one of the terms required the Power Plant to reimburse the Pellet Plant $120,000.00 for 12

months of Hansen's time (20 hours per month for 12 months). Unbeknownst to the Company,

the $120,000.00 fee represented the vast majority of Hansen's total compensation from the Pellet

Plant for overseeing both the Pellet Plant and the Power Plant after the sale.

37.     Another condition of the Acquisition Agreement required the Power Plant

to enter into a 10-year supply agreement with the Pellet Plant, the terms of which Brooks never

disclosed to, nor sought approval for from, any other member of the Group's commercial team.

---

[1]     Brooks negotiated a $300,000.00 reduction in the sale price from the original $5.8 million
offer in exchange for a $1 million hard deposit from Niantic.

The ensuing Supply Agreement dated January 31, 2020 required the Power Plant to pay the

Pellet Plant $50 per ton of pellet fuel, which was $10 more per ton than the Power Plant had paid

before the sale to Niantic; this put the value of the Supply Agreement at $40 million.

38.     Brooks spearheaded the entire sale process and "agreed" to the terms on

behalf of Convergen. As a result, the sale process was relatively quick and without issue. This is

reflected in the fact that Niantic was initially represented by attorneys from the law firms of

Clemente Mueller, P.A. and Andolino & Associates but on the date of the closing, the law firms'

involvement was negligible.

## C. The Fraudulent Scheme Uncovered

39.     On the day immediately following the closing, the Company fortuitously

learned that Brooks may have had an economic interest in Niantic. The suggestion was greeted

by extreme shock and utter disbelief by other principals of the Group and senior employees of

the Company. Brooks was not only a trusted senior executive within the Company, but he also

was a personal friend of one of the principals of the Group.

40.     At approximately 5:00 pm on February 3, 2020, a senior principal of the

Group confronted Brooks in a face-to-face meeting at the Company's headquarters in New York.

The meeting was recorded. Up until the meeting, the Group's senior principal had held out hope

that the suspicions about Brooks were unfounded.

41.     To the Group's surprise, in that recorded meeting, Brooks admitted to

having an undisclosed ownership interest in Niantic and to orchestrating the sale of Convergen's

asset to his own entity for less than fair market value. When asked who benefitted from the

transaction, Brooks stated, "at this point myself, Greg [Merle], and [the Spanish Investors]."

Brooks explained that he had raised the funds to buy the Pellet Plant from Merle and the Spanish

-12-

Investors. Brooks expressed remorse and asked for forgiveness saying, "I'm genuinely sorry." He was told that he had no future with the Company based on his massive breach of trust. At a meeting the following day, Brooks acknowledged "this was a huge huge mistake."

42.     Brooks' admissions sent shockwaves through the Group. Brooks was the person charged with overseeing the Group's assets and maximizing value of Convergen, and it turned out that he had secretly engaged in self-dealing for his own personal benefit and to the detriment of the Company with respect to those very assets under his watch. The pressing question for the Company was how much damage Brooks had caused the Company as a result of his faithlessness and thievery. The Company immediately launched an examination of Brooks and the sale of the Pellet Plant to Niantic. The investigation uncovered a number of disturbing ways in which Brooks unlawfully embezzled Convergen funds, most of which Brooks did not admit to when confronted with his fraudulent scheme.

43.     First, while Brooks acknowledged that he secretly "undersold" the Pellet Plant, he did not acknowledge the magnitude of how much he had undersold the asset to himself and the other defendants. After its initial investigation, the Company conservatively believes that the Pellet Plant was worth at least $10 million more than Niantic paid for it at the time of the sale. In other words, Brooks negotiated a purchase price that was as low as one third of the asset's fair market value.[2]

44.     Through its preliminary investigation, the Company learned that, contrary to longstanding Company divestiture policy and his fiduciary duties, Brooks did not obtain competing bids for the asset to be sold (the Pellet Plant). Brooks had gone so far as to rebuff unsolicited interest in the Pellet Plant from an energy sector investment banker who

---

[2]     Convergen had invested $15.2 million in the Pellet Plant by the time of the sale and Brooks arranged for Niantic to pay $5.5 million.

coincidentally reached out to Brooks at around the time Brooks was arranging the sale to Niantic.

45.     Second, a closer examination of the supply terms between the Pellet Plant and the Power Plant revealed that Brooks increased the price of pellets $10 per ton above the fair market value for such pellets and $10 more per ton than the Pellet Plant had previously sold the pellets for. Brooks locked in this significantly above market price for 10 years and for a minimum contracted tonnage of 40,000 per year. In one move, Brooks shifted $4 million in profit ($400k per year for 10 years) from the Power Plant to the Pellet Plant. The long-term agreement also effectively precluded the Power Plant from purchasing the much less expensive fuel sourced over the previous 10 years by the Power Plant from alternative fuel suppliers; this less expensive fuel is readily available and continues to be a viable and competitive substitute for the pellets in the Power Plant's energy generation process.

46.     Third, after the letter of intent had been executed but prior to closing, Brooks, Mikkelson and Hansen purchased a new shredder for the Pellet Plant at a cost of $350,000.00. Brooks knew that under the terms of the acquisition, this capital expense would be borne by Convergen immediately prior to the sale but would exclusively benefit the Pellet Plant and the defendants after the sale. In other words, Brooks had the seller "gift" the buyer with a new $350,000.00 shredder for the personal benefit of Brooks and the other defendants. Emails subsequently discovered show that both Mikkelson and Hansen, both full time employees of Convergen at the time, knew of the financial windfall to Niantic resulting from the pre-sale purchase of the shredder, specifically that Convergen's net proceeds from the sale would be reduced if a new shredder were purchased by the Pellet Plant prior to its sale to Niantic. In an email exchange between Mikkelson and Brooks on December 17, 2019, Mikkelson writes, "From what we discussed a few weeks ago, it would be best to wait until early 2020 to close on

-14-

the shredder loan since it would reduce sale proceeds to Libra."

47.     Fourth, Brooks arranged for the Power Plant to pay the Pellet Plant for Hansen's continued oversight of the Power Plant after the sale of the Pellet Plant. On its face, this seemed like a favorable term to assist Convergen transition management of the Power Plant until a replacement could be found. However, a closer examination of the financial terms indicates that Brooks secretly shifted the vast majority of the cost of Hansen's employment from the Pellet Plant to the Power Plant (the Power Plant is paying Hansen $120,000.00 per year, which, upon information and belief, represents most of his total compensation, including his responsibilities for Niantic). This is consistent with Brooks' self-serving scheme to shift as much profit from the Power Plant to the Pellet Plant after his acquisition.

48.     Fifth, Brooks ensured that Niantic did not pay Convergen $196,420.00 that the Pellet Plant had in cash as of the closing. In accordance with the Acquisition Agreement, that cash was to be transferred to the seller (Convergen). As part of its investigation, Convergen determined that the cash was never paid to it because Brooks was in charge and he made sure his new company and not his soon to be former employer received those monies.

**D. Defendants' Roles in the Fraudulent Scheme**

49.     As stated above, Brooks was able to execute his fraudulent scheme (and nearly get away with it) because in 2019 he was the senior most officer charged and trusted with vetting and overseeing these kinds of transactions. He also benefitted from the knowing assistance he received from his co-conspiring underlings, Hansen and Mikkelson, who as employees of Convergen were also responsible for the management of both the Power Plant and Pellet Plant. The investigation uncovered emails that unequivocally confirm Hansen and Mikkelson's knowledge of and roles in the fraudulent scheme. For example, a September 12,

2019 email from Mikkelson to Brooks and copied to Hansen indicated that he and Hansen knew of Brooks' fundraising from the Spanish Investors at around the time Brooks formally initiated the sale process with Niantic: "Hola Tio Esteban ["Hello Uncle Steve], [Hansen] mentioned that you are in Spain."

50.     The Spanish Investors knew that Brooks was a senior officer of the Company, knew that he was overseeing the sale of the Pellet Plant and was a financial stakeholder in the buyer (Niantic). During the February 3rd taped confession, Brooks admitted that the Spanish Investors had funded the fraudulent acquisition of the Pellet Plant. Upon information and belief, Brooks solicited the Spanish Investors on the basis that his double-dealing was expected to yield the Pellet Plant at a purchase price several million dollars below its fair market value. Brooks solicited investments from the Spanish Investors in September 2019, in and around the time he introduced Niantic to the Group. Upon information and belief, the Spanish Investors had extensive contacts with Brooks while he was in New York and employed by the Company in New York, and each wired funds directly or indirectly to New York for the fraudulent purchase of the Pellet Plant.

51.     Defendant Merle similarly knew of Brooks' duplicity and the financial windfall he would achieve as a result. Neither he nor Brooks disclosed their long-standing personal relationship to anyone at the Group. In fact, they both took deliberate steps to keep their relationship a secret. The two exchanged very few emails via Brooks' Company email account and those limited exchanges were written in an obvious formal, contrived arms' length manner. The lack of emails on a deal of this type and magnitude suggests that the parties engaged in discussions through some other clandestine means. Not surprisingly, the Company's investigation uncovered emails between the two utilizing Brooks' personal Gmail account. The

Gmail account emails reflect the hidden personal relationship and stand in sharp contrast to the faux formal emails to and from Brooks' Company email account. Indeed, in one of the recently discovered emails, Brooks referred to Merle as a "close friend" in pitching an energy project of Merle's to the above-referenced investment banker. None of this was disclosed to anyone at the Group, including during the meeting at which Merle was introduced to the Group's principal in New York.

52.     Also not disclosed was the significant fact that Brooks covertly signed a personal guaranty of more than two million dollars to finance the fraudulent acquisition of the Pellet Plant. At closing Plaintiffs knew that Niantic's ability to close the transaction was predicated on obtaining a credit agreement. Unbeknownst to anyone at the Company, the personal guaranty from Brooks enabled Niantic to obtain the credit agreement (this only came to light from the post-sale investigation). Each of the defendants had to know of the personal guaranty and that it was signed while Brooks was employed by the Company. There is no legitimate basis for Brooks to have personally guaranteed the payment obligations of Convergen's counterparty. The conflict of interest could not have been more pronounced and yet not one of the defendants raised the issue with the Company - presumably because to do so would have revealed and undone the fraudulent scheme and the opportunity to "buy" an asset for many million dollars less than what it was worth.

**E.  Misappropriation of Convergen's Trade Secrets**

53.     Prior to the fraudulent acquisition, Convergen personnel based in Wisconsin at the Power Plant, including Hansen and Mikkelson, had managed the Office 365 accounts for all of the Convergen entities, including the Power Plant, the Pellet Plant and EuroEnergy Biogas Latvia Limited, a subsidiary of Convergen with assets and operations in the

-17-

Republic of Latvia (in Northern Europe). Those Convergen personnel remained in Wisconsin working with the new Pellet Plant ownership and ceased working for Convergen. As part of the Pellet Plant transaction, Brooks, Hansen and Mikkelson should have segregated and relinquished control of the Office 365 accounts of the other Convergen entities like the Power Plant and EuroEnergy Biogas Latvia Limited, and should have maintained access to only a limited number of the Pellet Plant's emails necessary for operations. Plaintiffs recently learned that this did not happen.

54.    In late April 2020, the email account of a Convergen senior manager in Latvia was hacked, which resulted in Convergen's Chief Accountant in Latvia receiving an unauthorized request to pay an unknown party somewhere in Europe. As per Group protocol, this cybersecurity breach was immediately reported to the Group's Chief Information Officer, whose responsibility it is to ensure that the highest level of cybersecurity is maintained across all of the Group's businesses. When the Group's Chief Information Officer contacted Convergen's senior manager in Latvia to access the Office 365 account to assess the extent of the cyberattack and install countermeasures, he discovered that he lacked access because Brooks and the former Convergen employees (notably Mikkelson) still controlled the Office 365 accounts for the Latvian entity, the Power Plant and other Convergen entities. In other words, Brooks and his minions failed to segregate the electronic files as part of the Pellet Plant transaction.

55.    The Group's Chief Information Officer immediately contacted Mikkelson to gain access to Convergen's emails and remove any unlawful access by the defendants. His requests went unheeded. More senior Group personnel reached out directly to Merle, pointing out that, among other things, access was needed immediately to address the illegal hacking and long term for audit and compliance purposes. Merle rebuffed these requests as well.

56.    The irreparable harm to the Company is obvious. Without any basis in fact or law, the defendants are depriving Convergen of the ability to protect its own data, especially from unknown hackers. The defendants are also unlawfully granting themselves continued access to Convergen and the Company's proprietary and confidential information and trade secrets (all contained within the Company's email files located on the Office 365 accounts). In addition to engaging in misappropriation, defendants are denying Convergen access to the email files of the Pellet Plant prior to the sale, which, as stated above, are needed for future compliance requirements. Defendants' motive for denying access is also obvious: presumably among those files are incriminating emails about defendants' fraudulent scheme.

## FIRST CAUSE OF ACTION: FRAUD
### (Brooks)

57.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs of this Complaint.

58.    As set forth in detail above, Brooks engaged in a fraudulent scheme to acquire the Pellet Plant for at least $10 million less than what it was worth and loot his employer of additional monies for the benefit of his new acquisition, including the $196,420.00 in cash that went missing instead of being paid to Convergen. To accomplish this, Brooks made materially false representations to the Company about: (a) the sale price of the Pellet Plant; (b) his relationship to Merle and the other defendants; (c) the appropriateness of the new Supply Agreement between the Power Plant and the Pellet Plant; and (d) the appropriateness of Convergen funding the purchase of a new shredder for the Pellet Plant on the eve of its sale to Niantic.

59.    Brooks also intentionally hid from his employer material facts connected to the fraudulent scheme, notably his interest in Niantic and his longstanding relationship with

-19-

Merle. For example, on November 13, 2019 Brooks attended a meeting that he had organized for an Executive Board member of the Group to meet Merle who had just bid on the Pellet Plant. At the choreographed meeting, Brooks represented Merle as the CEO of Niantic and failed to disclose his own interest in Niantic and close friendship with Merle. Brooks also executed the personal guaranty discussed above on January 31, 2020 without making any disclosure to the Company. Finally, Brooks did not disclose to the Company that, at Brooks' instruction and without consulting the Company's General Counsel, Niantic's attorneys had previously represented Convergen in a substantially related matter. Niantic's attorneys did not clear conflicts or even seek Convergen's consent prior to representing Niantic in the acquisition of the Pellet Plant. When confronted with suspicions of his wrongdoing on February 3, 2020, Brooks confessed to his fraud and that he personally benefited from the sale of the Pellet Plant.

         60.      Plaintiffs justifiably relied, to their detriment, upon each of the misrepresentations set forth above in entering into the Acquisition Agreement with Niantic.

         61.      Plaintiffs have been injured as a proximate cause of each of these fraudulent acts and concealments in at least the following ways: (a) the Pellet Plant has been sold for millions of dollars below its value; (b) the final purchase price was reduced to account for a new expensive shredder without any basis or consideration; (c) the Power Plant is being overcharged in its supply contract with the Pellet Plant; (d) the Power Plant is being overcharged for Hansen's time to help run the Pellet Plant post-acquisition; and (e) $196,420.00 in cash went to the Pellet Plant instead of Convergen at the closing.

         62.      Because Brooks' fraudulent scheme was intentional, malicious and demonstrated a wanton disregard of Plaintiffs' rights, Plaintiffs are entitled to punitive damages.

## SECOND CAUSE OF ACTION: BREACH OF FIDCIARY DUTY

### (Brooks, Hansen and Mikkelson)

63.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs of this Complaint.

64.     As an officer of the Company, Brooks owed a fiduciary duty to his employer. He was afforded and empowered with considerable discretionary authority to manage Convergen and its subsidiaries, including the Pellet Plant. As a senior employee of the Company, Brooks was required to manage and invest assets of Convergen and the Pellet Plant in good faith and for the benefit of his employer.

65.     Pursuant to Brooks' Employment Agreement with the Company dated January 7, 2014, Brooks agreed "not to be engaged in any other business activity without the prior written consent of the Company." In accordance with the Employee Handbook, Brooks agreed not to engage in the "theft of money/property [of the Company]" and "any action, which can be construed as intent to defraud/deceive."

66.     Hansen and Mikkelson also served as officers of Convergen and, therefore, owed a fiduciary duty to their employer. Both exercised considerable control over the Power Plant and the Pellet Plant, including managing the flow of information (*e.g.*, EBITDA) to the Company. Had senior members of the Group's Executive Committee been made aware that the Pellet Plant's projected EBITDA for 2020 was substantially higher than represented by Brooks, the Group would never have agreed to pursue Niantic's offer to purchase the Pellet Plant for $5.8 million.

67.     By participating in the fraudulent scheme, Brooks, Hansen and Mikkelson violated their fiduciary obligations and contractual prohibitions. Each acted as a faithless servant by self-dealing and otherwise engaging in and enabling the fraudulent scheme to the detriment of

their employers. As faithless servants each must forfeit all compensation paid during their period of disloyalty.

68.     Plaintiffs have been injured as a proximate result of Brooks, Hansen, and Mikkelson's breaches of their fiduciary duties in at least the following ways: (a) the Pellet Plant has been sold many millions of dollars below its value; (b) the final purchase price was reduced to account for a new expensive shredder without any basis or consideration; (c) the Power Plant is being overcharged in its supply contract with the Pellet Plant; (d) the Power Plant is being overcharged for Hansen's time to help run the Pellet Plant post-acquisition; and (e) $196,420.00 in cash went to the Pellet Plant instead of Convergen at the closing.

69.     Based on all of the above, Plaintiffs are entitled to compensatory damages in an amount to be determined at trial, together with interest at the statutory rate, plus punitive damages.

## THIRD CAUSE OF ACTION: AIDING AND ABETTING FRAUD
### (All Defendants other than Brooks)

70.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs of this Complaint.

71.     Brooks confessed on tape that he fraudulently induced the Plaintiffs into selling the Pellet Plant significantly below value in a self-dealing transaction. As set forth in detail above, Brooks engaged in an extensive fraudulent scheme to transfer profits, cash, equitable value and assets from Convergen to the Pellet Plant.

72.     As insiders, Hansen and Mikkelson knew about the fraudulent scheme and in their positions managing the Pellet Plant they substantially assisted Brooks in every facet of the scheme by, among other things, facilitating the sale, arranging for the purchase of the shredder, not transferring the Pellet Company cash at closing to Convergen, signing off on an

-22-

inflated pellet price in the Supply Agreement. They provided confidential information about the Pellet Plant to Merle and, upon information and belief, to the other defendants. Further upon information and belief, Hansen and Mikkelson assisted Brooks' efforts to fundraise from the Spanish Investors, all in an effort to better themselves financially. Brooks could not have perpetrated the fraud without the substantial assistance of Hansen and Mikkelson. There was no one left at Convergen or the Company who was in a position to question or challenge the terms of the Niantic transaction, as Brooks, Hansen and Mikkelson were the three charged with overseeing all aspects of the Pellet Plant and its sale to Niantic.

73.     The Spanish Investors, Merle and his two entities, Riverview and Niantic, knew that Brooks was using his unique position at the Company to double deal and close a fraudulent transaction to their benefit and to the detriment of Plaintiffs. Brooks could not have perpetuated the fraud without funding from the Spanish Investors, Merle and his entities.

74.     Consequently, Plaintiffs have suffered millions of dollars in losses from the fraudulent sale, the inflated supply agreement, the incurrence of Hansen's compensation, the purchase of the shredder and the theft of $196,420 in cash due to Convergen at the closing, among other things.

75.     Based on all of the above, Plaintiffs are entitled to compensatory damages in an amount to be determined at trial, together with interest at the statutory rate, plus punitive damages.

### FOURTH CAUSE OF ACTION: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
**(All Defendants other than Brooks)**

76.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs of this Complaint.

-23-

77.     At all relevant times, Brooks owed fiduciary duties to Plaintiffs.

78.     Plaintiffs have been injured as a proximate result of Brook's breaches of his fiduciary duties.

79.     All of the defendants other than Brooks knew of Brooks' role and responsibilities at the Company. In fact, it was Brooks' unique position as the Company's gatekeeper of its energy assets, including the Pellet Plant, that made the opportunity to participate in the fraudulent scheme so attractive. The defendants knew of, enabled and participated in Brooks' fraudulent scheme.

80.     Plaintiffs have been injured as a result of Brooks' breaches of his fiduciary duties and the other defendants' substantial participation in those breaches.

81.     Consequently, Plaintiffs are entitled to compensatory damages in an amount to be determined at trial, together with interest at the statutory rate, plus punitive damages.

## FIFTH CAUSE OF ACTION: THEFT AND MISAPPROPRIATION OF TRADE SECRETS
### (Niantic, the Pellet Plant, Merle, Brooks, Hansen and Mikkelson)

82.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs of this Complaint.

83.     Convergen stored trade secrets of Convergen entities via the Office 365 accounts that, prior to the fraudulent sale, had been overseen by Pellet Plant personnel, including Hansen and Mikkelson.

84.     Under strict guidelines from the Group, which places the highest possible degree of importance on securing its entities from cybersecurity breaches and threats, the Company and Convergen had taken deliberate steps to secure the data, including, among other

-24-

things, the use of unique passwords for each email account and single administrator control to prevent unauthorized access.

85.     After the sale, Hansen and Mikkelson maintained control over all of the Convergen Office 365 accounts without basis or authority; they should have only maintained access to accounts for the Pellet Plant.

86.     Consequently, the defendants named in this claim knowingly and without authorization have ongoing access to Convergen trade secrets and other proprietary and confidential information and refuse to turn it over to Plaintiffs. Nor are the defendants willing to provide Plaintiffs with the Pellet Plant Office 365 accounts for the period prior to the sale.

87.     Upon information and belief, defendants are accessing Plaintiffs' data and may be using it to Plaintiffs' detriment; at a minimum, defendants are obstructing Convergen's access to Pellet Plant emails presumably to thwart efforts to further uncover the fraud.

88.     Defendants should be immediately enjoined from further accessing Convergen's data and should be ordered to turnover exclusive access to Convergen to its own files.

## SIXTH CAUSE OF ACTION: RESCISSION
### (Niantic, the Pellet Plant)

89.     Plaintiff the Power Plant repeats and realleges the allegations contained in the preceding paragraphs of this Complaint.

90.     The Power Plant was fraudulently induced to enter the Pellet Supply Agreement with the Pellet Plant by Brooks who engaged in self-dealing, and Niantic and Merle who collaborated with Brooks to make the Pellet Supply Agreement a condition of the transaction.

91.     There is no complete and adequate remedy at law and damages would not

-25-

be adequate because of the extended 10-year term and unfair pricing of the Pellet Supply
Agreement.

92.     Rescission of the Pellet Supply Agreement would substantially restore the
status quo for the Power Plant as the terms could revert to those prior to the sale of the Pellet
Plant, thus restoring the Power Plant's projected EBITDA and operational flexibility.

93.     The Power Plant promptly filed this claim for rescission immediately after
discovering the fraud.

**WHEREFORE**, Plaintiffs demand that judgment be entered in its favor and
against defendants as follows:

1.     Compensatory damages in excess of $10 million.

2.     Forfeiture of compensation earned during their period of disloyalty.

3.     Disgorgement of any profits resulting from their disloyalty.

4.     Rescission of the Pellet Supply Agreement.

5.     Punitive damages to be determined at trial.

6.     Injunctive relief.

7.     Attorneys' fees, costs of suit, interest and such other relief as the Court
deems fair and equitable.

8.     That Plaintiffs be awarded such other and further relief as the Court may
deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues in this action.

DATED: New York, New York
         May __, 2020

Respectfully submitted,

/s/ *Michael Stolper*

Michael Stolper
Dov Byron Gold
SEIDEN LAW GROUP LLP
469 7th Avenue, Suite 502
New York, NY 10018
(212) 337-3502

*Attorneys for Plaintiffs*

-27-

# EXHIBIT B
# TO COMPLAINT



·From: **Steve Brooks** <stevebrooks17@gmail.com>
Date: Sun, Dec 15, 2019 at 9:08 PM
Subject: Memo
To: Fidel Andueza <fidel.andueza@hotmail.com>

I put together the attached. We can discuss tomorrow.

Best Regards,

Steve

--
Steve J. Brooks
stevebrooks17@gmail.com

--
Steve J. Brooks
stevebrooks17@gmail.com

1

**Investment Memo: Convergen Energy Wisconsin, LLC**

December 15, 2019

**Purchase Price: ...........................................$5,800,000**

Purchase price corresponds to Total Assets of $5,770,828 on the August 31, 2019 CEWI Balance Sheet. Further, the purchase price represents a 6.5x multiple to the CEWI FY 2018 EBITDA of $886,773 inclusive of the CE LLC Administrative Expenses.

**Total Cash Consideration:............................$2,026,018**

| $ | |
|---|---|
| Total Consideration | (5,800,000) |
| Hard Deposit Discount | 50,000 |
| Due Diligence Reimbursement | 50,000 |
| Bank Debt | 2,592,167 |
| Equipment Financing | 211,498 |
| Capital Expenditure | 377,850 |
| Inter-Company Receivable | 357,621 |
| Working Capital Adjustment | 284,880 |
| Cash | (150,034) |
| **Net Consideration - NianticVista** | **(2,026,018)** |

- The Purchase Price was made on a Debt-Free basis, consequently CEWI's Bank Debt and Equipment Financing facilities are subtracted from the Purchase Price.
- The Capital Expenditure line refers to deferred maintenance capital items needed at CEWI and are based on quotes received from local service providers for each item.
- The Inter-Company Receivable refers to an intercompany loan with sister Convergen Energy company which will be transferred from the CEWI Balance Sheet.
- The Working Capital Adjustment represents the change in working capital from the August 31, 2019 Balance Sheet to the closing December 31, 2019 Balance Sheet. This will be determined with a final adjustment 30-days after Closing.
- The Cash item is the cash that will be on the December 31, 2019 Balance Sheet, which will be removed and transferred to CELLC.
- The $2,026,018 Net Consideration refers to the cash component NianticVista is committed to pay.

**Sources & Uses:**

$

**Sources**

| | |
|---|---|
| RU + DG | 500,000 |
| SB + FA | 500,000 |
| TH | 100,000 |
| Mezzanine Facility - CK | 700,000 |
| Mezzanine Facility - JB | 300,000 |
| **Total Sources** | **2,100,000** |

**Uses**

| | |
|---|---|
| Purchase Hard Deposit | (1,500,000) |
| Purchase Final Payment | (526,018) |
| Arrangement Fee - GM | (50,000) |
| Working Capital | (23,982) |
| **Total Uses** | **(2,100,000)** |

- The Mezzanine facilities refer to two separate lenders. Both Mezzanine facilities will have a term of 1-year and carry an annual interest rate of 10.0%.

**Closing Calendar:**

| $ | Total | 31-Dec-19 | 31-Jan-20 | 1-Feb-20 |
|---|---|---|---|---|
| Purchase Hard Deposit | (1,500,000) | (1,500,000) | | |
| Purchase Final Payment | (526,018) | | (526,018) | |
| Arrangement Fee - GM | (50,000) | | (50,000) | |
| Working Capital | (23,982) | | | (23,982) |
| **Total Uses** | **(2,100,000)** | **(1,500,000)** | **(576,018)** | **(23,982)** |
| RU + DG | 500,000 | 500,000 | | |
| SB + FA | 500,000 | 500,000 | | |
| TH | 100,000 | | 76,018 | 23,982 |
| Mezzanine Facility - CK | 700,000 | 500,000 | 200,000 | |
| Mezzanine Facility - JB | 300,000 | | 300,000 | |
| **Total Sources** | **2,100,000** | **1,500,000** | **576,018** | **23,982** |

- The initial $1,500,000 portion of the Purchase Price made on December 31, 2019 is in the form of a hard deposit which secures the transaction.
- The final closing on January 31, 2019 assumes the rollover of the CEWI Bank Debt. The final working capital adjustment will be made based on the December 31, 2019 Balance Sheet.
- The Working Capital Use refers to an injection of $23,982 by NianticVista into CEWI for working capital purposes as the cash in the CEWI accounts will be transferred out of the Company at Closing.

**Management:**

Prior to closing the CELLC employees, listed below will be transferred to CEWI:
- Ted Hansen, CEO
- Dennis Conn, SVP – Business Development and Technical Services
- Brian Mikkelson, Controller
- Randy Parmentier, Accounting Assistant

# EXHIBIT C
# TO COMPLAINT

EXHIBIT C
TO COMPLAINT

## Engineered Fuel Pellet Supply Agreement

## January 31, 2020

Buyer agrees to purchase Pellets from Seller, and Seller agrees to deliver Pellets to Buyer in accordance with terms and conditions in this Pellet Supply Agreement ("Agreement").

| **Buyer:** | L'Anse Warden Electric Company, LLC | **Seller:** | Convergen Energy WI, LLC |
|---|---|---|---|

**Commodity:** The engineered fuel pellets (the "Pellets") sold and delivered to Buyer hereunder from Seller's facility located in Green Bay, WI ("Facility"), and shall generally satisfy the Typical Specifications, as set forth herein.

**Contract Term:** The term of this Agreement shall commence on January 31, 2020 (the "Effective Date") and continue for a period of ten (10) years (the "Term"), subject to early termination of this Agreement as set forth in this Section below. Subject to the rights of the Bank (as defined below) under the Collateral Assignments (as defined below) and the Bank's rights set forth below, this Agreement may be terminated (each, a "Default"): (a) By either party, effective immediately upon written notice to the other party, if such other party: (i) becomes insolvent or is generally unable to pay, or fails to pay, its debts as they become due; (ii) files or has filed against it, a petition for voluntary or involuntary bankruptcy, or otherwise becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law; (iii) seeks reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts; (iv) makes or seeks to make a general assignment for the benefit of its creditors; or (v) applies for or has a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business, or (b) By either party if the other party is in material breach of, or threatens to breach, this Agreement and either the breach cannot be cured or, if the breach can be cured, it is not cured by such other party within a commercially reasonable period of time under the circumstances, in no case exceeding thirty (30) days following such other party's receipt of written notice of such breach or threatened breach from the non-breaching party.

The parties hereby acknowledge that each party has entered into a Collateral Assignment, dated January 31, 2020, with BMO Harris Bank N.A. (the "Bank"), pursuant to which each party has (A) collaterally assigned to the Bank all of its right, title and interest of, in and to this Agreement and any extensions or renewals of this Agreement, and (B) granted to Bank a security interest in and to all rights and remedies of such party arising under this Agreement (each, a "Collateral Assignment", and collectively, the "Collateral Assignments"). Each party hereby consents to the Collateral Assignment entered into by the other party and hereby acknowledges and agrees to the terms thereof. Neither party shall terminate this Agreement by reason of the occurrence of any Default, unless and until the party seeking to terminate this Agreement (the "Terminating Party") shall have given Bank a copy of the notice of Default delivered to the other party (the "Defaulting Party"). Each party agrees that the Bank shall have the right to cure such Default within forty-five (45) days of Bank's receipt of such notice (or, if such Default cannot reasonably be cured within such forty-five (45) day period, Bank shall have such longer time as may be necessary to cure such Default; provided that Bank commences the cure within such period and diligently pursues the cure thereafter). The Bank's right to cure under this Agreement shall not be construed as a requirement or affirmative duty to take such action. Upon Bank succeeding to a

1

party's interest under this Agreement pursuant to the Collateral Assignment of such party, the other party acknowledges and agrees to recognize Bank (and its successors and assigns) as party to this Agreement and to be bound by and perform all of the obligations and conditions imposed upon such other party under this Agreement.

**Base Price:** Subject to adjustment as provided below, the initial price for the Pellets shall be $50 per ton at Delivery Point (the "Base Price"). Commencing on the first anniversary of the Effective Date, and thereafter on each subsequent anniversary thereof during the Term, the Base Price shall increase by 1.5% on a cumulative basis (i.e., to $50.75 after the first anniversary date, $51.51 after the second anniversary date, etc.). Seller will arrange for transportation of the Pellets based on a mutually agreed upon delivery schedule. Transportation of the Pellets will be arranged and paid for by Seller. Buyer will reimburse Seller for transportation at cost based on invoices sent by Seller. Seller will negotiate with transportation providers on a commercial best efforts basis.

**Contract Quantity** Subject only to Force Majeure, Seller shall ship and Buyer shall accept for purchase a minimum of 40,000 total tons per year (the "Minimum Amount"). In order to account for scheduled power plant outages and other situations that could substantially reduce deliveries in any given month, the parties agree to target regular monthly shipments of approximately 4,500 tons per month. Buyer and Seller shall provide each other with advance notice of any scheduled power plant outages or other circumstances that would result in a material deviation from the agreed regular monthly shipping schedule.

**Delivery Point:** Buyer's Facility in L'Anse, MI, or any other location mutually agreed in writing by the parties. Seller shall be responsible for arranging all shipments of Pellets to Buyer.

**Specifications:** As used herein, the following capitalized terms shall have the meanings set forth herein: (i) "Shipments" means a shipment of Pellets loaded by Seller into one or more trucks for transportation to Buyer; and (ii) "Typical Specifications" means a set of specifications representing the general quality (subject to the acceptable variations as set forth herein) of the Pellets sold to Buyer from time to time; with the understanding that "Typical Specifications" are not to be considered guaranteed specifications and any given Shipment of Pellets may vary from the Typical Specifications and shall be accepted by the Buyer so long as such Pellets do not exceed the maximum sulfur, maximum chlorine, or ash content or fall below the minimum BTU/lb level, as the case may be, as set forth in the following Rejection Limits:

|  | Typical-Dry Basis | Rejection Limits-Dry Basis |
|---|---|---|
| Sulfur Content (% by weight) | 0.17 | 0.5 Max |
| BTU/lb | 11,250 | 8,500 Min |
| Moisture (% by weight) | 5.5% | 14 Max |
| Ash Content (% by weight) | 6.5 | 16 Max |
| Chlorine Content (ppm) | 1,000 | 1,800 Max |

**Epa Alternative Fuels Designation** Convergen Energy WI LLC was previously granted by U.S.EPA Alternative Fuels designation for the fuel pellets to be supplied from its Green Bay fuel production facility. This EPA designation or "comfort letter" indicates that the CE engineered fuel pellets are classified as a "non-waste", non-hazardous secondary material under 40 CFR 112. This alternative fuel designation is important in that solid fuel production of steam and power authorized under an applicable Federal or State permit will not be subject to the Commercial and Industrial Solid Waste Incinerator (CISWI) rules, i.e. the CE fuel pellets can be used similar to traditional fuels such as coal, tire-derived fuel, railroad ties, construction demolition material, traditional biomass, etc. While "comfort letters" are no longer issued under the more recent

2

changes to the U.S. EPA Alternative Fuels Program they are still approved as an Alternative Fuel on a case by case basis during the applicable Federal and/or State Air Permitting process.

**BTU Adjustment:** If the actual Btu of the Pellets **varies** from the Typical 11,250 BTU/lb +/- 250 BTU/lb level, there will be a per ton price adjustment (increase or reduction) for each ton of Pellets determined as follows:

$$BTU\ Price\ Adjustment = [\ (Act\ Btu - 11{,}250) \div 11{,}250]\ *\ Contract\ Price$$

Where: Act Btu = Actual average BTU content of the Pellets for deliveries made during any given month. If the pellets are between the 11,250 +/- 250 BTU/lb range, no BTU adjustment will be made.

**BTU Quality Determination:** BTU quality to be tested, at Seller's cost, at Seller's in-house laboratory based on representative samples collected by Seller from daily production at the Facility. Seller will prepare a monthly composite sample by combining daily representative samples. Seller, at Seller's cost, will test monthly composite sample at a certified third-party laboratory. These tests will consist of short proximate analysis (BTU/lg., Moisture, Ash, Chlorine and Sulfur). The results of the monthly composite test shall be provided to Buyer on a periodic basis. If Buyer requires a split test independently, Seller shall provide Buyer with the samples necessary to perform such tests. Buyer shall pay the cost of such split tests and any other additional sample testing performed by an outside laboratory.

**Weights:** The weight of all Pellets purchased and sold pursuant to this Agreement shall be determined by certified truck scales at the Delivery Point. Seller shall provide notice of such weights to Buyer within 48 hours of truck loading.

**Rejection:** Buyer may reject any Shipment of Pellets that fails to conform to any one of the Rejection Limits. Rejection of such non-conforming Pellets shall be Buyer's sole and exclusive remedy for Seller's failure to deliver conforming Pellets under this Agreement. Disposal of rejected Pellets, including all transportation charges associated with the rejected Pellets, shall be for Seller's account. Buyer and Seller shall cooperate to minimize Seller's cost of disposal.

**Invoices and Payment Terms:** Seller will invoice Buyer for Pellets delivered and corresponding transportation costs, promptly at the end of each week for Pellets loaded on trucks during the immediately prior week. Invoices shall be mailed to:

L'Anse Warden Electric Company LLC
157 S. Main Street
L'Anse, MI 49946
Attn: Plant Manager

Buyer shall pay invoices no later than thirty (30) days following receipt of Seller's invoice, based on weights of Pellets and Adjustments as determined in this Agreement. Payment shall be remitted to Seller at the address provided in the invoice. Late payment shall be subject to interest at the rate of 0.75% per month of amount due.

BTU adjustments will be calculated based on the monthly composite average and billed on a separate invoice at the end of each month.

**Additional Conditions:** The attached document entitled "Convergen – Additional Terms and Conditions" shall be part of this Agreement.

3

Convergen Energy WI LLC

By: _____

Name:  Gregory Merle

Title:  President

L'Anse Warden Electric Company, LLC

By: _____

Name:  FIDEL ANDUEZA

Title: _____

4

**CONVERGEN ENERGY WI LLC**
**ADDITIONAL TERMS AND CONDITIONS**

1. **LIMITATION ON WARRANTY**. EXCEPT AS EXPRESSLY SET FORTH HEREIN, SELLER EXPRESSLY DISCLAIMS ANY OTHER REPRESENTATIONS OR WARRANTIES, WRITTEN OR ORAL, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY WITH RESPECT TO CONFORMITY TO SAMPLES, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE.

2. **FORCE MAJEURE**. If, by reason of: (i) strikes or other labor troubles, (ii) governmental prohibitions, preemptions, restrictions or other controls, (iii) shortages of fuel, supplies or labor, (iv) acts of God or the elements (such as tornado, hurricane, flood, or abnormally inclement weather for the season), (v) civil commotion, acts of war, terrorism or the public enemy, (vi) fire or other casualty or catastrophe, (vii) accidents or mechanical breakdowns, (viii) any other cause beyond an affected party's reasonable control (excluding, however, any financial inability), or (ix) the making of alterations, installations, improvements, repairs, additions or other physical change in, to or about an affected party's premises (the events described in the preceding clauses being herein referred to as "Force Majeure"), the observance, performance or compliance with, any non-monetary obligation (i.e., any obligation other than the obligation to pay a sum of money) on the part of an affected party to observe, perform or comply with, is prevented or delayed, including the inability to supply, provide or furnish, or a delay in supplying, providing or furnishing, any product expressly or implicitly to be supplied, provided or furnished, or the inability to make, or a delay in making, any alteration, installation, improvement, repair, addition or other physical change in, to or about such affected party's premises or any other portion thereof, or the inability to supply, or a delay in supplying, any equipment, fixtures or other materials, then, for so long as such affected party shall be unable to observe, perform or comply with, or shall be delayed in the observance, performance or compliance with, any such non-monetary obligation, this Agreement and such affected party's obligation to observe, perform and comply with any such non-monetary obligation shall be excused for the period during which the Force Majeure prevents or delays such observance, performance or compliance. The party claiming suspension of performance by reason of Force Majeure shall notify the other party as soon as practicable but no later than ten (10) days after the commencement of the event of Force Majeure. During such event of Force Majeure, the affected party shall use reasonable commercial efforts to remedy or eliminate such Force Majeure. . Any deficiencies in deliveries or acceptance of delivery caused by Force Majeure shall not be taken into consideration for purposes of calculating damages suffered by a party as a result of the other party not shipping or accepting shipment of the Minimum Amount. In no event shall a Force Majeure be construed to relieve a party of any obligations under this Agreement solely because of increased costs or other adverse economic consequences that may be incurred by such party through performance of such obligations.

3. **LIMITATION ON LIABILITY**. Neither Seller nor Buyer shall be liable to the other for consequential, incidental, punitive, exemplary or indirect damages, lost profits, or business interruption damages, whether by statute, in tort or in contract, under any indemnity provision or otherwise.

4. **TITLE/RISK OF LOSS**. Seller warrants good title to all Pellets delivered hereunder free and clear of all claims and encumbrances. Title and risk of loss shall pass from Seller to Buyer upon delivery at the specified Delivery Point.

5. **ASSIGNMENT**. Neither party shall assign this Agreement without the prior written consent of the other party, which consent may not be unreasonably withheld or delayed.

5

6. **NO WAIVER**. Waiver of any breach of this Agreement shall not be construed as a waiver of any other breach.

7. **GOVERNING LAW**. THIS AGREEMENT SHALL BE CONSTRUED AND GOVERNED BY THE LAWS OF THE STATE OF WISCONSIN, WITHOUT GIVING EFFECT TO PRINCIPLES OF CONFLICTS OF LAW.

8. **CONFIDENTIALITY**. Each party acknowledges that this Agreement contains confidential information which would put them at a competitive disadvantage if disclosed to the public. Therefore, the terms of this Agreement shall be kept confidential by the parties, except to the extent disclosure may be required by law, regulation, or judicial or an administrative order, or to affiliated companies as necessary for the administration of this Agreement. Notwithstanding the above, in connection with the sale, disposition or financing of the Facility, Seller may disclose this Agreement to any lender, potential lender or any investor or potential investor, provided in each case that the party to whom the information is to be disclosed agrees in writing to be bound by confidentiality provisions at least as restrictive as those in this Agreement.

9. **NOTICES TO BUYER**. Notices required to be sent under this Agreement shall be in writing, shall be sent to Buyer, and shall be effective when received by mail, email or via facsimile at the address shown below:

10. **FORWARD CONTRACT**. **The parties agree that this transaction constitutes a "forward contract" and that the parties shall constitute "forward contract merchants" within the meaning of the United States Bankruptcy Code 11 U.S.C. Section 101 (25) and (26) respectively.**

11. **ARBITRATION**. All Disputes shall be exclusively, finally and conclusively settled by binding arbitration under the Rules of Arbitration of the American Arbitration Association in accordance with its Commercial Arbitration Rules (the "Arbitration Agency") then in effect (the "Rules") (except as specifically modified by this Agreement). The parties shall continue to perform their respective obligations under this Agreement pending conclusion of the arbitration. As used herein, Dispute means any disagreement, controversy or claim that arises between Vendor and Customer regarding the interpretation, fulfillment, or implementation of any provision of this Agreement, or regarding the rights and obligations of the parties (including, without limitation, the validity of the agreement of the parties to arbitrate, the arbitrability of the issues submitted to arbitration hereunder, and any conflict of laws issues in connection with this Agreement).

The arbitration shall be conducted by a single independent and impartial arbitrator (the "Arbitral Tribunal") to be appointed by the Arbitration Authority. Unless as otherwise required hereunder for a particular Dispute, the Arbitration Authority shall appoint an independent arbitrator that is generally familiar with the business which is the subject of this Agreement, and preferably has no fewer than five years of practical experience in the relevant field that is implicated by the Dispute in issue in accordance herewith. No more than 30 days after the Request for Arbitration has been delivered to the Arbitration Authority, the Arbitration Authority shall submit a list of at least five potential arbitrators to each party. Each party shall have a period of no more than 15 business days in which to register objections to any of the proposed arbitrators based upon lack of independence, lack of qualification or any other material factor which would substantially impair the arbitrator's effectiveness for the Dispute in issue. The Arbitration Authority shall then consider such objections, if any, and shall then appoint the Arbitral Tribunal no more than 60 days after the Request for Arbitration has been delivered to the Arbitration Authority. The appointment of the Arbitral Tribunal by the Arbitration Authority shall be final and binding on the parties.

6

Each party acknowledges and agrees that the other party would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms. Accordingly, pending completion of arbitration pursuant to this provision, either party shall have the right to seek a temporary restraining order, injunctive relief or other interim or provisional relief on the grounds that such relief would otherwise be available at law or in equity. If any such relief is obtained, the arbitrator will address the continuance, modification or termination of such relief, and the decision regarding such relief shall be binding on the parties.

The arbitration shall be conducted in the English language in Madison, Wisconsin. The Arbitral Tribunal conduct a hearing no later than 90 days after delivery of the Request for Arbitration, and a decision shall be rendered by the Arbitral Tribunal within 30 days after the final hearing.

At the hearing, the parties shall present such evidence and witnesses as they may choose, with or without counsel. Adherence to formal rules of evidence shall not be required, and the Arbitral Tribunal shall consider any evidence and testimony that it determines to be relevant, in accordance with procedures that it determines to be appropriate.

The arbitration award shall be in writing and shall specify the factual and legal bases for the award. Except with respect to (i) Seller's failure to ship the Minimum Amount (absent Force Majeure applicable to Seller) or (ii) Buyer's failure to pay for conforming Pellets actually received by Buyer up to the Minimum Amount (absent Force Majeure applicable to Buyer), neither party shall be entitled to, and no award shall include, any amount for, lost profits or revenues, lost business opportunities, business interruption, or punitive or exemplary damages for any claim arbitrated pursuant to this Agreement.

The Arbitral Tribunal shall be entitled to a fee commensurate with fees for professional services requiring similar time and effort in the location where the arbitration takes place. The fees of the Arbitral Tribunal and other costs of the arbitration shall be borne equally by the parties, except when the arbitrator decides to impose the total cost on the defeated party.

All decisions of the Arbitral Tribunal shall be final and binding on the parties and may be entered against them in any court of competent jurisdiction. Any judgment rendered by the Arbitral Tribunal against a party may be executed against such party's assets in any jurisdiction where the party has assets.

Each of the parties irrevocably submits to the non-exclusive jurisdiction of the appropriate courts in the country in which it has assets and in the United States in any legal action or proceeding relating to such execution of judgment.

Any Dispute brought pursuant to the terms of this provision must be brought within two years of the date that the party aggrieved by the event or condition, or notice of such event or condition giving rise to the dispute, becomes aware of the same.

7

# EXHIBIT D
# TO COMPLAINT

# ACQUISITION AGREEMENT

This ACQUISITION AGREEMENT (this "**Agreement**") is effective between the parties as of January 29, 2020, by and among **NIANTICVISTA ENERGY, LLC,** a Delaware limited liability company ("**NVE**"), **CONVERGEN ENERGY WI, LLC,** a Delaware limited liability company ("**CEW**"), and **CONVERGEN ENERGY, LLC,** a Delaware limited liability company ("**CE**"). Each of the parties to this Agreement is individually referred to herein as a "**Party**" and collectively as the "**Parties**".

## Background

WHEREAS, the Parties desire to enter into this Agreement pursuant to which NVE will acquire CEW, with CEW continuing as a wholly-owned subsidiary of NVE (the "**Acquisition**"), in accordance with this Agreement and the applicable provisions of the Delaware Limited Liability Company Act, codified in Chapter 18 of Title 6 of the Delaware Code, as the same may be amended from time to time (the "Act").

WHEREAS, the Manager and Member of NVE have unanimously approved and declared advisable the Acquisition, upon the terms and subject to the conditions set forth herein, and has determined that the Acquisition and the other transactions contemplated by this Agreement (collectively, the "**Contemplated Transactions**") are fair to, and in the best interests of, NVE and its shareholders.

WHEREAS, the members of the Management Committee of CE have unanimously approved and declared advisable the Acquisition, upon the terms and subject to the conditions set forth herein, and have determined that the Acquisition and the Contemplated Transactions are fair to, and in the best interest of CE.

WHEREAS, the parties intend that the Acquisition shall, through the binding commitments set forth in this Agreement, be effected immediately following the Closing Date (as defined below), on the terms and subject to the conditions of this Agreement and in accordance with the Act, without further approval, authorization or direction from or by any of the parties hereto;

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and intending to be legally bound hereby, the parties agree that they will carry out and consummate this Agreement pursuant to the following terms:

# ARTICLE I

## PLAN OF ACQUISITION

1.1.    The Acquisition.

On the Closing Date, as defined in Section 1.3(b) below, and subject to and upon the terms and conditions of this Agreement and the applicable provisions of the Acts, NVE will acquire all (100%) of membership interest of CEW and CEW will become a wholly owned subsidiary of NVE.

1.2.    Consideration.

(a)    Sale and Purchase of the CEW Membership Interest.  In accordance with the provisions of this Agreement, on the Closing Date, (i) CE shall sell, transfer, assign and deliver to NVE all (100%) of the membership interest of CEW (the "**CEW Interest**") in exchange for the Acquisition Consideration in accordance with Sections 1.2(b), and (ii) NVE shall purchase and acquire from CE, all (100%) of the CEW Interest.

(b)    Acquisition Consideration.  The purchase price to be paid by NVE for the CEW Interest (the "**Acquisition Consideration**") will be an amount equal to (i) $5,500,000, minus (ii) the Closing Indebtedness (as defined below), minus (iii) $377,850, the capital expenditures deduction hereby stipulated by the Parties, minus (iv) the CEW's receivables from Affiliates of CE, if any, at the Closing Date, minus (v) $50,000 for NVE's due diligence costs and expenses, plus or minus, as applicable (vi) the Working Capital Payment (as defined in Section 1.2(c)(iii) below).  NVE will pay the Acquisition Consideration in cash or other immediately available funds on the Closing Date.    For purposes of this Section 1.2(b), the term "**Closing Indebtedness**" means the sum of the outstanding principal amounts, at the Closing Date, owed by the Company under the following credit arrangements: (a) the "Term Note" in the original principal amount of $1,800,000 referenced in the Credit Agreement, dated as of January 24, 2019 (as amended on the Closing Date), entered into between the CEW, L'Anse Warden Electric Company, LLC and BMO Harris Bank N.A., (b) the State Energy Program Agreement, dated as of October 22, 2010 (as amended on November 4, 2011, December 7, 2012, January 14, 2013, January 10, 2014, March 10, 2015, September 12, 2016, October 25, 2016, May 27, 2019), entered into between the CEW and the Wisconsin Department of Commerce/Wisconsin Economic Development Corporation (which arrangement is subject to the Selective Business Security Agreement, dated May 23, 2012, entered into between the CEW and the Wisconsin Department of Commerce/Wisconsin Economic Development Corporation), (c) the Master Lease Agreement, dated November 7, 2016, between the CEW and Conger Industries Inc., (d) the Commercial Retail Installment Sale Contract, dated April 22, 2016, between the CEW and Conger Industries Inc., (e) the Loan Contract, dated April 26, 2019, between the CEW and

2

Brooks Tractor Incorporated, and (f) the Equipment Finance Agreement, dated March 16, 2018, between the CEW and Huntington Technology Finance, Inc.

(c)     Working Capital Adjustment. CEW's Target Net Working Capital shall be an amount equal to the Net Working Capital of CEW on the Base Balance Sheet of August 31, 2019 (the "**Target Net Working Capital**"). On or about January 28, 2020, but no later than close of business on January 29, 2020, CEW's financial staff shall prepare an updated balance sheet showing the **Almost Actual Closing Date Net Working Capital**, which amount will be used to adjust the Acquisition Consideration payable at Closing when compared to the Target Net Working Capital. If on the Closing Date CEW's actual Closing Date Net Working Capital (as defined below) is more or less than the Almost Actual Closing Date Net Working Capital by an amount greater than $10,000, an adjustment shall be made to the Acquisition Consideration in accordance with the following provisions:

(i)     NVE shall prepare, on an Accrual Basis consistent with CEW's past practices, a report containing a balance sheet of CEW as of the close of business on the day prior to the Closing Date (the "**Closing Balance Sheet**"), together with a statement based upon such report which: (x) states that it was prepared in accordance with this Agreement; (y) sets forth the Closing Date Net Working Capital; and (z) sets forth the Working Capital Payment (as defined below) required to be made to make the Closing Date Net Working Capital equal the Almost Actual Closing Date Net Working Capital as required under this Section (the "**Special Determination**"). NVE shall deliver a copy of the Special Determination to CE no later than six (6) months after the Closing Date.

(ii)     If CE does not agree that the Special Determination correctly states the Working Capital Payment calculation, CE shall promptly (but not later than 45 days after the delivery to CE of the Special Determination) give written notice to NVE of any exceptions thereto (in reasonable detail describing the nature of the disagreement asserted). If CE and NVE reconcile their differences, the Working Capital Payment calculation shall be adjusted accordingly and shall thereupon become binding, final and conclusive upon all of the parties hereto. If the dispute relates to an accounting issue, and if CE and NVE are unable to reconcile their differences in writing within 20 days after written notice of exceptions is delivered to NVE (the "**Reconciliation Period**"), the accounting item(s) in dispute shall be submitted to a mutually acceptable accounting firm (the "**Independent Auditors**") for final determination. The Working Capital Payment calculation shall be deemed adjusted in accordance with the determination of the Independent Auditors and shall become binding, final and conclusive upon all of the parties hereto. The Independent Auditors shall consider only the accounting item(s) in dispute and shall be instructed to act within 20 days (or such longer period as CE and NVE may agree) to resolve all accounting item(s) in dispute. If the dispute involves a non-accounting issue and such dispute is not reconciled within the Reconciliation Period, the dispute shall be settled by arbitration in accordance with Section 9.7 of this Agreement. If CE does not give written notice of any exception within 45 days after the delivery to CE of the Special Determination or if CE gives written notification of their acceptance of the Working Capital Payment prior to the end of such

3

45-day period, the Working Capital Payment calculation set forth in the Special Determination shall thereupon become binding, final and conclusive upon all the parties hereto.

(iii)     If the Special Determination reveals that the Closing Date Net Working Capital was less than the Almost Actual Closing Date Net Working Capital by more than $10,000, as finally determined pursuant to the procedures set forth above, CE shall pay NVE the amount by which the Closing Date Net Working Capital is less than the Almost Actual Closing Date Net Working Capital. If the Closing Date Net Working Capital is greater than the Almost Actual Closing Date Net Working Capital by more than $10,000, as finally determined pursuant to the procedures set forth above, NVE shall pay CE the difference between the Closing Date Net Working Capital and the Almost Actual Closing Date Net Working Capital. Any amount paid pursuant to this Section shall be referred to as the "**Working Capital Payment**".

The term "**Closing Date Net Working Capital**" shall mean CEW's actual current assets (including, accounts receivable and prepaid current expenses but excluding cash and cash equivalents), less current liabilities (including, but not limited to, accounts payable, accrued credit card debt, accrued lease expenses and deferred revenue but excluding interest-bearing debt) as of the effective date of the Acquisition immediately prior to the Closing, which determination shall be made within 120 days thereafter, as set forth in the following paragraphs.

1.3.   Timing.

(a)     Member Approval. The Manager and Members of NVE and the management committee of CE have unanimously approved and consented to the execution of, this Agreement and the Contemplated Transactions, as conclusively evidenced by their execution hereof.

(b)     Closing Date. The parties shall hold a closing (the "**Closing**") on a mutually agreeable date (the "**Closing Date**") no later than the fifth business day after the satisfaction or waiver of the conditions set forth in Article V and Article VI of this Agreement, at 10:00 A.M., local time, at the offices of Clemente Mueller P.A., 222 Ridgedale Avenue, Cedar Knolls, NJ 07927, or at such other place or time as the Parties agree upon. The legal effective date of the Acquisition shall be the Closing Date, which is targeted to be on or about January 31, 2020.

1.4.   Certificate of Formation. Operating Agreement, and Officers of CEW.

(a)     The Certificate of Formation of CEW in effect immediately prior to the Closing Date shall remain in effect as the Certificate of Formation of CEW after the Closing Date. The Operating Agreement of CEW after the Closing Date shall be in the form attached hereto as Exhibit E.

(b)     The Manager and Sole Officer of CEW after the Closing Date shall be Gregory Merle.

4

## ARTICLE II

### REPRESENTATIONS AND WARRANTIES OF THE CE

In order to induce NVE to enter into this Agreement and consummate the Contemplated Transactions, CE hereby make to NVE the representations and warranties contained in this Article II. Such representations and warranties are subject to the qualifications and exceptions set forth in the disclosure schedule delivered to NVE pursuant to this Agreement (the "**Disclosure Schedule**"). The Disclosure Schedule will be arranged to correspond to the representations and warranties in Article II of this Agreement, and the disclosure in any portion of the Disclosure Schedule will qualify the corresponding provision in Article II and any other provision of Article II to which it is reasonably apparent on its face that such disclosure relates.

2.1    Organization, Powers and Qualifications. CEW is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and is duly qualified as a foreign entity in the State of Wisconsin; and (ii) in each jurisdiction in which the failure to be so duly qualified or registered has had, or could reasonably be expected to have, an CEW Material Adverse Effect, as such term is defined in Exhibit A. CEW has all required corporate power and authority to carry on its Business as presently conducted, to enter into and perform this Agreement and the agreements contemplated hereby to which it is a party and to carry out the Contemplated Transactions. The copies of the Certificate of Formation, certified by the Secretary of State of the State of Delaware, and the Operating Agreement of CEW, certified by CE, have been furnished to NVE by CE, are correct and complete as of the date hereof, and CEW is not in violation of any material term of its Certificate of Formation or Operating Agreement (together, the "**Organizational Documents**").

2.2    Authorization and Non-Contravention.

(a)    This Agreement and all agreements, documents and instruments executed and delivered by CE pursuant hereto are valid and binding obligations of CE, enforceable in accordance with their respective terms. The execution, delivery and performance of this Agreement by CE and all agreements, documents and instruments executed and delivered by CE pursuant hereto, have been duly authorized by all necessary corporate or other action of CE.

(b)    Except as set forth in Section 2.2(b) of the Disclosure Schedule, the execution and delivery of this Agreement and all agreements, documents and instruments executed and delivered by CEW and CE pursuant hereto, and the performance of the Contemplated Transactions, do not and will not: (i) violate or result in a violation of, conflict with or constitute or result in a default (whether after the giving of notice, lapse of time or both) or loss of benefit under any contract or obligation to which CEW is a party or by which its assets are bound, or any provision of the Organizational Documents, or cause the creation of any all liens, claims, options, charges, pledges, security interests, deeds of trust, voting agreements, voting trusts, encumbrances, rights or restrictions of any nature upon any of the assets of CEW; (ii) to the best of CE's Knowledge violate, conflict with or result in a violation of, or constitute a default

5

(whether after the giving of notice, lapse of time or both) under, any provision of any law, regulation or rule, or any order of, or any restriction imposed by, any court or Government Authority applicable to CEW; (iii) require from CEW any notice to, declaration or filing with, or consent or approval of any Government Authority or other third party; or (iv) violate or result in a violation of, or constitute a default (whether after the giving of notice, lapse of time or both) under, accelerate any obligation under, or give rise to a right of termination of, any agreement, permit, license or authorization to which CEW is a party or by which CEW is bound, which has not been waived in writing.

2.3    Corporate Authority and Records. As of the Closing Date, the corporate records of CEW will accurately reflect proper authority for all corporate actions taken by its Member and Manager. The corporate records of CEW, as delivered to NVE, are either originals or true and complete copies of the originals of such documents.

2.4    Capitalization.

(a)      As of the date hereof, CE owns the CEW Interest. The CEW Interest represents one-hundred (100%) percent of membership interest of CEW. Except as otherwise set forth in Section 2.4 of the Disclosure Schedule, the CEW Interest is owned by CE free and clear of all encumbrances whatsoever. The CEW Interest was issued in compliance with Applicable Laws. The CEW Interest was not issued in violation of the Organizational Documents, or any other agreement, arrangement or commitment to which CEW is a party or is otherwise bound.

(b)      Except as otherwise set forth in Section 2.4 of the Disclosure Schedule, there are no existing voting trusts, proxies, subscriptions, options, warrants, calls, commitments, agreements, plans, conversion rights or other rights of any character (contingent or otherwise) providing for the issuance, sale, purchase, redemption, transfer, voting or registration, at any time, or upon the happening of any stated event, of any CEW Interest, whether or not presently issued or outstanding.

2.5    Subsidiaries; Investments. CEW does not own or control, directly or indirectly, any interest in any other corporation, partnership, limited liability company, association or other business entity that materially affects the Business. Except as disclosed in Section 2.5 of the Disclosure Schedule, CEW does not have any outstanding loan or advance to or from, any Person including, without limitation, any Manager, Officer or CE.

2.6    Financial Statements; Projections.

(a)      CEW has previously furnished to NVE copies of the following financial statements: (i) CEW's unaudited balance sheets as of August 31, 2019 (the "**Base Balance Sheet**"), December 31, 2019, December 31, 2018 and December 31, 2017 and the related unaudited statements of income, retained earnings and cash flows for the fiscal years then ended, and (ii) CEW's projected budget for 2020. Such financial statements were prepared on an accrual basis method of accounting ("**Accrual Basis**" applied on a consistent basis, and are

6

consistent in all material respects with the books and records of CEW and fairly present in all material respects the financial position of CEW as of the dates thereof and the results of operations and cash flows of CEW for the periods shown therein, subject to normal and recurring year-end adjustments in the case of any such financial statements that are unaudited; provided, however, that any such normal and recurring year-end adjustments will not result in a material adverse effect on the financial results, results of operations and/or cash flows reported in such unaudited financial statements. Nothing has come to the attention of CE since such respective dates that would indicate that such financial statements are not true and correct in all material respects as of the date thereof.

(b)      The 24-month projections provided by CE are reasonable good faith estimates of the performance of CEW for the periods stated therein based upon assumptions which were believed to be reasonable when made and continue to be reasonable as of the date hereof; provided, however, that the foregoing is not a guarantee that such projections will be achieved.

(c)      CEW maintains a system of accounting controls sufficient to provide reasonable assurances that: (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary to permit preparation of financial statements on an Accrual Basis and to maintain accountability for assets; and (iii) access to assets is permitted only in accordance with management's specific or general authorization.

(d)      CEW has not received any written correspondence from any independent accounting firm that has conducted a review of the financial statements for CEW that identifies any "material weakness" or "significant deficiency" with respect to the accounting practices, procedures or policies of, or internal accounting controls employed by CEW.

2.7      Absence of Undisclosed Liabilities.      CEW does not have any material debts or obligations of any nature, whether accrued, absolute, contingent, asserted, un-asserted or otherwise, except liabilities or obligations: (i) stated or adequately reserved against in the Base Balance Sheet or the notes to the related financial statements; or (ii) as set forth in Section 2.7 of the Disclosure Schedule.

2.8      Absence of Certain Developments.  Since the date of the Base Balance Sheet, CEW has conducted its business only in the ordinary course consistent with past practice and, except as set forth in Section 2.8 of the Disclosure Schedule, there has not been:

(a)      any change in the assets, liabilities, condition (financial or other), properties, business, operations or prospects of CEW, which change by itself or in conjunction with other such changes, whether or not arising in the ordinary course of business, has had or could be reasonably expected to have an CEW Material Adverse Effect;

(b)      any mortgage, lien or other encumbrance placed on any of the properties of CEW, other than purchase money liens and liens for Taxes not yet due and payable;

7

(c)     any purchase, sale or other disposition, or any agreement or other arrangement for the purchase, sale or other disposition, of any properties or assets by CEW, including any CEW Intellectual Property Assets (as defined below), involving the payment or receipt of more than $10,000;

(d)     any damage, destruction or loss, whether or not covered by insurance, that has had or could be reasonably expected to have a CEW Material Adverse Effect;

(e)     any direct or indirect redemption, purchase or other acquisition by CEW of any of CEW Interest;

(f)     any claim of unfair labor practices involving CEW, any change in the compensation payable or to become payable by CEW to any of its officers or employees other than normal merit increases to employees consistent with past practices, or any bonus payment or arrangement made to or with any of such officers or employees or any establishment or creation of any employment, deferred compensation or severance arrangement or employee benefit plan with respect to such persons or the amendment of any of the foregoing;

(g)     any resignation, termination or removal of any officer of CEW or material loss of personnel of CEW or material change in the terms and conditions of the employment of CEW's officers or key personnel;

(h)     any payment or discharge of a material lien or liability of CEW which was not shown on the unaudited balance sheet of CEW as of the date of the Base Balance Sheet or incurred in the ordinary course of business thereafter;

(i)     any contingent liability incurred by CEW as guarantor or otherwise with respect to the obligations of others or any cancellation of any material debt or claim owing to, or waiver of any material right of CEW, including any write-off or compromise of any accounts receivable other than in the ordinary course of business consistent with past practice;

(j)     any obligation or liability incurred by CEW to CE or CE's employees, or any loans or advances made by CEW to CE or CE's employees, except normal compensation and expense allowances payable to CE or employees in the ordinary course of business;

(k)     any change in accounting methods or practices, collection policies, pricing policies or payment policies of CEW;

(l)     to the best of CE's Knowledge, there are no known losses, or any known development that could reasonably be expected to result in a loss, of any significant supplier, customer, distributor or account of CEW; and neither CEW nor CE has received written notice from such supplier, customer, distributor or account of its intention to terminate, or change in a material and negative way, its relationship with CEW;

8

(m)    any amendment or termination of any Material Contract or agreement to which CEW is a party or by which it is bound, other than any expiration of any such contract or agreement in accordance with its terms;

(n)    any arrangements relating to any royalty or similar payment based on the revenues, profits or sales volume of CEW, whether as part of the terms of CEW's capital structure or by any separate agreement;

(o)    any transaction or agreement involving fixed price terms or fixed volume arrangements other than in the ordinary course of business;

(p)    any other material transaction entered into by CEW other than transactions in the ordinary course of business;

(q)    any amendment to CEW's Organizational Documents;

(r)    Except as otherwise set forth in Section 2.8 of the Disclosure Schedule, any agreement or understanding whether in writing or otherwise, for CEW to take any of the actions specified in paragraphs (a) through (q) above.

Notwithstanding the foregoing, the Parties acknowledge that, on or before the Closing Date, CEW anticipates making distributions to CE representing all cash and cash equivalents available to CEW prior to the Closing Date. For purposes of computing CEW's Closing Date Net Working Capital, such distributions shall be deemed to have been made prior to the Closing Date.

2.9    Accounts Receivable; Accounts Payable.

(a)    To CE's Knowledge all of the accounts receivable of CEW are valid and enforceable claims, are subject to no set-off or counterclaim other than in the ordinary course of business, and are fully collectible in the ordinary course of business, after deducting the reserve for doubtful accounts stated in the Base Balance Sheet. Since the date of the Base Balance Sheet, CEW has collected its accounts receivable in the ordinary course of its business consistent with past practices and has not accelerated any such collections. CEW does not have any accounts receivable or loans receivable from CE or CE's employees.

(b)    To CE's Knowledge, all accounts payable and notes payable of CEW arose in bona fide arm's length transactions in the ordinary course of business and no such account payable or note payable is delinquent in its payment. Since the date of the Base Balance Sheet, CEW has paid its accounts payable in the ordinary course of its business consistent with its past practices. CEW has no account payable to any Person which is affiliated with it or any of its CE or CE's employees that are outside the ordinary course of business or inconsistent with past practices.

9

2.10    Transactions with Affiliates.    There are no loans, leases or other agreements or transactions between CEW and: (a) any present or former member, director, officer or employee of CEW; (b) to CE's Actual Knowledge, any Affiliate of such member, director, officer, or employee; or (c) to CE's Actual Knowledge, any person controlled by such member, director, officer, or employee, or Affiliate of the foregoing. No Member or employee of CEW, or, to CE's Actual Knowledge, any of their respective Affiliates, owns directly or indirectly, on an individual or joint basis, any interest in, or serves as an officer or director or in another similar capacity of, any competitor, customer or supplier of CEW, or any organization which has a Material Contract or arrangement with CEW.

2.11. Supply Agreement and Transition Services Agreement.    Except as set forth in the Supply Agreement and Transition Services Agreement (as such terms are defined in Section 5.9 hereof), there shall be no intercompany transactions after the Closing Date between CEW and CE or any Affiliate of CE.

2.12    Properties.    Except as otherwise reflected in Section 2.12 of the Disclosure Schedule, CEW has good, valid and (if applicable) marketable title to, or a valid leasehold in, all assets material to the Business and to those assets reflected on the Base Balance Sheet or acquired by it after the date thereof (except for properties disposed of since that date in the ordinary course of business), in each case free and clear of encumbrances, except for liens for Taxes (as hereinafter defined) not yet due and payable, and minor liens and encumbrances that do not materially detract from the value of the property subject thereto or impair the operations of CEW.

2.13    Tax Matters.

(a)    CEW is a disregarded entity. As such, prior to the Closing Date income tax returns relating to CEW's Business have been included as part of the consolidated tax return filed by CEW's indirect parent, First North American Holdings II, Inc.  CEW has timely and properly filed all federal, state, local and foreign Tax Returns required to be filed by it through the date hereof, and all such Tax Returns are true, correct and complete in all material respects. CEW has paid or caused to be paid all federal, state, local, foreign and other taxes, including without limitation, income taxes, estimated taxes, alternative minimum taxes, excise taxes, sales and use taxes, franchise taxes, employment and payroll related taxes, withholding taxes, transfer taxes, and all deficiencies or other additions to tax, interest, fines and penalties owed by it (collectively, "**Taxes**"), required to be paid by it through the date hereof whether disputed or not and whether or not on an Tax Return, except Taxes which have not yet accrued or otherwise become due.  Since the date of the Base Balance Sheet, CEW has not, to CE's Knowledge, incurred any Taxes other than in the ordinary course of business.    All Taxes and other assessments and levies which CEW was or is required to withhold or collect have been withheld and collected and have been paid over to the proper Government Authorities.  CEW has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to any Tax payment, assessment, deficiency or collection.

10

(b)     (i) during the period CE has owned CEW, CEW has not received notice of any audit or of any proposed deficiencies from the Internal Revenue Service (the "**IRS**") or any other taxing authority (other than routine audits undertaken in the ordinary course and which have been resolved on or prior to the date hereof); (ii) to CE's Knowledge, neither the IRS nor any other taxing authority is now asserting or threatening to assert against CEW any deficiency or claim for additional Taxes or interest thereon or penalties in connection therewith; (iii) CEW does not have any liability for Taxes of any other Person under Treasury Regulations § 1.1502-6 (or any similar provision of foreign, state or local law) as a transferee or successor, by contract or otherwise; and (iv) CEW has not filed a consent under Section 341(f) of the Code concerning collapsible corporations.

(c)     During the period CE has owned CEW, CEW has not been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code.

(d)     The taxable year of CEW for federal and state income tax purposes is the calendar year ending December 31st.

(e)     During the period CE has owned CEW, CEW has not been (i) a passive foreign investment company, (ii) a foreign personal holding company, (iii) a foreign sales corporation, (iv) a foreign investment company, or (v) a person other than a United States person, each within the meaning of the Code.

(f)     No claim has been made by a Government Authority in a jurisdiction where CEW does not currently file Tax Returns that such filings may be required or that CEW is or may be subject to taxation by that jurisdiction.

(g)     CEW has been an accrual method taxpayer for all tax purposes during the period CE has owned CEW.

(h)     To CE's Knowledge, there is no power of attorney in effect or binding upon CEW with respect to Taxes for any period for which the statute of limitations (including any waivers or extensions) has not yet expired.

(i)     During the period CE has owned CEW, CEW has not been a party to any "tax shelter" within the meaning of Section 6662(d)(2)(C)(ii) of the Code or any "reportable transaction" within the meaning of Treasury Regulations Section 1.6011 4(b), or has otherwise made or been required to make a filing with respect to any such transaction.

(j)     There are no private letter rulings, determination letters, closing agreements, assessments, notices of deficiency and any other similar correspondence issued by or received from the IRS or any other Government Authority with respect to Tax matters relating to the Business, except as set forth in Section 2.13(j) of the Disclosure Schedule.

11

(k)     All material transactions entered into by CEW with Affiliates reflect arm's length terms.

(l)     To CE's Knowledge, CEW will not be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any:

(i)     change in method of accounting for a taxable period ending on or prior to the Closing Date;

(ii)     "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state, local or foreign income Tax law) executed on or prior to the Closing Date;

(iii)     intercompany transactions, except as otherwise set forth in Section 2.12(l)(iii) of the Disclosure Schedule;

(iv)     installment sale or open transaction disposition made on or prior to the Closing Date;

(v)     prepaid amount received on or prior to the Closing Date; or

(vi)     any similar election, action, or agreement that would have the effect of deferring any liability for Taxes of CEW or any Subsidiary, if any, from any taxable period ending on or before the Closing Date to any taxable period ending after such date.

(m)     Since the date of the Base Balance Sheet, CEW has not: (i) made, changed, or revoked any Tax or accounting election (including any change to the annual accounting period or any change or adoption of any accounting method); (ii) settled any action in respect of Taxes; (iii) entered into any contractual obligation in respect of Taxes with any taxing authority; (iv) surrendered any right to claim a Tax refund; or (v) agreed, committed, arranged or entered into any contract to do any of the foregoing.

(n)     For purposes of this Agreement, **"Tax Return"** (and, with correlative meaning, **"Tax Returns"**) means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(o)     If any realty transfer tax in connection with this transaction, such taxes shall be paid for or provided for at Closing by CE.

2.14    Certain Contracts and Arrangements.

12

(a)     Except as set forth in Section 2.14 of the Disclosure Schedule (with true and correct copies of each agreement referred to therein provided to and made available for review by NVE), CEW is not currently a party or subject to or bound by:

(i)     any contract or agreement under which the aggregate payments or receipts for the past twelve (12) months, or for the following twelve (12) months is expected to exceed, $25,000 (a "**Material Contract**");

(ii)     any Material Contract which is not cancelable by CEW without penalty on not less than ninety (90) days' notice;

(iii)     any contract containing covenants directly or explicitly limiting in any respect the right of CEW to compete in any line of business or with any Person;

(iv)     any contract or agreement relating to the licensing, distribution, development, purchase, sale or servicing of its Products except in the ordinary course of business consistent with past practices or relating to any CEW Intellectual Property Assets;

(v)     any indenture, mortgage, promissory note, loan agreement, guaranty or other agreement or commitment for borrowing or any pledge or security arrangement;

(vi)     any membership redemption or purchase agreements or other agreements affecting or relating to membership interest of CEW, including, without limitation, any agreement with any member which includes voting arrangements, operating covenants or similar provisions;

(vii)     any pension, profit sharing, retirement or stock option plans;

(viii)     any royalty, dividend or similar arrangement based on the revenues or profits of CEW or any contract or agreement involving so called "most favored customer" arrangements;

(ix)     any joint venture, partnership, manufacturer, development or supply agreement or other agreement which involves a sharing by CEW of revenues or profits or losses, costs or liabilities with any other Person;

(x)     any acquisition, merger or similar agreement;

(xi)     any collective bargaining agreement or other agreement with any labor union or other employee representative of a group of employees;

(xii)     any contract with any Government Authority;

(xiii)     any contract relating to the guarantee (whether absolute or contingent) by CEW of (i) the performance of any other Person (other than CEW) or (ii) the whole or any part of the indebtedness or liabilities of any other Person (other than CEW);

13

(xiv) any contract that provides for post-employment or post-consulting liabilities or obligations, including severance pay;

(xv)  any contract under which payments or obligations will be increased, accelerated or vested by occurrence (whether alone or in conjunction with any other event) of any of the Contemplated Transactions, including the Acquisition, or under which the value of the payments or obligations will be calculated on the basis of any of the Contemplated Transactions, including the Acquisition, whether pursuant to a change in control or otherwise;

(xvi)  any contract relating to the indemnification by CEW of CE, managers or agents;

(xvii)  any Material Contract of indemnification or guaranty;

(xviii)  any power of attorney authorizing the incurrence of an obligation on the part of CEW; or

(xix)  any contract not executed in the ordinary course of business

Each contract of the type described in this Section 2.14(a) is referred to herein as a "**CEW Contract**".

(b)     An accurate and complete copy of each CEW Contract (including all amendments thereto) has been made available to NVE.

(c)     Neither CEW nor, to CE's Knowledge, any other party to an CEW Contract is in material breach, violation or default thereunder, or has received written notice that it has breached, violated or defaulted under (nor, to the Knowledge of CE, does there exist any condition under which, with the passage of time or the giving of notice or both, would reasonably be expected to cause such a breach, violation or default under), any CEW Contract material to the operation of the Business.

(d)     Each CEW Contract is a valid, binding and enforceable obligation of CEW and, to the Knowledge of CE, of the other party or parties thereto, in accordance with its terms and is in full force and effect, in each case except to the extent enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally or by general equitable principles or by principles of good faith and fair dealing (regardless of whether enforcement is sought in equity or at law).

2.15   Intellectual Property.

(a)     Section 2.15 of the Disclosure Schedule contains a complete and accurate list of all: (i) Patents owned by CEW or otherwise used or held for use by CEW in the Business ("**CEW Patents**"), registered and material unregistered Marks owned by CEW or otherwise used or held for use by CEW in the Business ("**CEW Marks**") and registered and material

14

unregistered copyrights owned by CEW or otherwise used or held for use by CEW in the Business ("**CEW Copyrights**"), (ii) **Proprietary Software**, (iii) licenses, sublicenses or other agreements under which CEW is granted rights by others in CEW Intellectual Property Assets (other than commercial off-the-shelf software which is made available for a total cost of less than $2,000) ("**Licenses In**"), (iv) licenses, sublicenses or other agreements under which CEW has granted rights to others in CEW Intellectual Property Assets ("**Licenses Out**"); (v) **Products**; and (vi) social media accounts, websites, portals, and databases ("**CEW Accounts**").

(b)     Except as set forth on Section 2.15 of the Disclosure Schedule:

(i)     CEW exclusively owns or possesses adequate and enforceable rights to use, without payment to a third party, all of the Intellectual Property Assets necessary for the operation of the Business, free and clear of all mortgages, pledges, charges, liens, equities, security interests, or other encumbrances or similar agreements. CEW has the right, power and authority to grant rights, title and interest in CEW Intellectual Property Assets granted in this Agreement. CEW exclusively owns the "Convergen Energy" name, and convergenenergy.com domain, which will transfer with it as part of this transaction. CE can continue to use the Convergen Energy name (but not domain) for 6 months after Closing at which point it will to cease using the name.

(ii)     all CEW Patents, CEW Marks and CEW Copyrights which have been issued by or registered with, as applicable, the U.S. Patent and Trademark Office, the U.S. Copyright Office or in any similar office or agency anywhere in the world, are currently in compliance with formal legal requirements (including without limitation, as applicable, payment of filing, examination and maintenance fees, proofs of working or use, timely post-registration filing of affidavits of use and incontestability and renewal applications) and, to CE's Knowledge, are valid and enforceable;

(iii)     there are no pending, or, to CE's Knowledge, threatened claims against CEW or any of its CE, managers, officers or employees alleging that any use of CEW Intellectual Property Assets or the operation of the Business, infringes or conflicts with the rights of others ("**Third Party IP**") or constitutes a misappropriation of any subject matter of any Third Party IP or that any of CEW Intellectual Property Assets is invalid or unenforceable;

(iv)     to CE's Knowledge, neither the operation of the Business, nor any activity by CEW, nor manufacture, use, importation, offer for sale and/or sale of any Intellectual Property Assets infringes or violates (or in the past infringed or violated) any Third Party IP or constitutes a misappropriation of (or in the past constituted a misappropriation of) any subject matter of any Third Party Right;

(v)     CEW does not have any obligation to compensate any person for the use of any Intellectual Property Assets; CEW has not entered into any agreement to indemnify any other person against any claim of infringement or misappropriation of any Intellectual Property Assets; there are no settlements, covenants not to sue, consents, judgments, or orders or similar

15

obligations that: (A) restrict CEW's rights to use any Intellectual Property Asset; (B) restrict the Business, in order to accommodate any Third Party IP; or (C) permit third parties to use any CEW Intellectual Property Assets(s) other than in the ordinary course of the Business;

(vi)     all former and current employees, consultants, and independent contractors of CEW that have invented or created any CEW Intellectual Property Assets have executed written instruments with CEW that assign to CEW all rights, title and interest in and to any and all: (A) inventions, improvements, discoveries, writings, and other works of authorship, and information developed or conceived in the course of their employment or engagement with CEW, except to the extent any such failure to so perform would not reasonably be expected to have an CEW Material Adverse Effect; and (B) applicable Intellectual Property Assets relating thereto, and in each case where an CEW Patent is held by CEW by assignment, the assignment has been duly recorded with the U.S. Patent and Trademark Office and all similar offices and agencies anywhere in the world in which foreign counterparts are registered or issued;

(vii)     to CE's Actual Knowledge, there is not, nor has there been any, infringement, violation or misappropriation by any Person of any of CEW Intellectual Property Assets or the subject matter thereof or CEW's rights therein;

(viii)     CEW has taken commercially reasonable steps and security measures to protect the secrecy, confidentiality and value of all Trade Secrets used in the Business (the "**CEW Trade Secrets**") and Intellectual Property Assets, including but not limited to, ensuring that all employees, contractors and agents and other persons having access to CEW Trade Secrets and Intellectual Property Assets have executed valid confidentiality and assignment of invention agreements or similar agreements or contracts, copies or forms of which have been provided to NVE, and (A) there has been no misappropriation of any material trade secrets or other material confidential CEW Intellectual Property Assets by any Person; (B) no employee, independent contractor or agent of any of the Sellers has misappropriated any trade secrets of any other Person in the course of his performance as an employee, independent contractor or agent of CEW; and (C) no current or former employee, independent contractor or agent of CEW is in default or breach of any term of any employment agreement, non-disclosure agreement, non-compete obligation, assignment of invention agreement or similar agreement or contract relating in any way to the protection, ownership, development, use or transfer of CEW Intellectual Property Assets;

(ix)     the Proprietary Software and each Product perform in accordance with its documented specifications, except to the extent any such failure to so perform would not reasonably be expected to have a CEW Material Adverse Effect;

(x)     (A) CEW is in actual possession of and has exclusive control over a complete and correct copy of the source code for all proprietary components of the Proprietary Software and the Products, including all previous major releases; (B) the source code for all software developed by CEW has been documented; (C) CEW has not granted to any Person, directly or indirectly, any current or contingent rights, licenses or interests in or to the source

16

code of any of the software created by CEW or used by CEW in the conduct of the Business; (D) since the time of development of such source code, CEW has not provided or disclosed such source code to any Person; (E) Section 2.14(b)(x) of the Disclosure Schedule identifies each agreement pursuant to which CEW is or may be required to deposit, with an escrow agent or any other Person any Proprietary Software or Product source code, and further describes whether the execution of this Agreement or the consummation of the Contemplated Transactions, in and of itself, would reasonably be expected to result in the release from escrow of any such source code; (F) to CE's Knowledge, as of the date hereof, there has been no unauthorized theft, reverse engineering, decompiling, disassembling, or other unauthorized disclosure of or access to any source code; (G) none of the Proprietary Software nor Products contain, incorporate, link or call to or otherwise use any software (in source or object code form) licensed from another party under a license commonly referred to as an open source, free software, copyleft or community source code license (including but not limited to any library or code licensed under the GNU General Public License, GNU Lesser General Public License, Apache Software License, or any other public source code license arrangement) (collectively "**Open Source**"); and (H) CEW has not embedded any Open Source, copy left or community source code in any of its Proprietary Software or Products, including but not limited to any license arrangement that would require CEW to (xx) make any public disclosure or to make available any source code or other Intellectual Property Assets either used, developed, or modified by CEW or (yy) grant licensees rights under the Proprietary Software or other CEW Intellectual Property Assets or that contains other provisions that relinquish or compromise any Intellectual Property Assets or (zz) violates any Intellectual Property Agreements.

(xi)     all Proprietary Software and Products: (A) comply with all Applicable Laws and industry standards, including with respect to security; and (B) conform to all applicable contractual commitments, express and implied warranties (to the extent not subject to legally effective express exclusions thereof), representations and claims in packaging, labeling, advertising, and marketing materials, and applicable specifications, user manuals, training materials and other documentation.

(xii)     neither the Proprietary Software nor the Products contain any substantial bug, defect, or error that materially adversely affects, or could reasonably be expected to adversely affect, the value, functionality, or performance of such Proprietary Software or Products.

(xiii)     neither the Proprietary Software nor the Products or any other software used in or in connection with the operation of the Business, contain any, and CEW has taken commercially reasonable steps to prevent the introduction of, a "time bomb," "Trojan horse," "back door," "worm," virus, malware, spyware, or other device or code (collectively, "**Malicious Code**") into the Proprietary Software or Products.

(xiv) (A) the IT Systems are reasonably sufficient for the immediate needs of the Business, including as to capacity, scalability, and ability to process current and anticipated peak volumes in a timely manner; (B) the IT Systems are in sufficiently good working condition to

17

perform all information technology operations, include sufficient licensed capacity (whether in terms of authorized sites, units, users, seats, or otherwise) for all software, in each case as necessary for the conduct of the Business as currently conducted, and have been used and maintained substantially in accordance with their manufacturer's requirements, if any, as specified in the documentation for same and applicable insurance policies; (C) without limiting the foregoing, CEW owns or licenses the right to use all software development tools, library functions, or compilers used by CEW to provide, create, modify, compile, or support any Proprietary Software or Products; and (D) without limiting the foregoing, as of the Closing Date, CEW will own or license the right to use all software used in connection with the Proprietary Software and Products.

(xv)      in the last thirty-six (36) months, there has been no known or suspected unauthorized access, use, intrusion, or breach of security, or material failure, breakdown, performance reduction or other adverse event affecting the IT Systems, that has caused or could reasonably be expected to cause any: (A) substantial disruption of or interruption in or to the use of such IT Systems or the conduct of the Business; (B) loss, destruction, damage, or harm of or to CEW or its operations, personnel, property, or other assets; or (C) liability of any kind to CEW. CEW has taken all reasonable actions, consistent with applicable industry best practices, to protect the integrity and security of the IT Systems and the data and other information stored or processed thereon.

(xvi)     CEW has delivered or made available to NVE correct and complete copies of all agreements relating to Licenses In or Licenses Out (together, "**Intellectual Property Agreements**") to which CEW or CE is a party, except "shrink-wrapped" or "off-the-shelf" software that is readily available to the public. With respect to each such Intellectual Property Agreement: (A) such Intellectual Property Agreement is valid and binding on CEW, is in full force and effect and, together with the related invoices, represent the entire agreement between the respective parties with respect to the subject matter of such Intellectual Property Agreement; (B) assuming the receipt or making of all necessary consents, approvals, waivers, authorizations, novations, notices and filings in connection with the Contemplated Transactions, such Intellectual Property Agreement will not cease to be valid and binding and in full force and effect on terms identical to those currently in effect as a result of the consummation of the Contemplated Transactions, nor will the consummation of the Contemplated Transactions constitute a breach or default under such Intellectual Property Agreement or otherwise give a party a right to terminate such Intellectual Property Agreement; (C) CEW has not (i) received any notice of termination or cancellation under such Intellectual Property Agreement, (ii) received any notice of a breach or default under such Intellectual Property Agreement, which breach has not been cured, or (iii) granted to any other third party any rights, adverse or otherwise, under such Intellectual Property Agreement that would constitute a breach of such Intellectual Property Agreement; and (D) assuming the receipt or making of all necessary consents, approvals, waivers, authorizations, novations, notices and filings in connection with the Contemplated Transactions, neither CEW nor, to CE's Knowledge, any other party to such Intellectual Property Agreement is in breach or default in any material respect under an

18

Intellectual Property Agreement and, to CE's Knowledge, no event has occurred that, with notice or lapse of time would constitute such a breach or default or permit termination, modification or acceleration under such Intellectual Property Agreement.

(xvii)   CEW has not entered into any agreements with the United States government (or any of its agencies) pursuant to which CEW or any its employees are required to assign any CEW Intellectual Property Assets rights in favor of such government or agency.

(xviii)  (A) CEW maintains commercially reasonable backup and data recovery, disaster recovery, and business continuity plans, procedures, and facilities; (B) acts in compliance therewith; and (C) tests such plans and procedures on a regular basis, and such plans and procedures have been proven reasonably effective by such tests.

(c)     For purposes of this Agreement,

(i)      "**Business**" means the business of CEW as conducted immediately prior to the Closing Date.

(ii)     "**CEW Intellectual Property Assets**" means all Intellectual Property Assets owned by CEW or used or held for use by CEW in the Business, including without limitation CEW Patents, CEW Marks, CEW Copyrights, CEW Trade Secrets, CEW Accounts, Proprietary Software and Products.

(iii)    "**Intellectual Property Assets**" means any and all of the following, as they exist throughout the world: (A) patents, patent applications of any kind, patent rights, inventions, discoveries and invention disclosures (whether or not patented) (collectively, "**Patents**"); (B) rights in registered and unregistered trademarks, service marks, trade names, trade dress, logos, packaging design, slogans and Internet domain names, and registrations and applications for registration of any of the foregoing (collectively, "**Marks**"); (C) copyrights in both published and unpublished works, including without limitation all compilations, databases and computer programs, software, manuals and other documentation and all copyright registrations and applications, and all derivatives, translations, adaptations and combinations of the above (collectively, "**Copyrights**"); (D) rights in know-how, trade secrets, confidential or proprietary information, research in progress, algorithms, data, designs, processes, formulae, drawings, schematics, blueprints, flow charts, models, strategies, prototypes, techniques, Beta testing procedures and Beta testing results (collectively, "**Trade Secrets**"); (E) any and all other intellectual property rights and/or proprietary rights relating to any of the foregoing; and (F) goodwill, franchises, licenses, permits, consents, approvals, and claims of infringement and misappropriation against third parties.

(iv)     "**IT Systems**" means all personal property, equipment and physical or electronic media relating to communications and computer systems, including computer hardware, networks and peripherals.

19

(v)     "**Products**" means those services and hardware and software products, including related documentation, currently or previously researched, designed, developed, manufactured, marketed, sold, distributed, licensed, performed or otherwise made available by CEW in connection with the Business.

(vi)     "**Proprietary Software**" means all proprietary software developed and owned CEW, including all new versions, updates, revisions, improvements, and modifications thereof, whether in source code, object code, or executable code format, including systems software, application software (including mobile apps), firmware, middleware, programming tools, scripts, routines, interfaces, libraries, and databases, and all related specifications and documentation, including developer notes, comments and annotations, user manuals, and training materials relating to any of the foregoing.

2.16   Litigation. CEW has not received notice of any pending litigation or governmental or administrative proceeding or investigation. To CE's Knowledge, no litigation or governmental or administrative proceeding or investigation has been threatened: (a) against CEW; (b) affecting the property or assets of CEW; or (c) as to matters related to CEW, against any manager, Member or key employee of CEW in their respective capacities in such positions. To CE's Knowledge, there has not occurred any event, and there does not exist any condition, on the basis of which any litigation or governmental or administrative proceeding or investigation may reasonably be asserted.   There has been no litigation, governmental or administrative proceedings or, to CE's Knowledge, investigations involving CEW or any of its managers, CE or key employees in connection with the Business, occurring, arising or existing during the past five (5) years.

2.17   Labor Matters.  CEW employs approximately twenty-six (26) full-time and no (0) part-time employees. In addition, Ted Hansen, Dennis Conn, Brian Mikkelson, and Randall Parmentier will be transferred to CEW under current employment terms immediately prior to Closing. CEW is not delinquent in payments to any of its employees for any wages, salaries, commissions, bonuses or other direct compensation for any services performed for CEW as of the date hereof or amounts required to be reimbursed to such employees. CEW is and heretofore has been in compliance in all material respects with all applicable laws and regulations respecting labor, employment, fair employment practices, terms and conditions of employment, occupational safety and health, and wages and hours. There are no charges of employment discrimination, harassment or unfair labor practices or strikes, slowdowns, stoppages of work, or any other concerted interference with normal operations existing, pending or, to the Knowledge of CE, threatened against or involving CEW. CEW is, and during the period CE has owned CEW, CEW has been, in compliance in all material respects with the requirements of the Immigration Reform Control Act of 1986.  CEW has not received notice of any changes pending or threatened with respect to (including, without limitation, the resignation of) the key employees or key independent contractors of CEW.  During the period CE has owned CEW, CEW has not implemented any plant closing or mass layoff of employees as those terms are defined in the Worker Adjustment Retraining and Notification Act of 1988, amended, or any similar state or

20

local law or regulation, and no layoffs that could implicate such laws or regulations are currently contemplated. To CE's Actual Knowledge, none of CEW's employees is obligated under any contract (including licenses, covenants or commitments of any nature) or other agreement, or subject to any judgment, decree or order of any court or administrative agency, that would materially interfere with such employee's ability to fulfill their job responsibilities or that would conflict with the Business.   Neither the execution or delivery of this Agreement or the agreements contemplated hereby, nor the carrying on of the Business by the employees of CEW, nor the conduct of the Business as now conducted, will, to CE's Knowledge, conflict with or result in a breach of the terms, conditions, or provisions of, or constitute a default under, any contract, covenant or instrument under which any such employee is now obligated. CEW is not bound by or subject to (and none of its assets or properties is bound by or subject to) any written or oral, express or implied, contract, commitment or arrangement with any labor union, and no labor union has requested or, to CE's Actual Knowledge, has sought to represent any of the employees, representatives or agents of CEW. There is no strike or other labor dispute involving CEW pending, or to CE's Actual Knowledge, threatened, which could reasonably be expected to have a CEW Material Adverse Effect, nor are CE aware of any labor organization activity involving CEW's employees.

2.18     Permits; Compliance with Laws.   CEW has all franchises, authorizations, approvals, orders, consents, licenses, certificates, permits, registrations, qualifications or other rights and privileges (collectively "**Permits**") necessary to permit it to own its property and to conduct its Business as it is presently conducted, and all such Permits are valid and in full force and effect. Section 2.18 of the Disclosure Schedule sets forth a list of all Permits obtained or otherwise held by CEW. No Permit that CEW has is subject to termination as a result of the execution of this Agreement or consummation of the Contemplated Transactions. To CEW's Knowledge, CEW is now and has heretofore been in compliance in all material respects with all applicable statutes, ordinances, orders, rules and regulations promulgated by any U.S. federal, state, municipal, non-U.S. or other Government Authority, which apply to the conduct of its Business.  During the period CE has owned CEW, CEW has not entered into or been subject to any judgment, consent decree, compliance order or administrative order with respect to any aspect of the Business, affairs, properties or assets of CEW or received any request for information, notice, demand letter, administrative inquiry or formal or informal complaint or claim from any regulatory agency with respect to any aspect of the Business, affairs, properties or assets of CEW.  To CE's Knowledge, there are no pending or threatened filings against CEW of an action relating to CEW under any foreign, federal, or state whistleblower statute.

2.19     Employee Benefit Programs.   Section 2.19 of the Disclosure Schedule describes all Employee Benefit Programs (as such term is defined in Exhibit A) maintained by CEW.

2.20     Insurance Coverage.   Section 2.20 of the Disclosure Schedule contains a list of the insurance policies currently maintained by CEW. There are currently no claims pending against CEW under any insurance policies currently in effect and covering the property, Business or employees of CEW, and all premiums due and payable with respect to the policies maintained by

21

CEW have been paid to date. To CE's Knowledge, there is no threatened termination of any such policies or arrangements.

2.21    Investment Banking; Brokerage.    There are no claims for investment banking fees, brokerage commissions, broker's or finder's fees or similar compensation in connection with the Contemplated Transactions payable by CEW or based on any arrangement or agreement made by or on behalf of CEW.

2.22    Environmental Matters. CEW is, and has been during the period CE has owned CEW, in compliance in all material respects with all applicable environmental, health and safety laws, rules, ordinances, by-laws and regulations, and with all permits, registrations and approvals required under such laws, rules, ordinances, by-laws and regulations (collectively, "**Environmental Laws**"). CE is not aware of any fact or circumstance that could reasonably be expected to involve CEW in any litigation, or impose upon CEW any liability, arising under any Environmental Law.

2.23    Customers, Distributors and Partners.    Section 2.23 of the Disclosure Schedule sets forth the name of each customer of CEW who accounted for more than five percent (5%) of the revenues of CEW for any of the fiscal years ended December 31, 2017 and December 31, 2018 and December 31, 2019 (the "**Customers**") together with the names of any persons or entities with which CEW has a material strategic partnership or similar relationship ("**Partners**"). Except as set forth in Section 2.22 of the Disclosure Schedule, no Customer or Partner of CEW has canceled or otherwise terminated its relationship with CEW or has materially decreased its usage or purchase of the services or products of CEW in the last twelve (12) months. No Customer or Partner has, to CE's Actual Knowledge, any plan or intention to terminate, cancel or otherwise materially and adversely modify its relationship with CEW or to decrease materially or limit its usage, purchase or distribution of the services or products of CEW.

2.24    Suppliers. CEW's relationships with its major suppliers are good commercial working relationships.  Within the last twelve (12) months, no supplier that CEW has paid, or is under contract to pay, $25,000.00 or more has canceled, materially modified, or otherwise terminated its relationship with CEW, or materially decreased its services, supplies or materials to CEW, nor to the Actual Knowledge of CE, does any supplier have any plan or intention to do any of the foregoing.

2.25    Warranty and Related Matters.  There are no existing or, to the Actual Knowledge of CE, threatened, claims against CEW relating to any work performed by CEW, product liability, warranty or other similar claims against CEW alleging that any CEW Product (as defined below) is defective or fails to meet any product or service warranties. To CE's Knowledge, there are: (a) no inherent design defects or systemic or chronic problems in any CEW Product; and (b) no claims relating to any defects or problems with a CEW Product which could reasonably be expected to have a CEW Material Adverse Effect. The term "**CEW Product**" means products or services that CEW distributes, services, markets, sells or produces for itself, a customer or a third party.

2.26   Money Laundering.  The operations of CEW are and, during the period CE has owned CEW, have been conducted at all times in compliance with the money laundering statutes of applicable jurisdictions, the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any applicable governmental agency (collectively, the "**Money Laundering Laws**").  To CE's Knowledge, no action, suit or proceeding by or before any court, Government Authority, or any arbitrator involving CEW with respect to the Money Laundering Laws, is pending or threatened.

2.27   Illegal Payments.  During the period CE has owned CEW, neither CEW nor, to CE's Actual Knowledge any Affiliate of CEW, has offered, made or received on behalf of CEW any illegal payment or contribution of any kind, directly or indirectly, including, without limitation, payments, gifts or gratuities, to any person, entity, or United States or foreign national, state or local government officials, employees or agents or candidates therefor or other Persons.

2.28   Government Contracts.   CEW has (a) no contractual obligation to renegotiate government, quasi-government, sovereign or quasi-sovereign contracts or subcontracts, (b) not been suspended or debarred from bidding on contracts or subcontracts with any federal, state or local agency or governmental or sovereign authority, (c) not been audited or investigated by any such agency or authority with respect to contracts entered into or goods and services provided by CEW or any of its Affiliates or (d) not had a contract terminated by any such agency or authority for default or failure to perform in accordance with applicable standards. During the period CE has owned CEW, CEW has not had any outstanding agreements, contracts or commitments that require it to obtain or maintain a United States government security clearance or a foreign government security clearance. CEW has no government contracts.

2.29   Regulatory Authorities.  Neither CEW, nor, to CE's Actual Knowledge, any Member, manager, agent, employee, Affiliate or Person acting on behalf of CEW, is currently subject to any U.S. sanctions administered by any applicable regulatory authorities.

2.30   Security Program; Privacy.  (a) To CE's Knowledge, CEW has in all material respects complied at all times with all Applicable Laws regarding the collection, use, storage, transfer, or disposal of personal information in connection with the operation of the Business; (b) CEW is in material compliance with the terms of all contracts to which it is a party relating to data privacy, security, or breach notification (including provisions that impose conditions or restrictions on the collection, use, storage, transfer, or disposal of personal information); (c) no Person (including any Government Authority) has commenced any action relating to CEW's information privacy or data security practices, including with respect to the collection, use, transfer, storage, or disposal of personal information maintained by or on behalf of CEW, or, to CE's Knowledge, threatened any such action or made any complaint, investigation, or inquiry relating to such practices; (d) CEW has established and implemented policies, programs, and procedures that are in compliance with applicable industry practices, including administrative, technical, and physical safeguards, to protect the confidentiality, integrity, and security of personal information in its possession, custody, or control against unauthorized access, use, modification, disclosure, or other misuse of any personal information in CEW's possession, custody, or control, or

23

otherwise held or processed on its behalf, and (e) to CE's Knowledge, CEW has not experienced any loss, damage, or unauthorized access, disclosure, use, or breach of security of any personal information in CEW's possession, custody, or control, or otherwise held or processed on its behalf.

2.31    Disclosure.  The representations and warranties made or contained in this Agreement, the Disclosure Schedule and exhibits hereto and the certificates and statements executed or delivered in connection herewith and all other information provided in writing by CEW and CE to NVE in connection with the Contemplated Transactions, when taken together, do not and shall not contain any untrue statement of a material fact and do not and shall not omit to state a material fact required to be stated herein or therein or necessary in order to make such representations, warranties or other material not misleading in the light of the circumstances in which they were made or delivered.   No Member or manager of CEW has been: (a) convicted in a criminal proceeding or named as a subject of a pending criminal proceeding (excluding traffic violations and other minor offenses) or been otherwise accused of any act of moral turpitude; (b) the subject of any order, judgment, or decree (not subsequently reversed, suspended or vacated) of any court of competent jurisdiction permanently or temporarily enjoining him or her from, or otherwise imposing limits or conditions on his or her ability to engage in any Securities, investment advisory, banking, insurance or other type of business or acting as an officer or director of a public company; or (c) has engaged in other conduct that would be required to be disclosed in a prospectus under Item 401(f) of Regulation S-K promulgated by the Securities and Exchange Commission.

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES OF NVE

NVE represents and warrants to CE as follows, except as set forth in a disclosure schedule (the "**NVE Schedule**") delivered by NVE contemporaneously with the execution of this Agreement:

3.1.    Organization, Powers and Qualifications.  NVE is a corporation duly organized and validly existing and in good standing under the laws of the State of Delaware.  NVE has all requisite corporate power and authority to carry on its business as it has been and is now being conducted and to own, lease and operate the properties and assets used in connection therewith. NVE is duly qualified as a foreign corporation authorized to do business and is in good standing in every jurisdiction in which such qualification is required, other than such jurisdictions where the failure so to qualify would not have a NVE Material Adverse Effect, as such term is defined in Exhibit A.

3.2.    Authority.  The execution and delivery of this Agreement and the consummation of the Contemplated Transactions have been authorized by all necessary corporate action on the part of the Board of Directors of NVE and by those shareholders of NVE holding voting common stock

24

and no other corporate proceedings on the part of NVE are necessary to authorize this Agreement or to carry out the Contemplated Transactions. This Agreement is binding and enforceable upon NVE in accordance with its terms, subject to any bankruptcy, insolvency, moratorium or other laws affecting the enforcement of creditors' rights.

3.3.     Conflict with Other Agreements; Consents and Approvals.

With respect to the following: (a) the Certificate of Formation and Operating Agreement of NVE; (b) any law, statute, rule or regulation applicable to NVE; (c) any contract to which NVE is a party or may be bound or any Permit held by NVE; and (d) any judgment, order, injunction, decree or ruling of any court, arbitrator or governmental or regulatory official, body or authority applicable to NVE; the execution, delivery and performance by NVE of this Agreement and the Contemplated Transactions will not (i) result in any violation, conflict or default, or give to others any interest or rights, including rights of termination, cancellation or acceleration which would have a NVE Material Adverse Effect, or (ii) require any authorization, consent, approval or exemption by any person, the failure to obtain which would have a NVE Material Adverse Effect, which has not been obtained, or any notice to or filing which has not been given or done, other than filings pursuant to applicable state and federal securities laws, and the filing of appropriate Acquisition documentation under the Acts.

3.4.     Brokerage.     In connection with the Contemplated Transactions, no broker, finder or similar agent has been employed by or on behalf of NVE, and no person with which NVE has had dealings or communications of any kind is entitled to any brokerage or finder's fee or other commission in connection with the transactions.

3.5.     Disclosure. The representations and warranties made or contained in this Agreement, the Disclosure Schedule and exhibits hereto and the certificates and statements executed or delivered in connection herewith and all other information provided in writing by NVE to CE in connection with the Contemplated Transactions, when taken together, do not and shall not contain any untrue statement of a material fact and do not and shall not omit to state a material fact required to be stated herein or therein or necessary in order to make such representations, warranties or other material not misleading in the light of the circumstances in which they were made or delivered.   No officer or director of NVE has been: (a) convicted in a criminal proceeding or named as a subject of a pending criminal proceeding (excluding traffic violations and other minor offenses) or been otherwise accused of any act of moral turpitude; (b) the subject of any order, judgment, or decree (not subsequently reversed, suspended or vacated) of any court of competent jurisdiction permanently or temporarily enjoining him or her from, or otherwise imposing limits or conditions on his or her ability to engage in any Securities, investment advisory, banking, insurance or other type of business or acting as an officer or director of a public company; or (c) has engaged in other conduct that would be required to be disclosed in a prospectus under Item 401(f) of Regulation S-K promulgated by the Securities and Exchange Commission.

25

## ARTICLE IV

## COVENANTS

4.1.    Conduct of Business Prior to Closing.

From the date of this Agreement to the Closing Date, CEW (except as expressly contemplated or permitted by this Agreement, or to the extent that NVE shall otherwise consent in writing) agrees that it:

(a)     will conduct and operate its Business only in the ordinary course consistent with past practice;

(b)     will not conduct its Business in such a manner so as to purposely cause the representations and warranties made by it herein not to be true on the Closing Date as though such representations and warranties were made on and as of such date;

(c)     will use its reasonable best efforts to keep available the services of its present employees and agents and to maintain its current business relationships and goodwill;

(d)     will not modify or amend its Organizational Documents or Bylaws;

(e)     will not enter into or amend any employment contracts or any employee benefit plan or arrangement, increase the rate of compensation (or other bonus or benefit) payable or to become payable by it to any officer or any other executive employee, extend any credit or make any loans to any employee, make any general increase in compensation or rate of compensation (or other bonus or benefit) payable or to become payable to hourly employees or except in the ordinary course of business consistent with past practice, or make any material increase in the contributions to any employee benefit program or arrangement;

(f)     will not incur or guarantee any debt in excess of $10,000.00 except in the ordinary course of business consistent with past practice;

(g)     will not sell or dispose of any assets (tangible or intangible) except for sales in the ordinary course of business consistent with past practice;

(h)     will not transfer, assign, license or encumber, or permit any of its employees or agents to transfer, assign, license or encumber, in whole or in part, any proprietary right owned or held by it, including but not limited to any rights to or interest in CEW Intellectual Assets;

(i)     will not change in any material respect its accounting and tax practices, policies or principles;

26

(j)    will not cancel or waive any debts or claims having a value of $10,000.00 in the aggregate, except for such cancellations and waivers which will not cause an CEW Material Adverse Effect;

(k)    will pay all Taxes as they become due, file all federal, state, local and foreign tax returns, reports and statements required to be filed by CEW within the time and in the manner prescribed by Applicable Law, and collect or withhold all Taxes required to be collected or withheld from employees, independent consultants or other third parties;

(l)    will not enter into any (or modify any existing) lease, contract, commitment or agreement or engage in any transaction (including without limitation any borrowing, capital expenditure, capital financing, leasing arrangement or purchase commitment) except in the ordinary course of business consistent with past practice (other than special arrangements with brokers, attorneys, and accountants to consummate a fundamental transaction).

Notwithstanding the foregoing, the Parties acknowledge that, on or before the Closing Date, CEW anticipates making distributions to CE representing all available cash and cash equivalents prior to the Closing Date.  For purposes of computing CEW's Closing Date Net Working Capital, such distributions shall be deemed to have been made prior to the Closing Date.

4.2.    Updating of Schedules.  From the date of this Agreement to the Closing Date, each of CEW and NVE agrees that it will promptly inform the other Party in writing if any information set forth in a Schedule provided hereunder is not accurate and complete in all material respects as of such later date and will promptly disclose to the other Party in writing any information which arises after the date hereof and which would have been required to be included in its Schedule to make such Schedule accurate and complete in all material respects as of such later date; provided, however, that none of such disclosures shall be deemed to modify, amend or supplement its representations and warranties or its Schedule for purposes of any provision hereof unless the other shall have consented thereto in writing.

4.3.    Access.  From the date of this Agreement to the Closing Date, each of the Parties hereto agrees that it will give to the other Party hereto and its respective financial advisers, counsel, accountants and other representatives full access, during normal business hours upon reasonable advance notice, to all personnel, properties, books, contracts, documents and records with respect to its affairs as such requesting party may reasonably request, including without limitation all work papers, schedules and calculations relating to financial statements, and any other information that may be necessary for such requesting party to conduct an audit of the books and records of such other party. Any such information shall be delivered subject to the provisions regarding confidentiality set forth in the Confidentiality Agreement between the Parties, dated September 6, 2019, shall be deemed to be Confidential Information as defined therein, and NVE and CEW shall be bound by the provisions of the Confidentiality Agreement which are incorporated herein by this reference.

4.4.    Member and Manager Approvals. The Parties acknowledge and agree that Contemplated Transactions and the execution of this Agreement have been approved by the Managers of CE and NVE.

4.5.    Third Party Consents.  Prior to the Closing Date, each of NVE and CEW shall make commercially reasonable efforts to obtain all consents, approvals or authorizations of third parties which are required to be obtained by each of them in order to effect the Contemplated Transactions and such other consents, approvals or authorizations the absence of which would have an CEW Material Adverse Effect or a NVE Material Adverse Effect, as applicable.

4.6.    Satisfaction of Conditions.  Each Party hereto will use its reasonable best efforts to satisfy all the conditions to be satisfied by it to effect the Contemplated Transactions.

4.7.    Public Announcements.  The Parties acknowledge and agree that the terms of this Agreement and the Acquisition are strictly confidential and that significant damages may result if either Party improperly discloses such terms to anyone without the need to know. Neither CE, CEW nor NVE will make, issue or release any oral or written public announcement or statement concerning, or acknowledgment of the existence of, or reveal the terms, conditions and status of, the Contemplated Transactions (other than to their respective shareholders and CE), or issue any other communications to the public, directly or indirectly (including, without limitation, press releases), without first obtaining the written consent and authorization of the other Party.

28

4.8.   Other Proposals.  CE hereby agrees that it shall not nor shall it authorize or permit any managers, employees, Affiliates, or other representatives or agents (collectively, the "**CE Representatives**") to, directly or indirectly, solicit, encourage (including by way of furnishing non-public information), initiate discussions or negotiations relating to or take any other action to facilitate, any inquiries or the making of any proposal for an Acquisition Transaction.  As used herein, the term "**Acquisition Transaction**" shall mean the occurrence of any of the following events: (i) all or any part of CEW is acquired by Acquisition or otherwise by any Person, other than NVE or any of NVE's Affiliates (a "**Third Party**"); (ii) a Third Party acquires all or any part of the assets of CEW other than in the ordinary course of business; or (iii) CEW enters into a preliminary or definitive agreement with a Third Party relating to any of the transactions referred to in clauses (i) through (ii) above. CEW agrees that it shall promptly notify NVE in writing of any such inquiries or proposals relating to an Acquisition Transaction, which notification shall include the identity of the Person making such proposal or request, the terms thereof, and any other information with respect thereto as NVE may reasonably request.

4.9.   Assurances.  CE shall use its reasonable best efforts to obtain reasonable assurances that all material contractual rights of CEW will survive the Acquisition, except where the failure to do so will not cause a CEW Material Adverse Effect.

4.10.   CEW's Employees. CEW shall use its reasonable best efforts to retain all of CEW's employees through Closing.

## ARTICLE V

### CONDITIONS TO OBLIGATIONS OF NVE

The obligations of NVE to consummate the Acquisition provided for in this Agreement shall be subject to satisfaction, on or before the Closing Date, of the following conditions:

29

5.1.    Due Diligence Investigation.  NVE shall have completed its due diligence investigation of the assets, properties, Business and operations of CEW to its sole satisfaction.

5.2.    Representations, Warranties, and Covenants of CEW.  The representations and warranties of CEW herein contained and the information contained in CEW Disclosure Schedule and other documents delivered by CEW in connection with this Agreement shall be true and correct at the Closing Date with the same effect as though made at such time, except to the extent waived hereunder or affected by the Contemplated Transactions; CEW shall have performed in all material respects all obligations and complied in all material respects with all agreements, undertakings, covenants and conditions required by this Agreement to be performed or complied with by CEW prior to the Closing Date.

5.3.    Reserved.

5.4.    Reserved.

5.5.    No Injunctions.  No preliminary or permanent injunction or other order, decree or ruling by any federal, state or provincial court in the United States or by any United States governmental, regulatory or administrative agency which prevents the consummation of the Contemplated Transactions (including the Acquisition) shall have been issued and remain in effect.

5.6.    Consents.  All consents of third parties reasonably necessary to the consummation of the Contemplated Transactions, including but not limited to those set forth in CEW's Disclosure Schedule, shall have been obtained.

5.7.    Securities Laws.  All approvals, consents, permits, licenses or qualifications from authorities administering the securities laws of any state having jurisdiction, required in the reasonable judgment of NVE for the consummation of this Agreement and the Acquisition, shall have been obtained and shall be in full force and effect.

5.8.    Reserved.

5.9    Supply Contract and Transition Services Agreement.  CE shall have executed and delivered the Supply Contract and a Transition Services Agreement in the form attached hereto as Exhibit I and J ("**Supply Contract" and "Transition Services Agreement**" respectively) on terms acceptable to the Parties.

5.10    CEW Material Adverse Effect. There shall not have occurred after the date of this Agreement, and be continuing as of the Closing Date, any CEW Material Adverse Effect, except where such CEW Material Adverse Effect is due to any negligence or willful act or omission on the part of NVE.

30

## ARTICLE VI

### CONDITIONS TO OBLIGATION OF CE

The obligations of CE to consummate the Acquisition provided for in this Agreement shall be subject to satisfaction, on or before the Closing Date, of the following conditions:

6.1. <u>Due Diligence Investigation</u>. CE shall have completed its due diligence investigation of the assets, properties, business and operations of NVE to its sole satisfaction.

6.2. <u>Representations, Warranties, and Covenants of NVE</u>. The representations and warranties of NVE herein contained and the information contained in NVE's Disclosure Schedule and other documents delivered by NVE in connection with this Agreement shall be true and correct at the Closing Date with the same effect as though made at such time, except to the extent waived hereunder or affected by the Contemplated Transactions; NVE shall have performed in all material respects all obligations and complied in all material respects with all agreements, undertakings, covenants and conditions required by this Agreement to be performed or complied with by them at or prior to the Closing Date; and NVE shall have delivered to CEW a certificate in form and substance satisfactory to CEW dated the Closing Date and signed by the President and Chief Executive Officer of NVE to such effect.

6.3. <u>Approvals</u>. The requisite approval of this Agreement and the Contemplated Transactions shall have been given by Board of Directors of NVE. Additionally, the consent of the holders of the Voting Common Stock of NVE shall have been given.

6.4. <u>Consents</u>. All consents of third parties necessary or appropriate to the consummation of the Contemplated Transactions, including but not limited to those set forth in CEW Disclosure Schedule, shall have been obtained.

6.5. <u>NVE Material Adverse Effect</u>. There shall not have occurred after the date of this Agreement, and be continuing as of the Closing Date, any NVE Material Adverse Effect, except where such NVE Material Adverse Effect is due to any negligence or willful act or omission on the part of CEW or a Member.

6.6 <u>Employee Transfer.</u> Ted Hansen, Dennis Conn, Brian Mikkelson, and Randall Parmentier will be transferred to CEW as employees under current employment terms immediately prior to Closing.

## ARTICLE VII

### TERMINATION, WAIVER AND AMENDMENT

31

7.1.    Termination.  This Agreement may be terminated by written notice of termination at any time before the Closing Date (whether before or after action by CE or Managers of CE or NVE) only as follows:

    (a)    by mutual consent of NVE and CE;

    (b)    by NVE:

        (i)    upon written notice to CE given prior to the Closing Date, if the representations and warranties of CEW contained in Article II hereof were not true and correct when made or if CE fails to perform in all material respects all obligations and comply in all material respects with all agreements, undertakings, covenants and conditions required by this Agreement to be performed or complied with by it at or prior to the Closing Date, unless CE cures the same prior to the Closing Date; or

        (ii)    upon written notice to CE given prior to the Closing Date, if the Closing Date shall not have occurred on or before April 1, 2020 unless the absence of such occurrence shall be due to the failure of NVE to perform in all material respects each of its obligations under this Agreement required to be performed by it at or prior to the Closing Date (except to the extent such performance or compliance is qualified by materiality in which event such performance or compliance shall have failed to occur); and

    (c)    By CE:

        (i)    upon written notice given to NVE prior to the Closing Date, if the representations and warranties of NVE contained in Article III hereof were not true and correct when made or as of the Closing Date or if NVE fails to perform in all material respects all obligations and comply in all material respects with all agreements, undertakings, covenants and conditions required by this Agreement to be performed or complied with by it at or prior to the Closing Date, unless NVE cures the same prior to the Closing Date; or

        (ii)    upon written notice to NVE given prior to the Closing Date, if the Closing Date shall not have occurred on or before April 1, 2020 unless the absence of such occurrence shall be due to the failure of CE to perform each of its obligations under this Agreement required to be performed by it at or prior to the Closing Date (except to the extent such performance or compliance is qualified by materiality in which event such performance or compliance shall have failed to occur).

7.2.    Effect of Termination. In the event of the termination of this Agreement and the abandonment of the Acquisition, the provisions of this Agreement shall thereafter become void and have no effect, and no Party hereto shall have any liability to any other Party hereto or its Affiliates, directors or officers in respect thereof, except that nothing herein shall relieve any Party from liability for any willful breach thereof or from its obligations under the confidentiality

32

provisions of the Confidentiality Agreement between the Parties, referred to and incorporated by reference in Section 4.3.

7.3     Waiver of Terms.  Any of the terms or conditions of this Agreement may be waived at any time prior to the Closing Date by the Party which is, or whose Affiliates are, entitled to the benefit thereof, by action taken by the Managers or Affiliates of such party, or by its chairman, president or any officer authorized to act for such party; provided, however, that such waiver shall be in writing and shall be taken only if, in the judgment of such Managers or Affiliates or officer taking such action, such waiver will not have a materially adverse effect on the benefits intended hereunder to the shareholders of such corporation, or Affiliates of such limited liability company, and the other Parties hereto may rely on the delivery of such a waiver as conclusive evidence of such judgment and the validity of the waiver.

7.4     Amendment of Agreement.  Anything herein or elsewhere to the contrary notwithstanding, to the extent permitted by law, this Agreement may be amended, supplemented or interpreted at any time prior to the Closing Date only by written instrument duly authorized and executed by each of the Parties hereto.

7.5     Fees and Expenses.  All costs and expenses incurred in connection with this Agreement and the Contemplated Transactions shall be paid by the Party incurring such expenses.

## ARTICLE VIII

## POST-CLOSING OBLIGATIONS

8.1.     Survival of Representations.  All representations, warranties, covenants, indemnities and other agreements made by any Party to this Agreement herein or pursuant hereto shall also be deemed made on and as of the Closing Date as though such representations, warranties, covenants, indemnities and other agreements were made on and as of such date, and all such representations, warranties, covenants, indemnities and other agreements shall survive the Closing for a period of twelve (12) months after the Closing Date, except to the extent that the applicable statute of limitation for claims relating to such representations, warranties, covenants, indemnities and other agreements expires earlier or later than twelve (12) months after the Closing Date.

8.2.     Indemnification Agreement

(a)     Indemnification by CE

(i)     Subject to the conditions and provisions of this Section 8.2, CE (the **"Indemnifying Party"**) hereby agree to indemnify, defend and hold harmless NVE, and its officers, directors, shareholders, employees, representatives, agents, predecessors, successors, subsidiaries, Affiliates and assigns (collectively, the **"NVE Indemnified Persons"**) in proportion to their post-Closing ownership interests in CEW from and against and in respect of all claims,

33

losses, damages, judgments, penalties, deficiencies, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and costs of litigation), including but not limited to responsibility for payments of any amounts due in connection with an audit by the IRS or the State of Delaware (collectively, "**Claims**") asserted against, resulting to, imposed upon or incurred by the NVE Indemnified Persons, directly or indirectly, by reason of or resulting from any misrepresentation or breach of any representation or warranty, or noncompliance with conditions, covenants or other agreements, given or made by CE in this Agreement or in the Schedules or Exhibits attached hereto or in any document furnished by or on behalf of CEW or the Indemnifying Party pursuant hereto or thereto; and (ii) all liability for Taxes of CEW with respect to any taxable period (or portion thereof) ending on or before 11:59 p.m. on the day prior to the Closing Date ("**Pre-Closing Tax Period**"). The Parties agree that CE's obligation to defend and indemnify under this Section shall not apply to the extent that there is insurance coverage with respect to such Claim and its defense.

   (ii) Notwithstanding the foregoing: (A) CE shall not have any obligation to indemnify the NVE Indemnified Persons in accordance with subparagraph (i) above unless and until the NVE Indemnified Persons have suffered damages arising from Claims in excess of Ten Thousand ($10,000.00) Dollars in the aggregate (at which point CE will be obligated to indemnify the NVE Indemnified Persons from and against all such damage relating back to the first dollar); (B) the aggregate amount of indemnifiable damages which may be sought, claimed and/or recovered by the NVE Indemnified Persons (collectively) from CE on account of Claims arising from breaches of any Non-Fundamental Representations shall not exceed two percent (2%) of the Acquisition Consideration; and (C) the aggregate amount of indemnifiable damages which may be sought, claimed and/or recovered by the NVE Indemnified Persons (collectively) from CE on account of Claims arising from breaches of any Fundamental Representations shall not exceed seven and one-half percent (7.5%) of the Acquisition Consideration; provided, however, the limitations on indemnifiable damages set forth in clause (B) and (C) of this Section 8.2(a)(ii) shall not apply with respect to any damages incurred by the NVE Indemnified Persons as a result of fraud committed by CE.

  (b) <u>Indemnification by NVE</u>.

   (i) Subject to the conditions and provisions of this Section 8.2, NVE hereby agrees to indemnify, defend and hold harmless CE and its officers, directors, shareholders, employees, representatives, agents, predecessors, successors, subsidiaries, Affiliates and assigns (collectively, the "**CEW Indemnified Persons**") from and against and in respect of all Claims asserted against, resulting to, imposed upon or incurred by CEW Indemnified Persons, directly or indirectly, by reason of or resulting from: (i) any misrepresentation or breach of any representation or warranty, or noncompliance with conditions, covenants or other agreements, given or made by NVE in this Agreement or in the Schedules or Exhibits attached hereto or in any document furnished by or on behalf of NVE pursuant hereto or thereto; and (ii) all liability for Taxes of CEW with respect to any taxable period (or portion thereof) ending after the Pre-Closing Tax Period. The Parties agree that NVE's obligation to defend and indemnify under this

Section shall not apply to the extent that there is insurance coverage with respect to such Claim and its defense.

(ii)    Notwithstanding the foregoing: (A) NVE shall not have any obligation to indemnify CEW Indemnified Persons in accordance with subparagraph (i) above unless and until CEW Indemnified Persons have suffered damages arising from Claims in excess of Ten Thousand ($10,000.00) Dollars in the aggregate (at which point NVE will be obligated to indemnify CEW Indemnified Persons from and against all such damage relating back to the first dollar); (B) the aggregate amount of indemnifiable damages which may be sought, claimed and/or recovered by CEW Indemnified Persons (collectively) from NVE on account of Claims arising from breaches of any Non-Fundamental Representations shall not exceed two (2%) percent of the Acquisition Consideration; and (C) the aggregate amount of indemnifiable damages which may be sought, claimed and/or recovered by CEW Indemnified Persons (collectively) from NVE on account of Claims arising from breaches of any Fundamental Representations shall not exceed even and one-half percent (7.5%) of the Acquisition Consideration; provided, however, the limitations on indemnifiable damages set forth in clause (B) and (C) of this Section 8.2(b)(ii) shall not apply with respect to any damages incurred by CEW Indemnified Persons as a result of fraud committed by NVE.

(c)    Definitions.

(i)    **"Fundamental Representations"** shall mean, collectively, the representations and warranties of CE set forth in Section 2.1, Section 2.2, Section 2.3, Section 2.4, Section 2.5, Section 2.7, Section 2.12, Section 2.14, Section 2.15, Section 2.16, Section 2.18, Section 2.26, Section 2.27, Section 2.29, and Section 2.30; and of NVE set forth in Section 3.1, Section 3.2, Section 3.3, Section 3.4, Section 3.5, and Section 3.6.

(ii)    **"Non-Fundamental Representations"** shall mean all of the representations and warranties of CE and NVE set forth in this Agreement other than the Fundamental Representations.

(d)    Indemnification Procedure

(i)    In the event that any claim or demand for indemnification is brought by NVE Indemnified Persons or CEW Indemnified Persons (together, the **"Indemnified Persons"**), the Person from whom indemnification is claimed shall be called an **"Indemnifying Party"**. In the event that any claim or demand for which the Indemnifying Party would be liable to an Indemnified Person hereunder is asserted against or sought to be collected from an Indemnified Person by a third party, the Indemnified Person shall promptly notify the Indemnifying Party of such claim or demand and the amount or the estimated amount thereof to the extent then feasible (which estimate shall not be conclusive of the final amount of such claim and demand (the **"Claim Notice"**). The Indemnifying Party shall have thirty (30) days from the personal delivery or mailing of the Claim Notice (the **"Notice Period"**) to notify the Indemnified Person: (i) whether or not the Indemnifying Party disputes his liability to the Indemnified Person hereunder

35

with respect to such claim or demand, and (ii) notwithstanding any such dispute, whether or not the Indemnifying Party desires, at his sole cost and expense, to defend the Indemnified Party against such claim or demand; provided, however, that no delay on the part of the Indemnified Party in giving the Claim Notice shall relieve the Indemnifying Party from any obligation hereunder unless (and solely to the extent) the Indemnifying Party is prejudiced thereby.

(ii)     If the Indemnifying Party disputes his liability with respect to such claim or demand or the amount thereof (whether or not the Indemnifying Party desires to defend the Indemnified Person against such claim or demand as provided in subparagraphs (iii) and (iv) below), such dispute shall be resolved in accordance with Section 8.2(d) hereof. Pending the resolution of any dispute by the Indemnifying Party of his liability with respect to any claim or demand, such claim or demand shall not be settled without the prior written consent of the Indemnified Person and the Indemnifying Party.

(iii)     In the event that the Indemnifying Party notifies the Indemnified Person within the Notice Period that he desires to defend the Indemnified Person against such claim or demand then, except as hereinafter provided, the Indemnifying Party shall have the right to defend the Indemnified Person by appropriate proceedings, which proceedings shall be promptly settled or prosecuted by the Indemnifying Party to a final conclusion in such a manner as to avoid any risk of any Indemnified Person becoming subject to liability for any other matter; provided, however, the Indemnifying Party shall not, without the prior written consent of the Indemnified Person, consent to the entry of any judgment against the Indemnified Person or enter into any settlement or compromise which does not include, as an unconditional term thereof, the giving by the claimant or plaintiff to the Indemnified Person of a release, in form and substance satisfactory to the Indemnified Person, as the case may be, from all liability in respect of such claim or litigation. If any Indemnified Person desires to participate in, but not control, any such defense or settlement, it may do so at its sole cost and expense. If, in the reasonable opinion of the Indemnified Person, any such claim or demand or the litigation or resolution of any such claim or demand involves an issue or matter which could have a materially adverse effect on the business, operations, assets, properties or prospects of the Indemnified Person, including without limitation the administration of the tax returns and responsibilities under the tax laws of any Indemnified Person, then the Indemnified Person shall have the right to control the defense or settlement of any such claim or demand and its reasonable costs and expenses shall be included as part of the indemnification obligation of the Indemnifying Party hereunder; provided, however, that the Indemnified Person shall not settle any such claim or demand without the prior written consent of the Indemnifying Party, which consent shall not be unreasonably withheld or delayed. If the Indemnified Person should elect to exercise such right, the Indemnifying Party shall have the right to participate in, but not control, the defense or settlement of such claim or demand at his sole cost and expense.

(iv)     If the Indemnifying Party elects not to defend the Indemnified Person against such claim or demand, whether by not giving the Indemnified Person timely notice as provided above or otherwise, then the amount of any such claim or demand, or if the same be

36

defended by the Indemnifying Party or by the Indemnified Person (but the Indemnified Person shall not have any obligation to defend any such claim or demand), then that portion thereof as to which such defense is unsuccessful, in each case shall be conclusively deemed to be a liability of the Indemnifying Party hereunder, unless the Indemnifying Party shall have disputed his liability to the Indemnified Person hereunder, as provided in (b) above, in which event such dispute shall be resolved as provided in Section 8.2(d) hereof.

(v)    In the event any Indemnified Person should have a claim against the Indemnifying Party hereunder that does not involve a claim or demand being asserted against or sought to be collected from it by a third party, the Indemnified Person shall promptly send a Claim Notice with respect to such claim to the Indemnifying Party. If the Indemnifying Party disputes his liability with respect to such claim or demand, such dispute shall be resolved in accordance with Section 8.2(d) hereof; if the Indemnifying Party does not notify the Indemnified Person within the Notice Period that the Indemnifying Party disputes such claim, the amount of such claim shall be conclusively deemed a liability of the Indemnifying Party hereunder.

(vi)    Any dispute by the Indemnifying Party of his obligations pursuant to this Section 8.2 shall be submitted to arbitration in accordance with Section 9.7 hereof.

8.3.    Tax Matters; Audits. The following provisions shall govern the allocation of responsibility as between NVE, CEW and CE, for certain tax matters following the Closing Date:

(a)    CE covenants and agrees that it will cause outside accountants ("**Outside Accountants**") of its indirect parent, First North American Holdings II, Inc.("**FNA**"), to prepare, at FNA's or CE's expense, and will file or cause to be filed, within the time and in the manner provided by law, and will pay all amounts owed with respect to, all Tax Returns not already filed on behalf of CEW by FNA for all tax periods ended or ending on or before the end of the taxable year immediately prior to the Closing Date (the "**Unfiled Tax Returns**"). CE covenants and agrees that it will send or cause to be sent a copy of all Unfiled Tax Returns to NVE for its review and comments and, if required, appropriate execution, at least fifteen (15) days prior to the filing thereof.

(b)    The Unfiled Tax Returns shall be prepared in a manner consistent with Tax Returns previously filed by FNA on behalf of CEW. Notwithstanding the foregoing, if NVE's accountants believe that there is not a reasonable basis for any position that FNA directs be taken in connection with any Unfiled Tax Return, Outside Accountants, NVE's accountants, NVE and CE shall confer with respect to the matter and if they are unable to resolve their differences, the matter will be referred to arbitration in accordance with the procedure set forth in Section 9.7 and the decision of the arbitrator shall be final and binding.

(c)    Except with respect to the Unfiled Tax Returns, NVE shall be responsible for the preparation and timely filing of all Tax Returns due with respect to CEW after the Closing Date and shall timely pay all amounts owed with respect to such returns. NVE will provide CEW

37

with all information available to NVE to assist FNA to fulfill its obligations with respect to the Unfiled Tax Returns, and CE will provide NVE with all information available to CE to assist NVE to fulfill its obligations with respect to all Tax Returns of CEW other than the Unfiled Tax Returns.

(d)     NVE, on one hand, and CE, on the other hand, shall: (i) cooperate fully, as reasonably requested, in connection with the preparation and filing of Tax Returns pursuant to this Section 8.3 and any audit, litigation or other proceeding with respect to Taxes; (ii) make available to the other, as reasonably requested, all information, records or documents with respect to Tax matters pertinent to CEW for all periods ending prior to or including the Closing Date; and (iii) preserve information, records or documents relating to Tax matters pertinent to CEW that are in their possession or under their control for the longer period of: (x) seven (7) years; or (y) the expiration of any applicable statute of limitations or extensions thereof. NVE and CE shall notify the other of any audit by any regulatory agency, which may result in an assessment for which CE may be liable under this Agreement and shall not consent to any such actual or proposed assessment without the prior written consent of CE, which shall not be unreasonably withheld.

(e)     Notwithstanding anything to the contrary contained in this Agreement, NVE shall have no obligation to pay or make any provision for the payment of, by indemnification or otherwise, and CE shall be solely responsible for all, Taxes of CEW for periods ending on or before the Closing Date, and CE will be liable directly to the applicable regulatory authorities for all such Taxes; and, if CE is not directly liable, such Taxes must be accrued under the Closing Balance Sheet.

(f)     All tax sharing agreements or similar agreements with respect to or involving CEW shall be terminated as of the Closing Date and, after the Closing Date, NVE shall not be bound thereby or have any liability thereunder.

(g)     After the Closing Date, NVE shall permit CE and their representatives reasonable access to such books and records of CEW as may be necessary for the purpose of preparing CEW's final Tax Return for the period up to and including the Closing Date.

8.3     Convergen Energy Name and Domain Name. On or before the six (6) month anniversary of the Closing Date, CE shall, and shall cause its Affiliates to, (i) discontinue the use of the corporate name "Convergen Energy" in connection with CE's and its Affiliates' business and operations, including, without limitation, discontinuing the use of the name "Convergen Energy" with respect to any website or letterhead of CE or its Affiliates and removing any placard or sign containing the name "Convergen Energy" located in or around the offices or facilities of CE or its Affiliates, and (ii) transfer and assign to CEW, at actual cost, any domain name owned by CE or its Affiliates containing the term "Convergen Energy."

**ARTICLE IX**

38

GENERAL PROVISIONS

9.1.    Cooperation.  Subject to the terms and conditions herein provided, each Party shall cooperate with the other Party in carrying out the provisions of this Agreement and shall execute and deliver, or cause to be executed and delivered, such governmental notifications and additional documents and instruments and do, or cause to be done, all additional things necessary, proper or advisable under applicable law to consummate and make effective the Contemplated Transactions.

9.2.    Assignment; Third Party Beneficiaries. Neither this Agreement nor any right, interest or obligation hereunder shall be assigned by any of the Parties hereto without the prior written consent of the other Parties hereto.  This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.   This Agreement is not intended to confer any rights or remedies upon any Person other than (i) the Parties hereto; and (ii) the Indemnified Persons only after the Closing Date and only with respect to Section 8.2.

9.3.    Contents of Agreement. This Agreement and the Confidentiality Agreement, including the exhibits hereto and the documents and instruments referred to herein (including the Disclosure Schedule) embody the entire agreement and understanding of the Parties with respect to the subject matter hereof. Any previous agreements or understandings between the Parties regarding the subject matter hereof. There are no representations, promises, warranties, covenants, or undertakings, other than those expressly set forth or referred to herein and therein.

9.4.    Section Headings, Gender.  The Section headings herein have been inserted for convenience of reference only and shall in no way modify or restrict any of the terms or provisions hereof.  The use of the masculine or any other pronoun herein when referring to any person has been for convenience only and shall be deemed to refer to the particular person intended regardless of the actual gender of such person.  Each Party has been participated in the drafting of this Agreement, which each Party hereto acknowledges is the result of extensive negotiations among the Parties hereto.  Consequently, this Agreement will be interpreted without reference to any rule or precept of Applicable Law that states that any ambiguity in a document be construed against the drafter.

9.5.    Counterparts.  This Agreement may be executed in any number of counterparts, and by facsimile signature, any one of which need not contain the signatures of more than one Party and each of which shall be an original, but all such counterparts taken together shall constitute one and the same instrument.  The exchange of copies of this Agreement or amendments thereto and of signature pages by facsimile transmission or by e-mail transmission in portable digital format (or similar format) shall constitute effective execution and delivery of such instrument(s) as to the Parties and may be used in lieu of the original Agreement or amendment for all purposes. Signatures of the Parties transmitted by facsimile or e-mail transmission in portable digital format (or similar format) shall be deemed to be their original signatures for all purposes.

9.6 <u>Notices</u>. All notices, consents, waivers or other communications which are required or permitted hereunder shall be sufficient if given in writing and delivered personally, by overnight mail service, by facsimile transmission (which is confirmed) or by registered or certified mail, return receipt requested, postage prepaid, as follows (or to such other addressee or address as shall be set forth in a notice given in the same manner):

If to NVE:

NianticVista Energy, LLC
222 Ridgedale Ave., Suite 302
Cedar Knolls, NJ 07927
Attention: _____
Facsimile_____

With a required copy to:

Clemente, Mueller P.A.
PO Box 1296
Morristown, NJ 07962-1296
Attention: Jonathan D. Clemente, Esq.
Facsimile: (973) 455-8118
jclemente@cm-legal.com

With a required copy to:

Joseph F Andolino Esq.
Andolino & Associates
110 Nativa Circle
North Palm Beach Florida 33410
joe@andolinoassociates.com

With a required copy to:

Ted Hansen
Convergen Energy WI LLC
600 Liberty Street
Green Bay, WI 54304
ted.hansen@convergenergy.com

If to CEW and CE:

Convergen Energy, LLC
c/o Libra Capital US, Inc.

40

Case 1:20-cv-00823-WCG    Filed 06/02/20    Page 103 of 128    Document 1

134 E. 40th Street
New York, NY 10016
Steven.brooks@libra.com

With a required copy to:

Libra Capital US, Inc.
134 E. 40th Street
New York, NY 10016
bert.diaz@libra.com

All such notices shall be deemed to have been given three business days after mailing if sent by registered or certified mail, one business day after mailing if sent by overnight courier service or on the date delivered or transmitted if delivered personally or sent by facsimile transmission.

9.7     Arbitration.

(a)     Any dispute arising between the Parties in connection with this Agreement, which cannot be resolved by the Parties themselves, shall be submitted to binding arbitration. Either Party may initiate arbitration by giving written notice to that effect to the other Party. Within ten (10) days after service of such written notice, each Party shall designate one arbitrator. If either Party fails to designate its arbitrator in a timely fashion, the other Party may designate an arbitrator on behalf of that Party. The two arbitrators so named shall designate a third arbitrator, who shall be an attorney licensed to practice law in the State of Delaware, to act as the head arbitrator; provided, however, that should the partisan arbitrators be unable to agree upon a third arbitrator, then the third arbitrator shall be named pursuant to the applicable rules of the American Arbitration Association upon the application of either Party.

(b)     Except as modified herein, the arbitration shall be conducted in accordance with the then-prevailing Commercial Rules of the American Arbitration Association. In connection with the arbitration, the arbitrators shall, at the request of either Party, direct that discovery be provided. In rendering their decision and award, the arbitrators shall not add to, subtract from or otherwise modify the provisions of this Agreement, but rather shall be bound thereby. Each Party shall bear its own costs and expenses in connection with the arbitration and the costs and expenses of the arbitrators shall be borne equally; provided, however, that if the arbitrators determine that either party has intentionally breached his or its obligations under this Agreement, the arbitrators shall assess all costs and expenses of the prevailing Party against the Party found to have intentionally breached its obligations.

(c)     Judgment upon the award rendered by the arbitrators may be entered by any court having jurisdiction thereof.

41

9.8.    Governing Law. This Agreement shall be governed by and interpreted and enforced in accordance with the laws of the State of Delaware without giving effect to any conflicts of law provisions.

*[The Remainder of this Page Has Been Intentionally Left Blank]*

42

IN WITNESS WHEREOF, the Parties have executed this Agreement and Plan of Acquisition as of the date first above written.

**NIANTICVISTA ENERGY, LLC**

By: _____

Title: CEO

**CONVERGEN ENERGY WI, LLC**

By: _____

FIDEL ANDUEZA
President

**CONVERGEN ENERGY, LLC**

By: _____

FIDEL ANDUEZA
President

43

ACQUISITION AGREEMENT

Among

NIANTICVISTA ENERGY, LLC,

CONVERGEN ENERGY WI, LLC,

and

CONVERGEN ENERGY, LLC,

Dated as of January 29, 2020

44

# EXHIBIT E
# TO COMPLAINT

EXHIBIT E
TO COMPLAINT

OPERATIONS AND MANAGEMENT SERVICES AGREEMENT

between

L'ANSE WARDEN ELECTRIC COMPANY, LLC

and

CONVERGEN ENERGY WI, LLC

dated as of

January 31, 2020

# TABLE OF CONTENTS

**ARTICLE I** SERVICES ..................................................................................................... 2

Section 1.01 Provision of Services. ......................................................................................... 2

Section 1.02 Standard of Service. ........................................................................................... 2

Section 1.03 Third-Party Service Providers. .......................................................................... 3

Section 1.04 Access to Premises. ............................................................................................ 3

**ARTICLE II** COMPENSATION ....................................................................................... 3

Section 2.01 Responsibility for Wages and Fees. ................................................................... 3

Section 2.02 Terms of Payment and Related Matters. ............................................................ 3

Section 2.03 Extension of Services. ........................................................................................ 4

Section 2.04 Terminated Services. .......................................................................................... 4

Section 2.05 Invoice Disputes. ............................................................................................... 4

Section 2.06 No Right of Setoff. ............................................................................................. 5

Section 2.07 Taxes. ................................................................................................................. 5

**ARTICLE III** TERMINATION ......................................................................................... 5

Section 3.01 Termination of Agreement. ................................................................................ 5

Section 3.02 Breach. ............................................................................................................... 5

Section 3.03 Insolvency. ......................................................................................................... 5

Section 3.04 Effect of Termination. ....................................................................................... 5

Section 3.05 Force Majeure. ................................................................................................... 6

**ARTICLE IV** CONFIDENTIALITY ................................................................................. 6

Section 4.01       Confidentiality. ............................................................................................ 6

**ARTICLE V** LIMITATION ON LIABILITY[; INDEMNIFICATION] ........................... 7

Section 5.01 Limitation on Liability. ...................................................................................... 7

**ARTICLE VI** MISCELLANEOUS .................................................................................... 7

Section 6.01 Notices. .............................................................................................................. 7

Section 6.02 Headings. ........................................................................................................... 8

Section 6.03 Severability. ....................................................................................................... 8

Section 6.04 Entire Agreement...........................................................................................................8

Section 6.05 Successors and Assigns. ................................................................................................9

Section 6.06 No Third-Party Beneficiaries........................................................................................9

Section 6.07 Amendment and Modification; Waiver. .......................................................................9

Section 6.08 Governing Law; Submission to Jurisdiction. ...............................................................9

Section 6.09 Waiver of Jury Trial....................................................................................................10

Section 6.10 Counterparts................................................................................................................10

**EXHIBIT A** SERVICES............................................................................................12

## OPERATIONS AND MANAGEMENT SERVICES AGREEMENT

This Operations and Management Services Agreement, dated as of January 31, 2020 (this **"Agreement"**), is entered into between L'Anse Warden Electric Company, LLC, a Delaware limited liability company (**"LWEC"**), and Convergen Energy WI, LLC, a Delaware limited liability company (**"CEWI"**) (and collectively "the Parties").

## <u>RECITALS:</u>

**WHEREAS**, Convergen Energy LLC, a Delaware limited liability company ("**Seller**"), and Nianticvista Energy, LLC, a Delaware limited liability company ("**Buyer**"), have entered into that certain Acquisition Agreement of even date herewith (the **"Purchase Agreement"**), pursuant to which Seller has agreed to sell to Buyer, and Buyer has agreed to purchase from Seller, all (100%) of the membership interest of CEWI;

**WHEREAS**, prior to the consummation of the Purchase Agreement (the "**Closing**"), each of LWEC and CEWI were wholly-owned subsidiaries of the Seller

**WHEREAS**, after the Closing, LWEC shall continue to be a wholly-owned subsidiary of Seller;

**WHEREAS**, prior to the Closing Ted Hansen ("**Hansen**") was employed by Seller and provided managerial services to both LWEC and CEWI;

**WHEREAS**, after the Closing Hansen has had terminated his respective employment with Seller and has become an employee of CEWI;

**WHEREAS**, in order to ensure an orderly transition of LWEC's business after the Closing, CEWI and LWEC have agreed to enter into this Agreement, pursuant to which CEWI will provide LWEC, solely through Hansen, certain services in each case on a transitional basis and subject to the terms and conditions set forth herein.

**NOW, THEREFORE**, in consideration of the mutual agreements and covenants hereinafter set forth, CEWI and LWEC hereby agree as follows:

**ARTICLE I**
**SERVICES**

**Section 1.01  Provision of Services.**

(a)  CEWI agrees to provide the services (the **"Services"**) set forth on Exhibit A attached hereto (the **"Service Exhibit"**) to LWEC for the period and on the other terms and conditions set forth in this Agreement.

(b)  The parties hereto acknowledge the transitional nature of the Services. Accordingly, prior to the expiration of the End Date (as defined below), LWEC agrees to use commercially reasonable efforts to make a transition of the Services to its own internal organization or to obtain alternate third-party sources to provide the Services.

(c)  Subject to **Section 2.03**, **Section 2.04** and **Section 3.05**, the obligations of CEWI under this Agreement to provide Services shall terminate with respect to the Services on December 31, 2020 (the **"End Date"**). Notwithstanding the foregoing, the parties acknowledge and agree that either party may terminate the Service, in whole and not in part, upon no less than ninety (90) days' prior written notice.

**Section 1.02  Standard of Service.**

(a)  CEWI represents, warrants and agrees that the Services shall be provided in good faith, in accordance with applicable law and, except as specifically provided in the Service Exhibit, in a manner generally consistent with the historical provision of the Services and with the same standard of care as historically provided. Subject to **Section 1.03**, CEWI agrees to make available Hansen for an average of 20 hours per month (the "**Target Work Period**") in accordance with the standards set forth in the preceding sentence; provided that CEWI and LWEC agree to increase or decrease, as applicable, on a case-by-case basis the compensation paid to CEWI for the provision of the Services pursuant to Article II on an equitable basis if during any period covered by an Invoice (as defined below) the time reasonably required for Hansen to perform the Services is materially different from the Target Work Period (such case-by-case adjustment to the compensation, a "**Targeted Compensation Adjustment**"), as determined by CEWI and LWEC in their respective reasonable discretion.

(b)  Except as expressly set forth in **Section 1.02(a)**, CEWI makes no representations and warranties of any kind, implied or expressed, with respect to the Services, including, without limitation, no warranties of merchantability or fitness for a particular purpose, which are specifically disclaimed. LWEC acknowledges and agrees that this Agreement does not create a fiduciary relationship, partnership, joint venture or relationships of trust or agency between the parties and that all Services are provided by CEWI as an independent contractor.

**Section 1.03   No Third-Party Service Providers.** [It is understood and agreed that the Services shall be provided exclusively by Hansen and that CEWI may not use other CEWI employees or retain any third-party service providers to provide the Services or any portion thereof to LWEC.

**Section 1.04   Access to Premises.**

(a)     In order to enable the provision of the Services by CEWI, LWEC agrees that it shall provide Hansen, at no cost to CEWI, access to the facilities, assets and books and records of LWEC, in all cases to the extent necessary for CEWI to fulfil its obligations under this Agreement.

(b)     CEWI agrees that Hansen, when on the property of LWEC or when given access to any equipment, computer, software, network or files owned or controlled by LWEC, shall conform to the policies and procedures of LWEC concerning health, safety and security which are made known to CEWI in advance in writing.

## ARTICLE II
### COMPENSATION

**Section 2.01   Responsibility for Wages and Fees.** For such time as Hansen is providing the Services to LWEC under this Agreement, Hansen will remain an employee of CEWI and shall not be deemed to be an employee of LWEC for any purpose, and (b) CEWI shall be solely responsible for the payment and provision of all wages, bonuses and commissions, employee benefits, including severance and worker's compensation, and the withholding and payment of applicable Taxes relating to such employment.

**Section 2.02   Terms of Payment and Related Matters.**

(a)     As consideration for provision of the Services, LWEC shall pay CEWI the amount specified for the Services on the Service Exhibit. In addition to such amount, in the event that CEWI incurs, on behalf of Hansen, reasonable and documented out-of-pocket expenses in the provision of the Services, including, without limitation, travel and lodging expenses, but excluding payments made Hansen pursuant to **Section 2.01** (such included expenses, collectively, **"Out-of-Pocket Costs"**), LWEC shall reimburse CEWI for all such Out-of-Pocket Costs in accordance with the invoicing procedures set forth in **Section 2.02(b)**.

(b)     As more fully provided in the Service Exhibit and subject to the terms and conditions therein:

(i)     CEWI shall provide LWEC, in accordance with **Section 6.01** of this Agreement, with monthly invoices (**"Invoices"**), which shall set forth in reasonable detail, with such supporting documentation as LWEC may reasonably request with respect to Out-of-Pocket Costs, amounts payable under this Agreement; and

(ii)    payments pursuant to this Agreement shall be made within thirty (30) days after the date of receipt of an Invoice by LWEC from CEWI.

(c)    It is the intent of the parties that the compensation set forth in the Service Exhibit reasonably approximate the cost of providing the Services, including the cost of Hansen's wages and compensation, without any intent to cause CEWI to receive profit or incur loss. As opposed to a Targeted Compensation Adjustment pursuant to Section 1.02(a) hereof, if at any time CEWI believes that the payments contemplated by the Service Exhibit are materially insufficient to compensate it for the cost of providing the Services it is obligated to provide hereunder, or LWEC believes that the payments contemplated by the Service Exhibit materially overcompensate CEWI for such Services, such party shall notify the other party as soon as possible, and the parties hereto will commence good faith negotiations toward an agreement in writing as to the appropriate course of action with respect to pricing of such Services for future periods.

**Section 2.03   Extension of Services.** The parties agree that CEWI shall not be obligated to perform any Service after the applicable End Date; *provided*, *however*, that if LWEC desires and CEWI agrees to continue to perform any of the Services after the applicable End Date, the parties shall negotiate in good faith to determine an amount that compensates CEWI for all of its costs for such performance, including the time of Hansen and Out-of-Pocket Costs. The Services so performed by CEWI after the applicable End Date shall continue to constitute Services under this Agreement and be subject in all respects to the provisions of this Agreement for the duration of the agreed-upon extension period.

**Section 2.04   Terminated Services.** Upon termination or expiration of the Services pursuant to this Agreement, or upon the termination of this Agreement in its entirety, CEWI shall have no further obligation to provide the applicable terminated Services and LWEC will have no obligation to pay any future compensation or Out-of-Pocket Costs relating to such Services (other than for or in respect of Services already provided in accordance with the terms of this Agreement and received by LWEC prior to such termination).

**Section 2.05   Invoice Disputes.** In the event of an Invoice dispute, LWEC shall deliver a written statement to CEWI no later than ten (10) days prior to the date payment is due on the disputed Invoice listing all disputed items and providing a reasonably detailed description of each disputed item. Amounts not so disputed shall be deemed accepted and shall be paid, notwithstanding disputes on other items, within the period set forth in **Section 2.02(b)**(ii). The parties shall seek to resolve all such disputes expeditiously and in good faith. CEWI shall continue performing the Services in accordance with this Agreement pending resolution of any dispute.

**Section 2.06   No Right of Setoff.** Each of the parties hereby acknowledges that it shall have no right under this Agreement to offset any amounts owed (or to become due and owing) to the other party, whether under this Agreement, the Purchase Agreement or otherwise, against any other amount owed (or to become due and owing) to it by the other party.

**Section 2.07   Taxes.** LWEC shall be responsible for all sales or use Taxes imposed or assessed as a result of the provision of Services by CEWI.

## ARTICLE III
### TERMINATION

**Section 3.01   Termination of Agreement.** Subject to **Section 3.04**, this Agreement shall terminate in its entirety (i) on the date upon which CEWI shall have no continuing obligation to perform any Services as a result of the expiration or termination of this Agreement in accordance with **Section 1.01** or **Section 3.02** or (ii) in accordance with **Section 3.03**.

**Section 3.02   Breach.** Any party (the **"Non-Breaching Party"**) may terminate this Agreement with respect to the Service, in whole but not in part, at any time upon prior written notice to the other party (the **"Breaching Party"**) if the Breaching Party has failed (other than pursuant to **Section 3.05**) to perform any of its material obligations under this Agreement relating to such Service, and such failure shall have continued without cure for a period of fifteen (15) days after receipt by the Breaching Party of a written notice of such failure from the Non-Breaching party seeking to terminate such service. For the avoidance of doubt, non-payment by LWEC for the Service provided by CEWI in accordance with this Agreement and not the subject of a good-faith dispute shall be deemed a breach for purposes of this **Section 3.02**.

**Section 3.03   Insolvency.** In the event that either party hereto shall (i) file a petition in bankruptcy, (ii) become or be declared insolvent, or become the subject of any proceedings (not dismissed within sixty (60) days) related to its liquidation, insolvency or the appointment of a receiver, (iii) make an assignment on behalf of all or substantially all of its creditors, or (iv) take any corporate action for its winding up or dissolution, then the other party shall have the right to terminate this Agreement by providing written notice in accordance with **Section 6.01**.

**Section 3.04   Effect of Termination.** Upon termination of this Agreement in its entirety pursuant to **Section 3.01**, all obligations of the parties hereto shall terminate, except for the provisions of **Section 2.04**, **Section 2.06**, **Section 2.07**, **Article IV**, **Article V** and **Article VI**, which shall survive any termination or expiration of this Agreement.

**Section 3.05   Force Majeure.** The obligations of CEWI under this Agreement with respect to any Service shall be suspended during the period and to the extent that CEWI is prevented or hindered from providing such Service, or LWEC is prevented or hindered from receiving such Service, due to any of the following causes beyond such party's reasonable control (such causes, **"Force Majeure Events"**): (i) acts of God, (ii) flood, fire or explosion, (iii) war, invasion, riot or other civil unrest, (iv) governmental order or applicable law, (v) actions, embargoes or blockades in effect on or after the date of this Agreement, (vi) action by any governmental authority, (vii) national or regional emergency, (viii) strikes, labor stoppages or slowdowns or other industrial disturbances, (ix) shortage of adequate power or transportation facilities, or (x) any other event which is beyond the reasonable control of such party.  The party suffering a Force Majeure Event shall give notice of suspension as soon as reasonably practicable to the other party stating the date and extent of such suspension and the cause thereof, and CEWI shall resume the performance of its obligations as soon as reasonably practicable after the removal of the cause. Neither LWEC nor CEWI shall be liable for the nonperformance or delay in performance of its respective obligations under this Agreement when such failure is due to a Force Majeure Event. The applicable End Date for any Service so suspended shall be automatically extended for a period of time equal to the time lost by reason of the suspension.

# ARTICLE IV
## CONFIDENTIALITY

**Section 4.01          Confidentiality.**

(a)      During the term of this Agreement and thereafter, the parties hereto shall, and shall maintain in confidence and not disclose the other party's financial, technical, sales, marketing, development, personnel, and other information, records, or data, including, without limitation, customer lists, supplier lists, trade secrets, designs, product formulations, product specifications or any other proprietary or confidential information, however recorded or preserved, whether written or oral (any such information, **"Confidential Information"**). Each party hereto shall use the same degree of care, but no less than reasonable care, to protect the other party's Confidential Information as it uses to protect its own Confidential Information of like nature. Unless otherwise authorized in any other agreement between the parties, any party receiving any Confidential Information of the other party (the **"Receiving Party"**) may use Confidential Information only for the purposes of fulfilling its obligations under this Agreement (the **"Permitted Purpose"**). Any Receiving Party may disclose such Confidential Information only to its representatives who have a need to know such information for the Permitted Purpose and who have been advised of the terms of this **Section 4.01** and the Receiving Party shall be liable for any breach of these confidentiality provisions by such Persons; *provided*, *however*, that any Receiving Party may disclose such Confidential Information to the extent such Confidential Information is required to be disclosed by a governmental order,

in which case the Receiving Party shall promptly notify, to the extent possible, the disclosing party (the **"Disclosing Party"**), and take reasonable steps to assist in contesting such governmental order or in protecting the Disclosing Party's rights prior to disclosure, and in which case the Receiving Party shall only disclose such Confidential Information that it is advised by its counsel in writing that it is legally bound to disclose under such governmental order.

(b)     Notwithstanding the foregoing, "Confidential Information" shall not include any information that the Receiving Party can demonstrate: (i) was publicly known at the time of disclosure to it, or has become publicly known through no act of the Receiving Party or its Representatives in breach of this **Section 4.01**; (ii) was rightfully received from a third party without a duty of confidentiality; or (iii) was developed by it independently without any reliance on the Confidential Information.

(c)     Upon demand by the Disclosing Party at any time, or upon expiration or termination of this Agreement with respect to any Service, the Receiving Party agrees promptly to return or destroy, at the Disclosing Party's option, all Confidential Information. If such Confidential Information is destroyed, an authorized officer of the Receiving Party shall certify to such destruction in writing.

## ARTICLE V
### LIMITATION ON LIABILITY[; INDEMNIFICATION]

**Section 5.01     Limitation on Liability.** In no event shall CEWI have any liability under any provision of this Agreement for any punitive, incidental, consequential, special or indirect damages, including loss of future revenue or income, loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement. LWEC acknowledges that the Services to be provided to it hereunder are subject to, and that its remedies under this Agreement are limited by, the applicable provisions of **Section 1.02**, including the limitations on representations and warranties with respect to the Services.

## ARTICLE VI
### MISCELLANEOUS

**Section 6.01     Notices.** All Invoices, notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the [third] day after the date mailed, by certified or registered mail, return receipt requested,

postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this **Section 6.01**):

> (a)     if to CEWI:

CONVERGEN ENERGY WI, LLC
 600 Liberty Street, Green Bay, WI  54304
E-mail: ted.hansen@convergenenergy.com
Attention: Ted Hansen:  President

> (b)     if to LWEC:

L'ANSE WARDEN ELECTRIC COMPANY LLC
157 S. Main Street
L'Anse, MI 49946
E-mail:  Steven.Brooks@libra.com
Attention:  Steven Brooks, Vice President

with a copy (which shall not constitute notice) to:

LIBRA CAPITAL US, INC.
134 E. 40th Street
New York, NY 10016
E-mail:  Bert.Diaz@libra.com
Attention:  Bert Diaz, general Counsel

>    **Section 6.02    Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

>    **Section 6.03    Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

>    **Section 6.04    Entire Agreement.** This Agreement, including the Service Exhibit, constitutes the sole and entire agreement of the parties to this Agreement with

respect to the subject matter contained herein and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event and to the extent that there is a conflict between the provisions of this Agreement and the provisions of the Purchase Agreement as it relates to the Services hereunder, the provisions of this Agreement shall control.

**Section 6.05   Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party.

**Section 6.06   No Third-Party Beneficiaries.** This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit or remedy of any nature whatsoever, under or by reason of this Agreement.

**Section 6.07   Amendment and Modification; Waiver.** This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving.  No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 6.08   Governing Law; Submission to Jurisdiction.** This Agreement shall be governed by and construed in accordance with the internal laws of the State of Wisconsin without giving effect to any choice or conflict of law principles. Any legal suit, action or proceeding arising out of or based upon this agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the state of Wisconsin in each case located in the city of Madison and county of Dane, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding. Service of process, summons, notice or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

**Section 6.09   Waiver of Jury Trial.** Each party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this agreement or the transactions contemplated hereby. Each party to this agreement certifies and acknowledges that (a) no representative of any other party has represented, expressly or otherwise, that such other party would not seek to enforce the foregoing waiver in the event of a legal action, (b) such party has considered the implications of this waiver, (c) such party makes this waiver voluntarily, and (d) such party has been induced to enter into this agreement by, among other things, the mutual waivers and certifications in this **Section 6.09**.

**Section 6.10   Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

L'ANSE WARDEN ELECTRIC
COMPANY, LLC

By _____
Name: FIDEL ANDUEZA
Title:

CONVERGEN ENERGY WI,
LLC

By _____
Name: Gregory Merle
Title: President

# EXHIBIT A

## SERVICES

| Description of Service: | Hansen is to provide management services to LWEC in a manner that is consistent with the services he provided to LWEC immediately prior to the Closing. |
|---|---|
| End Date: | December 31, 2020 |
| Fee: | $10,000 per month |
| Time Commitment: | 20 hours per month |
| CEWI Contact: | Ted Hansen<br>c/o Convergen Energy WI, LLC<br>600 Liberty Street<br>Green Bay, WI 54304<br>Phone No.: (920) 427-5390<br>E-mail: ted.hansen@convergenenergy.com |
| LWEC Contact: | Steven Brooks<br>c/o LIBRA CAPITAL US, INC.<br>134 E. 40th Street<br>New York, NY 10016<br>Phone No.: (212) 401-9324<br>E-mail: Steven.Brooks@libra.com |

# EXHIBIT F
# TO COMPLAINT

## AMENDED AND RESTATED CLOSING STATEMENT
### (February 21, 2020)

SELLER:        CONVERGEN ENERGY LLC
BUYER:        NIANTICVISTA ENERGY LLC
TARGET:      100% MEMBERSHIP INTEREST OF CONVERGEN ENERGY WI, LLC
PROPERTY:   Fuel Pellet Company located at 600 Liberty St, Green Bay, WI 54304
CLOSING DATE:  January 31, 2020
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---:|
| **Purchase Price per Acquisition Agreement** | $5,450,000.00 |
| Adjustment to Purchase Price | |
| • *Reversal of Hard Deposit Discount* | 300,000.00 |
| • *Reversal of Due Diligence Reimbursement* | 50,000.00 |
| **Revised Purchase Price** | ***$5,800,000.00*** |
| | |
| **Credits to Buyer** | |
| WC Adjustments - per Section 1.2(b)(vi) | |
| *Initial WCA Closing Balance* | ($300,942.39) |
| *Modifications of WCA in Seller's Favor* | |
| • 50% of Latvia Receivable Balance (8/31/19) | 175, 401.16 |
| • **Total WCA Modifications in Seller's Favor** | **175,401.16** |
| • **Final Closing WCA in Buyer's Favor:** | **($125,541.27)** |
| | |
| Cash Adjustments - per Section | |
| • Reversal of WEDC Payable | 19,873.00 |
| • Reversal of WPS Payable | 36,042.71 |
| • Adjustment to Closing Receivables Amount | 37,043.16 |
| • **Total Cash Modifications in Seller's Favor** | **$92,958.87** |
| | |
| Additional Credits to Buyer | |
| • BMO Indebtedness - per Section 1.2(b)(ii) | (2,552,555.00) |
| • Equipment Financing Indebtedness per Section 1.2(b)(ii) | (206,077.24) |
| • Capital expenditures – per Section 1.2(b)(iii) | (377,850.31) |
| • Hard deposit (held by Seller) | (1,000,000.00) |
| • Portion of Purchase Price paid to Seller at Closing | (1,012,575.18) |
| **Total Additional Credits to Buyer:** | **(5,149,057.73)** |
| | |
| ***Total Credit to Buyer:*** | ***[$5,274,598.96]*** |
| | |
| ***BALANCE DUE TO SELLER:*** | ***$618,359.91*** |

***Additional Notes***:
- Convergen Energy WI. LLC ("**Target**") actually distributed Closing cash by to Seller in an amount equal to 24,599.60
- Seller paid to BMO loan modification closing costs in the amount of $20,000.00
- This Amended and Restated Closing Statement amends, restates and replaces in its entirety any prior closing statement relating to this transaction previously signed by Buyer and Seller.

1

- Buyer and Seller hereby agree that the Closing Adjustments reflected in this document shall be deemed, without further action, to amend the Acquisition Agreement, dated as of January 29, 2020, as required, entered into among Seller, Buyer and Target (the "**Acquisition Agreement**"), to (i) conform to terms of this Amended and Restated Closing Statement and (ii) the Parties further agree to modify 12.5(b)(i) of the Acquisition Agreement to extend the timing of the transfer of the ConvergenEnergy.com domain name and the Libra Group's use of the "Convergen Energy" name from six months to 12 months.

- L'Anse Warden Electric Company LLC ("**LWEC**") and Target Buyer hereby agree that this Closing Adjustments shall be deemed, without further action, to amend the Operations and Management Services Agreement (the "**O&M Agreement**"), dated as of January 31, 2020, between Target and LWEC to add Brian Mikkelson as an additional consultant under the O&M Agreement.

- The Buyer and Seller agree that there will be no further adjustments or changes to this Amended and Restated Closing Statement after the date hereof, as both Parties have confirmed that this document is now complete and accurate in all regards.

- By signing this Amended and Restated Closing Statement each Party confirms and ratifies that the Closing was completed on the Closing Date.

- Other than as expressly modified pursuant to this Amended and Restated Closing Statement, all of the terms, conditions and other provisions of the Acquisition Agreement and The O&M Agreement are hereby ratified and confirmed and shall continue to be in full force and effect in accordance with their respective terms.   No reference to this Amended and Restated Closing Statement need be made in any instrument or document making reference to the Acquisition Agreement or the O&M Agreement.  Any reference to the Acquisition Agreement or the O&M Agreement, as applicable, in any such instrument or document shall be deemed a reference to the Acquisition Agreement or the O&M Agreement, as applicable, as amended hereby.  In the event of any conflict or inconsistency between the provisions of the Acquisition Agreement or the O&M Agreement, as applicable, and the provisions of this Amended and Restated Closing Statement, the provisions of this Amended and Restated Closing Statement shall control.

- The parties hereto agree to take such further action as is reasonably necessary to implement the provisions set forth in this Amended and Restated Closing Statement.

- This Amended and Restated Closing Statement may be signed in any number of counterparts, all of which taken together shall constitute one and the same instrument. Any party hereto may enter into this Amendment by signing any such counterpart and a facsimile signature shall constitute an original for all purposes and each such counterpart shall be as valid and effectual as if executed as an original.

- No provision of this Amended and Restated Closing Statement may be amended or modified except by an instrument in writing executed by the each pf the Parties hereto.

- Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought against any of the parties in the courts of the State of New York, County of New York, or, if it has or can acquire jurisdiction, in the United States District Court for the Southern District of New York, and each of the parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein.

**(<u>Signatures on Next Page</u>)**

2

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the date first above written.

**Buyer**

**Seller**

**NIANTICVISTA ENERGY LLC**
  a Delaware limited liability company

By: _____
Name:  Greg Merle
Title:

**CONVERGEN ENERGY, LLC,**
a Delaware limited liability company

By:
Name: Bert Diaz
Title: Secretary

**CONVERGEN ENERGY WI, LLC**
  a Delaware limited liability company

By: _____
Name:  Greg Merle
Title:

**L'ANSE WARDEN ELECTRIC COMPANY, LLC,**
a Delaware limited liability company

By:
Name:  Bert Diaz
Title: Secretary

3

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

<u>Buyer</u>                                                                <u>Seller</u>

**NIANTICVISTA ENERGY LLC**                    **CONVERGEN ENERGY, LLC,**
  a Delaware limited liability company          a Delaware limited liability company

By: _____              By: _____
Name:  Greg Merle                                        Name:  Bert Diaz
Title:  CEO                                                      Title: Secretary


**CONVERGEN ENERGY WI, LLC**                **L'ANSE WARDEN ELECTRIC**
  a Delaware limited liability company          **COMPANY, LLC,**
                                                                          a Delaware limited liability company

By: _____              By: _____
Name:  Greg Merle                                        Name:  Bert Diaz
Title:  President                                             Title: Secretary

3